IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

ROBERT L. SCHULZ, 2458 Ridge Road, )
Queensbury, NY 12804; )
                       )
      Plaintiff )    CASE No. 1:15-CV-1299
                       )
   v. )    Hon. BKS/CFH
                       )
UNITED STATES; INTERNAL REVENUE )
SERVICE, 1111 Constitution Ave. NW, )
Washington, D.C. 20220, John Koskinen, )
Commissioner; )
                       )
      Defendants )

U.S. DISTRICT COURT
N.D. OF N.Y.
FILED

NOV 0 2 2015

LAWRENCE K. BAERMAN, CLERK
ALBANY

## COMPLAINT FOR DECLARATORY
## EQUITABLE AND INJUNCTIVE RELIEF

Plaintiff Robert L. Schulz, ("Schulz") pursuant to IRC 6703(c)(2), and Rules 20, 23, and 65 of the Federal Rules of Civil Procedure, hereby moves the Court for an entry of an Order:

   a. Granting declaratory, equitable and injunctive relief by determining Plaintiff's liability for civil penalty under IRC 6700 to be zero; and

   b. Granting any other, non-financial relief to the Plaintiff that the Court may deem just and proper.

## PRELIMINARY STATEMENT REGARDING
## THE ATTACHMENT TO THIS COMPLAINT

Under IRC Section 6700(a), a financial penalty cannot be imposed on a person found to have promoted an abusive tax shelter in violation of Section 6700, <u>if the gross income derived (or to be derived) by the promoter from the forbidden activity was zero.</u>

In 2003, IRS, declaring it had launched a Section 6700 investigation, summoned the 2003 books of Schulz and the 501(c)(3) and 501(c)(4) organizations he founded and chaired.

In 2005, the 2nd Circuit blocked the Summonses, for reasons of due process.

In May of 2007, following its audit of the books of the two organizations for 2003, <u>which audit demonstrated Schulz had not received any compensation from the organizations</u>, IRS sued Schulz and the two organizations for promoting an abusive tax shelter. In light of the evidence from the audit that Schulz had not derived any gross income from the complained of activity, the IRS did not request a financial penalty and this Court did not include a financial penalty in its August 2007 decision, which decision granted IRS's motion for a summary judgment against Schulz, who was pro se.

In March of 2015, the IRS assessed a $225,000 penalty against Schulz for the 2003 activity the IRS complained about in its 2007 lawsuit against Schulz. As part of its March 2015 Notice of Assessment, IRS told Schulz he could appeal the assessment after paying a small amount and seeking a refund by sending a completed Form 6118 to the IRS in Andover, Mass.

Attached to this Complaint is a copy of the financial records of the two organizations for 2003, proving Schulz received no gross income from the described activity.

<u>This is the fourth time Schulz has had to provide these financial records to the government</u>. These records were also provided to the IRS:

- in 2006 during IRS's audit of the two organizations, and
- in April of 2015 as part of Schulz's Form 6118 appeal to IRS in Andover from IRS's March 2015 assessment, and
- in August of 2015, on the advice of IRS's Collection unit that Schulz resend his Form6118 appeal to Andover due to the Collection unit's inability to find any evidence in Schulz's file that Andover had acknowledged receipt of and was working on the Form 6118 appeal.

2

In light of the statutory requirements of IRC Section 6703(c)(2) (that is, if the IRS did not resolve Schulz's Form 6118 appeal in six months, Schulz had 30 days to file his case in District Court for a determination of his liability under 6700, or lose his protection against IRS's collection of the penalty), Schulz found it necessary to prepare and provide those financial records, once again, in support of this Complaint.

In furtherance of this Motion, Plaintiff alleges and says:

## I. BACKGROUND AND INTRODUCTION

1. In 1988, Schulz decided to forgo the work he had been successfully engaged in for twenty-five years and to stop earning income.

2. Schulz had come to believe defense of our Charters of Freedom was a necessary service to God and humanity, and as he would be speaking to political power, he did not want his motive to be compromised or impugned.

3. Between 1979 and 1988 Schulz learned, first hand, all public officers were not always benevolent, did not always have the public interest uppermost in their minds and could be vindictive if you questioned the legality of their actions.

4. For instance, in 1979, Schulz learned first-hand that some public officers are capable of deliberately violating the Rule of Law while they manufactured a problem and prescribed a solution that would benefit them and their friends at the expense of everyone else.[1] In 1987, Schulz learned first-hand there are some public officers who do not like opposition from any quarter and who could be vindictive, engaging in retribution against those citizens who challenged the legality of their actions. [2i]

---

[1] See *Tri-County Taxpayers Association v Town of Queensbury, et al.*, 55 N.Y.2s 41 (1982); Schulz, as Chairman of TCTA successfully sued the Town and County for violating the State Environmental Quality Review Act.
[2] See *Schulz v. Town of Queensbury*, 150 A.D.2d 854; Schulz successfully sued the Town of Queensbury, who had attempted to punish him, under color of law, for bringing the 1979 action against the Town.

5. As a consequence, in 1988, Schulz decided that it was his duty, as a U.S. Citizen to be better informed about: a) the Rule of Law as it applied to public officers; b) whether public officers had stepped outside the boundaries drawn around their power; c) how to intelligently, rationally and professionally confront illegal and unconstitutional behavior by public officers; and d) how to encourage others to do the same.

6. In 1988 Schulz embarked on his second career – claiming and exercising his First Amendment Right to Petition the Government for Redress of Grievances by challenging public officers who appear to be ignoring the Constitution and laws pursuant thereto, and advocating non-violent civic action against those public officers if they first ignore the Rule of Law and then ignore proper Petitions for Redress, and, to do so without any compensation – i.e., earned income.

7. To support his work and family he chose to rely on the sale of his real property surrounding his home, two acres at a time, and occasionally on gifts from family and friends.

8. In 2003, the IRS announced it was conducting an investigation of Schulz and the We The People organization under IRC 6700; the IRS set out to prove Schulz was a promoter of an abusive tax shelter, through the distribution of certain written materials contained in a Blue Folder.

9. To be liable for a civil penalty under 6700, as a promoter of an abusive tax shelter that person had to have been earning income from the activity, something Schulz had not done.

10. In 2006 and 2007, the IRS conducted a thorough audit of the books and records of Schulz's We The People organization ("WTP") and found no money had gone to Schulz from the organization's activity.

11. The IRS obtained access to Schulz's personal bank and Pay Pal records and to the private bank and PayPal records of Schulz's organizations, again finding no money had gone to Schulz from the described activity.

12. In the District Court, in defense of the 6700 claim against him, Schulz testified under oath that no money from the activity IRS had described had passed to him.

13. District Court ruled Schulz had violated 6700; the Court did not impose a financial penalty; the Court gave the IRS all the relief it had requested, which did not include a request for a financial penalty, ostensibly because Schulz was known not to have earned any income from the described activity.

14. In 2008, during oral argument on appeal from District Court's decision Schulz repeatedly answered "No" and "None" to Judge Newman's (2nd Circuit) strong questioning from the bench as to whether he had any income other than from the sale of his land (for which Schulz has always paid the required State and federal capital gains tax).

15. In November of 2014, notwithstanding the Court's prior decision and Schulz's lack of compensation from WTP and, therefore, his lack of gross income from the described activity, IRS Agent David Gordon wrote a letter to Schulz saying he had made a determination that Schulz should be penalized $225,000 for mailing the Blue Folders in 2003; he arranged for the IRS to assess Schulz, in 2015, $225,000 -- $1,000 for each of the 225 copies of the Blue Folder which WTP mailed to people who voluntarily sent WTP up to $20 to cover the cost of printing and postage.

## II. STATEMENT OF THE CLAIM

16. This Complaint arises from the March 5, 2015 assessment by the IRS, in error, of a civil penalty against Schulz in the amount of $225,000 for "Promoting an Abusive Tax Shelter."

## III. THE PARTIES

17. Plaintiff Schulz is a citizen of the United States of America and the State of New York; he resides at 2458 Ridge Road, Queensbury, NY 12804. In 2003and all times relevant to this proceeding, Schulz was the volunteer, unpaid Chairman and volunteer unpaid, chief operating officer of the We The People organization that in the course of its operation in 2003 published a document that questioned the government's authority to force employers to withhold taxes from its employees and to turn those earnings over to the IRS long before those taxes were due to be paid by the employees. In 2003, the document was posted on WTP's website for free download. WTP distributed 225 copies of the document by mail.

18. The Internal Revenue Service is a Division of the U.S. Department of the Treasury, with principle offices located at 1111 Constitution Ave NW, Washington DC. Mr. John Koskinen is the IRS Commissioner.

## STATEMENT OF FACTS

19. In 2006 and 2007, the IRS conducted a thorough audit of the financial records of the We The People organization for 2003- both the We The People Foundation for Constitutional Education, Inc., and the We The People Congress, Inc.

20. The audit took place in Albany, N.Y., at the offices of WTP's accounting firm.

6

21. The auditor received all the records that he asked, for including but by no means limited to WTP's income and expense records and bank statements for 2003.

22. The auditor learned Schulz was not compensated for his work and received no salary, that all funds were accounted for, and that WTP was in full compliance with the law.

23. However, in April of 2007, the IRS sued Schulz and the We The People organization for distributing in 2003, said documents that questioned the authority of the IRS to force employers to withhold taxes from their employees and turn those taxes over to the IRS long before they were due to be paid by the employees; the IRS charged Schulz and the WTP organization with "promoting an abusive tax shelter" in violation of IRC 6700.

24. Schulz, pro-se, provided sworn testimony that he received no compensation from the WTP organization, and no gross income from the described activity before, during or after 2003.

25. In August of 2007, the District Court for the Northern District of New York granted IRS' motion for a summary judgment, having determined Schulz and the We The People organization had promoted an abusive tax shelter in 2003.

26. The government received all the relief it had requested, which did not include a request for a civil penalty, and the Court did not impose a civil penalty

27. However, on November 24, 2014, IRS Agent David Gordon sent a letter to Schulz saying that he had made a determination to penalize Schulz $1,000 for each of 225 documents mailed to people in 2003, and that if Schulz had any questions he could telephone him.

28. On December 14, 2014, Schulz and his attorney, Samuel Lambert spoke by phone with Gordon. Lambert told Gordon that Schulz received no income as a result of the distribution of said document in 2003 or as the result of any activity of the We the People

organization, and therefore under IRC 6700, the penalty had to be zero. Gordon said he had closed his file and sent the case to the assessment unit and that Schulz could challenge the assessment by paying 15% of $1,000 and seeking a refund. Lambert asked to speak to Gordon's manager.

29. On December 16, 2014, Schulz and his attorney, Samuel Lambert spoke by phone with Gordon and "Chris", Gordon's acting group manager; Lambert asked Gordon and his manager to retrieve the file from the assessment unit because according to IRC 6700, Schulz is not liable for any penalty because he earned no income from the activity Gordon's manager said he would try to retrieve the file.

30. On March 5, 2015, Schulz received from the IRS a CP15, Notice of Penalty Charge, "for promoting an abusive tax shelter," assessing Schulz $225,000 ($1,000 for each of the 225 Blue Folders WTP mailed to people). A copy of the CP15 is annexed hereto as Exhibit A.

31. The CP15 Notice read in part, "The penalty for activity described in IRC section 6700(a)(1) is the lesser of $1,000 or 100 percent of the gross income derived (or to be derived) from the activity. The penalty for making or furnishing (or causing another person to make or furnish) a statement described in IRC section 6700(a)(2)(A) is 50 percent of the gross income derived (or to be derived) from the activity." See Exhibit A

32. The Notice also read in relevant part, "If you want to contest the IRC section 6700 penalty…within 30 days after the date of this Notice and Demand, pay an amount which is not less than 15 percent of the penalty and file a claim for refund on a Form 6118 for the amount you paid. You may file suit in United States district court within 30 days after the date we deny your claim, or if earlier, within 30 days after the expiration of six months from the date you filed your claim…." See Exhibit A

33. On April 3, 2015, Schulz mailed $1,000 to the IRS with a notice that a claim for refund is being filed with the IRS in Andover, Mass. See <u>Exhibit B</u>

34. On April 6, 2015, Schulz's attorney, Samuel Lambert, mailed a letter to the IRS in Andover, enclosing:(see Exhibit C which includes a mailing confirmation from FedEx).

    - a completed Form 6118 (Claim for Refund),
    - an attachment to Form 6118,
    - a Form 2848 (Power of Attorney),
    - a copy of the IRS Notice CP15, and
    - an Affidavit of Robert L. Schulz with accompanying exhibits.

    NOTE: The Affidavit is included in the Attachment to this Complaint, not in Exhibit C.

35. On April 13, 2015, Schulz received a notice CP503 from the IRS, reminding Schulz that he has unpaid taxes for 2003 in the amount of $225,000 plus interest of $648.17. See <u>Exhibit D</u>

36. On May 18, 2015 Schulz received a notice CP504 from the IRS, declaring "If you don't call us immediately at 1-800-829-0922), or pay the amount due ($224,000 plus interest of $1,294.91), we may seize ("levy") your property or rights to property …. See <u>Exhibit E</u>

37. On May 18, 2015, Schulz called the number provided and spoke to IRS Agent "Charmin" ID 1000890657 who told Schulz his file showed receipt of the $1,000 but no indication of Andover's receipt of the Form 6118. She said she put a 60 day hold on collections to give Andover more time to resolve the Claim for Refund.

38. On July 14, 2015, Schulz telephoned the IRS and spoke with a Miss Wilkerson, ID No. 100067905, who confirmed there was a nine week hold put on collection which will end

on August 10, 2015. She said she saw no confirmation of the Form 6118 being filed or any additional information posted on the open IRS system she was viewing.

39. On August 3, 2015, Schulz received a Notice LT11 Notice of Intent to levy saying if Schulz does not pay the IRS $224,000 plus interest of $3,284.93 by September 2, 2015 the IRS may seize his car, home and other personal property, his bank accounts and social security benefits, among other property. See Exhibit F

40. On August 4, 2015, Schulz spoke by phone with IRS Agent Ms. Johnson, I.D. No. 1000154491 who told Schulz the Form 6118 "must have dropped through the cracks." She recommended Schulz resend the Form 6118 to Andover, telling Andover that it is the second time the material had been sent and enclosing a copy of the mailing confirmation from FedEx. She also told Schulz she had put a hold on collections until September 17, 2015, and "I apologize on behalf of the service."

41. On August 6, 2015, Schulz sent a letter to IRS in Andover, attaching a copy of all that was sent to Andover on April 6, 2015. See Exhibit G.

42. A copy of said August 6, 2015 and April 6, 2015 letters and all of their attachments and exhibits, together with the mailing confirmations for the April 6, 2015 and the August 6, 2015 mailings are attached to and made a part of this Complaint.

43. On or about October 14, 2015, Schulz received a letter from the IRS saying, "Thank you for your inquiry of Sep. 15, 2015. We haven't resolved this matter ...we'll contact you again within 90 days with our reply. You don't need to take any further action now on this matter...Thank you for your cooperation." See Exhibit H.

44. However, Schulz made no inquiry of the IRS on September 15, 2015.

## JURISDICTION AND VENUE

45. This Court has jurisdiction under IRC 6703(c), which reads:

> 1. **6703(c) Extension of period of collection where person pays 15 percent of penalty.**
> **(1) In general.**
> If, within 30 days after the day on which notice and demand of any penalty under **section 6700** or **6701** is made against any person, such person pays an amount which is not less than 15 percent of the amount of such penalty and files a claim for refund of the amount so paid, **no** levy or proceeding in court for the collection of the remainder of such penalty shall be made, begun, or prosecuted until the final resolution of a proceeding begun as provided in **paragraph (2)**. Notwithstanding the provisions of **section 7421(a)**, the beginning of such proceeding or levy during the time such prohibition is in force may be enjoined by a proceeding in the proper court. Nothing in this paragraph shall be construed to prohibit any counterclaim for the remainder of such penalty in a proceeding begun as provided in **paragraph (2)**.
> **(2) Person must bring suit in district court to determine his liability for penalty.**
> If, within 30 days after the day on which his claim for refund of any partial payment of any penalty under **section 6700** or **6701** is denied (or, if earlier, within 30 days after the expiration of 6 months after the day on which he filed the claim for refund), the person fails to begin a proceeding in the appropriate United States district court for the determination of his liability for such penalty, **paragraph (1)** shall cease to apply with respect to such penalty, effective on the day following the close of the applicable 30-day period referred to in this paragraph.

46. Given the language of IRC 6703(c), it seems Schulz had no choice but to file this complaint, rather than wait any longer for the IRS in Andover to respond to Schulz's Form 6118 Claim – that is, to make a determination of Schulz's liability for a civil penalty under IRC 6700.

## CAUSE OF ACTION

### Since 100% of Schulz's Gross Income From The Described Activity Is Zero, the Maximum Penalty Is Zero

11

47. Schulz sent a $1,000 payment to the IRS in Fresno, California, and requested a refund in accordance with the procedures outlined in IRS's letter dated March 9, 2015. See paragraphs 33-34 above and Exhibits A and B.

48. The penalty should be fully refunded (or in the alternative reduced to a much smaller amount) for the following reasons:

### A. Schulz Had No Income From The Activity Described By The IRS

49. Section 6700 is aimed at penalizing persons who promote abusive tax shelters for their own enrichment; accordingly, it limits the penalty imposed to the lesser of $1,000 or "100 percent of the gross income derived (or to be derived) by such person from such activity." IRC Section 6700(a).

50. Since 100% of Schulz's gross income from the described activity is zero, the maximum penalty is zero. See the annexed Affidavit from Schulz and its accompanying documents in support of this claim, which are included in the Attachment to this Complaint.

51. Furthermore, the government has treated each mailing of a Blue Folder as a separate "activity" within the meaning of Section 6700. The statute requires the penalty to be capped by gross income the person derived "from such activity." This means the penalty calculation must be done with respect to each mailing. There is no evidence that Schulz derived any income related to any particular mailing of the Blue Folder. At most, the evidence shows that many (but not all) of the people who requested a copy of the Blue Folder be mailed to them voluntarily donated up to $20 to WTP. Even if WTP's receipts are somehow attributed to Schulz (which they should not be), the total income amounts to no more than $20 per "activity," which would total less than $4500.

52. Moreover, the amount of the proposed penalty is unjustified because the government has not shown that each and every mailing of documents was a violation of Section 6700. At most, the Injunction decision concludes that Schulz and WTP engaged in some activity in violation of 6700. There is no finding that each and every transmittal of the Blue Folder was a violation of Section 6700.

### B. Schulz's Activities Do Not Meet The Statutory Requirements Set Forth In Section 6700(a).

53. Section 6700(a) imposes a penalty on

Any person who—

(1)

    (A) organizes (or assists in the organization of)

        (i) a partnership or other entity,

        (ii) any investment plan or arrangement, or

        (iii) any other plan or arrangement, or      Any person who

    (B) participates (directly or indirectly) in the sale of any interest in an entity or plan or arrangement referred to in subparagraph (A), and

(2) makes or furnishes or causes another person to make or furnish (in connection with such organization or sale)—

    (A) a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by reason of holding an interest in the entity or participating in the plan or arrangement which the person knows or has reason to know is false or fraudulent as to any material matter, or

    (B) a gross valuation overstatement as to any material matter,

13

54. No partnership, investment plan, or other "plan or arrangement" within the meaning of Section 6700(a)(1)(A)(iii) was organized by Schulz.

55. No interests in any plan or arrangement were sold.

56. Schulz did not make any statements "with respect to the allowability of any deduction or credit, the excludability of an income, or the securing of any other tax benefit," within the meaning of the statute.

57. No statement made by Schulz respecting taxes required "holding an interest" in any entity or "participating in [any] plan or arrangement."

58. Schulz did not know or have reason to know that any statements he made were false or fraudulent.

59. To the extent any of these issues were decided in a prior proceeding, Schulz is preserving the issue for appeal by raising them here. However, Schulz asserts that any prior decision should not be binding because, among other reasons, the issues were not fully litigated. Schulz was representing himself pro se, the decision was on motion for summary judgment, and the issue at hand (whether or not Schulz could distribute certain documents) was minor compared with the amount of money at stake in this proceeding.

60. In addition, Schulz challenges the interpretation of the statutory language in the prior decision with respect to whether disseminating the documents was a "plan or arrangement" within the meaning of the statute and whether any statements made by Schulz required holding an interest or participating in any plan or arrangement within the meaning of the statute.

61. Further, the court's finding that Schulz "should have known" his statements were false includes no temporal element. The Court did not conclude that Schulz should have

known this in 2003, but merely concluded that Schulz "admits being aware" of various court decisions. Since Schulz's declaration was dated 2007, the court's conclusion can at best be a determination that Schulz should have known in 2007. The penalty at issue is for tax year 2003 and the government has not demonstrated Schulz knew or should have known in 2003.

### C. Statute of Limitations and/or Laches Prevents Imposition of the Penalty

62. Although some courts have held no statute of limitations applies in the case of Section 6700, the issue has not been tested in Schulz's circuit. Further, if the Court concludes that no limitations period applies, Schulz believes the doctrine of laches would apply. The government was aware of the complained of activity in 2003 and actually filed a lawsuit in 2007. Waiting until 2015 to assert the penalty was dilatory and prejudicial against Schulz. Various circuits have indicated that in egregious cases and in cases in which there is no statute of limitations, the doctrine of laches applies, even against the federal government. *Sage v. United States*, 908 F.2d 18 (5th Cir. 1990); *Martin v. Consultants & Admrs.*, 966 F.2d 1078 (7th Cir. 1992); *Cayuga Indian Nation v. Pataki*, 413 F.3d 266 (2d Cir. 2005).

**WHEREFORE,** Plaintiff Schulz respectfully requests the Court enter an Order:

  a. Granting declaratory equitable and injunctive relief by determining Plaintiff's liability for penalty under IRC 6700 to be zero; and

  b. Directing the IRS to refund the $1,000 received from Schulz in April of 2015, and

  b. Granting any other, relief to the Plaintiff that the Court may deem just and proper, including but not necessarily limited to a reimbursement of Plaintiff's costs and fees related to this case

Respectfully Submitted,

*[signature: Robert L. Schulz]*
ROBERT L. SCHULZ
pro se
2458 Ridge Road
Queensbury, NY 12804
TEL: [518] 656-3578
FAX: [518] 656-9724

Sworn to before me
this 2nd day of November, 2015

*[signature: Lucinda Burke (French)]*
Notary

———————————————
LUCINDA BURKE (French)
Notary Public, State of New York
Warren County No. 04BU6256016
Commission Expires Feb. 21, 20 16