# AFFIDAVIT

U.S. DISTRICT COURT
N.D. OF N.Y.
FILED

MAR 2 1 2017

LAWRENCE K. BAERMAN, CLERK
ALBANY

I, Roscoe Bartlett, being duly sworn, deposes and says:

1. I reside at 4317 Buckeystown Pike, Frederick, MD 21704.

2. I was the U.S. Representative for Maryland's 6th Congressional District, serving from 1993 through 2013 upon taking the oath to support and defend the Constitution for the United States of America at the start of each two-year term of office.

3. During my tenure in the House of Representatives I was a member of the Liberty Caucus.

4. On or about July 10, 2001, Robert L. Schulz, in his capacity as founder and chairman of the We The People Foundation for Constitutional Education, Inc., appeared at my office at the Rayburn House Office Building to notify me that he was in the process of visiting the office of each member of the Liberty Caucus for the purpose of informing its members:

   a. that since July of 1999 the Foundation had repeatedly petitioned the Government for Redress of Grievances regarding the constitutionality of the current operation and enforcement of the Internal Revenue Code; and

   b. that the Government had yet to respond to the Petitions for Redress; and

   c. that on June 11, 2001 he had written to President George Bush, House Speaker Dennis Hastert, Senate Majority Leader Trent Lott and IRS Commissioner Charles Rossotti to say that he would embark on a hunger fast on July 1, 2001 and would not eat again until the Government agreed to respond to the Petition for Redress in a recorded public forum in September of 2001.

5. On information and belief, the documents annexed hereto as Exhibit A are true copies of the documents Mr. Schulz had delivered to my office on July 10, 2001.

6. On July 10, 2001, having learned of the nature of Mr. Schulz's visit to my office, I immediately gathered my staff together to read to them the First Amendment of the Constitution for the United States of America,

1

to inform them the Government was obligated under the First Amendment to respond to a citizen's First Amendment Petition for Redress of Grievances regarding an alleged violation of the Constitution, and that I was placing a high priority on helping Mr. Schulz obtain answers to his questions.

7. From July 10, 2001 through July 19, 2001, I intervened on Mr. Schulz's behalf by:

   a. negotiating with Mr. Floyd Williams at the Internal Revenue Service and Mr. Daniel Bryant at the Department of Justice; and

   b. sponsoring a press conference on the House Triangle on July 17, 2001.

8. On July 20, 2001, I received a telephone call from IRS Commissioner Rossotti who told me he had agreed to have his experts meet with Mr. Schulz and his experts in a recorded, public forum to respond to the questions presented in the Petition for Redress of Grievances.

9. On July 20, 2001 I telephoned Mr. Schulz to request that he join me in my office at the Rayburn House Office Building where I would soon be receiving a telephone call from Mr. Bryant.

10. With Mr. Schulz in my office, I received the call from Mr. Bryant who informed me that DOJ was also willing to meet in a recorded, public forum with Mr. Schulz and his experts for the purpose of responding to the Petition for Redress of Grievances regarding the constitutionality of the Government's operation and enforcement of the Internal Revenue Code.

11. During the call, Mr. Bryant asked me to write him a letter requesting the meeting as he said he wanted history to reflect that the Department of Justice was responding to a letter from a Congressman rather than a citizen's Petition for Redress of Grievances.

12. I sat down with Mr. Schulz and composed a hand written letter (see Exhibit B).

13. Mr. Schulz and I, along with Sallie Taylor from my office proceeded to the office of the Attorney General where we met with Mr. Bryant and one of his aids to deliver the letter and negotiate the details of the

22. In March of 2007, the Treasury Secretary issued Treasury Notice 2007-30 which included a list of "specified frivolous positions" and declared that any person who relied on a "specified frivolous position" in any proceeding before the Internal Revenue Service would be fined $5,000. (see Exhibit F, particularly pages 2 and 6).

23. By its Treasury Notice 2007-30, the Government has in effect responded to WTP's Petition for Redress by summarily, and without explanation, documentary evidence or argument declared WTP's questions to be "frivolous."

24. Number (9)(b) on Treasury's list of specified frivolous positions is particularly noteworthy as it appears to remove the enforceability of the Petition Clause of the First Amendment; quoting:

"*Frivolous Positions.* Positions that are the same or similar to the following are frivolous.

(9) … a taxpayer has a constitutional right not to comply with the Federal tax laws for one of the following reasons:

(b) A taxpayer may withhold payment of taxes or the filing of a tax return until the Service or other government entity responds to a First Amendment petition for redress of grievances.

25. With every Right there is a Remedy and any Right that is not enforceable is not a Right

Roscoe Bartlett
4317 Buckeystown Pike,
Frederick, MD 21704

Sworn to before me
this 2 day of ~~February~~, 2017
march

Notary

4

# EXHIBIT A

# We The People Foundation For Constitutional Education, Inc.

2458 Ridge Road, Queensbury, NY 12804
**Telephone: (518) 656-3578  Fax: (518) 656-9724**
acta@capital.net        www.givemeliberty.org

June 11, 2001

Hon. George W. Bush
President of the United States
The White House
1600 Pennsylvania Avenue, NW
Washington, D.C. 20500

Dear President Bush,

An early response to this letter would be appreciated.

On July 1, 2001, I will begin a fast which will continue until I die or until IRS
Commissioner Charles O. Rossotti delivers to me a list of the government's experts
who will meet on September 18, 2001, in a public forum, at the National Press Club in
Washington DC, with tax law researchers from the tax honesty movement, to argue
against the conclusions of those researchers.

This comes as a result of the government's continued evasion of opportunities the We
The People Foundation For Constitutional Education and others have provided to the
government over the past two years to discuss the allegations of fraud and illegal
operations of the income tax system. The allegations include the following: 1) in 1913,
the 16th Amendment (the "income tax" Amendment) was fraudulently and illegally
declared to be ratified by a lame-duck Secretary of State just days before leaving
office; 2) there is NO LAW requiring most Americans to file a tax return, pay the
federal income tax nor have the tax withheld from their earnings; 3) people who file a
Form 1040 "voluntarily" waive their 5th Amendment right not to bear witness against
themselves; 4) the IRS routinely violates citizens' 4th Amendment rights against illegal
search and seizure, without a warrant issued by a court upon probable cause and
supported by oath and affirmation; and 5) the IRS, as standard operating procedure,
routinely violates citizens' due process rights in its administrative procedures and
operates far outside the law.

On February 10, 1999, Joseph Banister, a Special Agent of the Criminal Investigation
Division of the IRS submitted his 95-page research report to his superiors in the San
Jose office of the IRS. The report contained the allegations and supporting evidence
and respectfully requested some answers. Mr. Banister was concerned that he was
enforcing the Internal Revenue Code as though payment was compulsory, when his

research showed payment of the tax to be voluntary. Instead of answers, Mr. Banister was asked to resign!

The Foundation respectfully, and properly, invited the leaders of the Executive and Legislative branches to have their most knowledgeable experts on the subject participate in academic symposiums and conferences the Foundation sponsored at the National Press Club in July and November of 1999 and in April and June of 2000. The Foundation received no response, not even an acknowledgement of the receipt of the invitations!

On April 13, 2000, while a delegation of people representing all 50 states waited outside, Mr. Banister and I, and a videographer, met in the White House with Jason Furman, the Executive Director of the National Economic Council. He accepted, for President Clinton, a Remonstrance which addressed the allegations, he promised to have the staff of the NEC and White House lawyers and historians review the evidence, and he expressed his agreement to have the government's experts participate with Mr. Banister and other tax law researchers in the June 29, 2000 conference the Foundation was arranging for that purpose. Mr. Banister and I then proceeded to a meeting in the capitol with Dr. William Koetzle, representing Speaker Hastert's policy office, and then to a meeting with Keith Hennessey, Senator Lott's policy director. They accepted the Remonstrance for Mr. Hastert and Mr. Lott, promised to have the experts at the House Ways and Means Committee and the Senate Finance Committee review the evidence, and expressed their agreement to have those experts participate in the upcoming June 29th conference. However, on June 2nd, Mr. Furman told me, "The legality of the income tax is not a high priority item at the White House and we will not be participating in any conference on the subject." A similar response was received from Dr. Koetzle and Mr. Hennessey.

At a cost of $252,000, the Foundation then published full-page educational messages in USA TODAY on July 7, 2000, February 16, 2001, March 2, 2001 and March 23, 2001, featuring the photographs and names of three of the principal tax law researchers and their allegations, three former IRS agents who have come to believe the researchers are correct, and five employers who have stopped withholding the income tax from the paychecks of their employees because they also have come to believe the researchers' allegations are correct.

On April 5, 2001, the Senate Finance Committee held a hearing featuring large blow-ups of the Foundation's USA TODAY messages, mounted on easels. THE FOUNDATION WAS NOT ALLOWED TO TESTIFY AT THE HEARING. Two days prior to the hearing, Senator Grassley was quoted in the Saint Petersburg Times saying," We will not allow the We The People Foundation to testify at the hearing because their message will detract from the message we are trying to convey." The message the Committee conveyed was that those people who question the validity of the income tax laws are "tax cheats, schemers, scammers and cons. They must be kept off the internet, and will be dealt with harshly!"

On April 9, 2001, hundreds of citizens from across the country gathered outside the main entrance of the IRS headquarters building. Three weeks earlier, on March 19th,

the Foundation delivered a letter to IRS Commissioner Rossotti, letting him know that the citizens would be there and respectfully requesting that he address the group at 11:30 a.m., to let them know when his experts would be available to meet with the tax law researchers in a public forum to discuss the allegations. He refused to step outside to address the citizens, choosing instead to schedule an interview with a reporter from The New York Times at 11:30 that day. The Times' article ran on April 16th. In its first paragraph it said, "As a few protestors gathered in front of the Internal Revenue Service building on a warm April day, Charles O. Rossotti was cool and relaxed in his third-floor office, reflecting on his three and a half years running the agency."

On April 11, 2001 USA TODAY informed the Foundation of its decision to stop publishing the Foundation's full-page educational messages about these issues, and the government's failure to address them, because "the ads could be misleading." The Foundation offered to meet with USA TODAY's legal department to discuss the veracity of the Foundation's messages. They refused.

On May 2, 2001, the home and business of one of the employers who has stopped withholding was raided by scores of government agents, at gunpoint. As of this day, those agents have not provided a list of the charges. Nor have they specified the probable cause for the search warrant. They have, however, asked the judge who signed the warrant for 45 days to analyze the computer hard drives, papers and effects that were seized during the raid before they finally specify the charges and probable cause for the raid. The judge granted the request!

The tax law research provides a substantial amount of very credible evidence that since 1913 the Executive, Legislative and Judicial branches have been cooperating to deprive the People of a large percentage of the fruits of their labor by enforcing laws and regulations that are prohibited by the Constitution and which do not exist under the Internal Revenue Code. The evidence shows that the Code and regulations have intentionally been written in such a deceptive way as to obscure and obfuscate so as to give citizens the false impression that they are required to pay.

As a result of the Foundation's four messages in USA TODAY, and its other educational efforts, a growing number of people are becoming familiar with the facts of this research and now realize that Congress is prohibited by the Constitution from requiring individual citizens of the fifty states to file and pay the income tax or a social security tax as they currently operate. More and more citizens now believe that it is precisely because of the absence of proper constitutional authority that Congress has not passed any law requiring most Americans to file and pay an income tax.

So far, the IRS has responded with armed raids and with increased threats and saber rattling, but with no attempts to discuss in a rational way the allegations about the laws and regulations.

Journalists from the dominant media, including David Cay Johnston of The New York Times, have responded as apologists for the IRS by portraying individuals and employers who question the legality of the federal income tax laws as "tax cheats," even though those individuals often have a history of intelligent, rational and

professional attempts to get their federal representatives and IRS officials to answer legitimate questions about the legal authority of the IRS to force the collection of the federal income tax.

Obviously, the current situation must not continue.

The question is: What can a free People do when faced with a government that has apparently stepped outside the boundary drawn around its taxing power by the Constitution and by its own laws, and refuses to justify its behavior, evades all requests by citizens to answer legitimate questions, and uses a heavy handed, steel-fisted approach to enforcing the income tax -- as though its payment by most Americans was compulsory when, in fact, most citizens apparently are not liable -- and when the dominant media will not allow the people to purchase space to tell their story?

Answer: We the People must educate one another about the discrepancies between the way the Constitution and the tax law are written and the operations of the IRS. Knowledge is power. Only a well-informed citizenry will bring the federal tax policies and programs back under the control of the People and their Constitution.

Education can take many forms.

I pray that my stand in defense of the Constitution and the rule of law, and my death, should it come to that, will help to educate citizens about the apparent discrepancy between the government's behavior in enforcing the federal tax laws and the legality of those laws, the government's recalcitrance and refusal to reconcile the discrepancy, and the importance of keeping the government within the boundaries the people have drawn around its power. My act should not be seen as one of frustration or despair, but as a measure of my devotion to our sacred constitutional principles for which so many others have laid down their lives.

Frankly Mr. President, now that America's only national newspaper, USA TODAY, has refused to publish any more messages on the subject from this Foundation, I don't know what else to do to get the federal government to answer the legitimate and serious questions regarding the legal authority of the IRS to force employers to withhold the income tax from the paychecks of their employees and to force individuals to file tax returns and pay the income tax -- questions that have been raised by a substantial and credible body of evidence gathered by federal and state tax agents, CPAs, attorneys, employers and other tax researchers.

Everything else has been tried. The People have done everything right and they have been so very respectful in their attempts to obtain answers from their government What must a free people do when faced with a government that has apparently stepped outside the boundary the people have drawn around its taxing power, will not justify its behavior, treats all people who raise questions about its legal authority as "tax cheats," (even if those people, such as myself and Mr. Banister do pay their taxes in full and on time), enforces the Internal Revenue Code at gunpoint and throws citizens in jail, seizes homes, cars and bank accounts, even though those citizens have tried repeatedly,

but unsuccessfully, to get answers from the IRS and their Congressmen regarding the legality of the tax.

I am not some wild-eyed radical. I believe deeply in the principles upon which our constitutional republic was shaped and formed. And I do not take lightly the risks of losing the freedoms, rights and liberties that were purchased by the blood and sacrifices of so many before us. I have, otherwise, much to live for. I am only 61 years of age. I am in perfect health. I am debt free. I am well educated. I have a lovely wife of 38 years, a very nice house and surrounding property, four wonderful children who have each been educated at the country's finest Universities, and I have four grandchildren that give me much pleasure.

It is up to you Mr. President. I will either die in defense of our Constitution, which I have sworn to defend against foreign and domestic enemies, or there will be a public conference on September 18th to discuss and debate the questions raised by the tax researchers from what has become known as the "tax honesty movement."

Sincerely,

Robert L. Schulz
Chairman

Enc.

cc: Hon. Trent Lott
    President Pro Tempore
    487 Russell Senate Office Building
    Washington, D.C. 20510

    Hon. J. Dennis Hastert
    Speaker
    2263 Rayburn House Office Building
    Washington, D.C. 20515-1314

    Charles O. Rossotti,
    Commissioner
    Internal Revenue Service
    1111 Constitution Ave.
    Room 3000
    Washington, DC 20224

# This Man Will Die Unless You Act. Now.

## 1. Hunger Fast Until Death or IRS Answers.

On July 1st, Bob Schulz, a constitutional scholar, began a <u>hunger fast which will continue until his death or until IRS Commissioner Charles Rossotti agrees to send government tax experts to a public meeting</u> on September 18th to confront legal researchers who contend the IRS has no legal authority to collect income taxes.

Despite the 1st Amendment to the Constitution which clearly requires the government to answer petitions from the People for redress of grievances — the IRS, Congress and the Courts have <u>repeatedly evaded any direct response to the well documented and specific legal allegations of fraud and illegal operations</u> of the federal income tax system. The IRS and dominant media have avoided and suppressed detailed and open discussion of these claims.

## 2. Show Us the Law ! The Specific Legal Charges :

- There is <u>NO law that requires</u> most Americans to file a return, pay income taxes or have any taxes withheld.
- The 16th (Income Tax) Amendment was <u>ratified by FRAUD</u>.
- If you file, <u>you have WAIVED</u> your 5th Amendment (Miranda) rights.

## 3. How You Can Help . . .

<u>Contact President Bush</u> !

- Phone the White House:
  202-395-3000

- Write the President:
  The White House
  Washington, D.C. 20500
  (fax) 202-456-2461

- E-mail the President:
  president@whitehouse.gov

<u>Copy This Handout &
Tell Your Friends, Coworkers
and Neighbors</u> !

<u>Contact Your Representatives
Contact the Media. Be Heard</u> !

- Call, Fax or Write your Congressmen. Info at:
  www.visi.com/juan/congress
  Toll Free to Congress: 800-648-3516
  or 202-224-3121

- Send multiple e-mails to **ALL** your congressmen OR the media in your area.
  http://capwiz.com/washtimes/home/

Remember, e-mails are easy, but letters, phone calls and Express Mail are what gets heard !

## 4. One Man Hungers. A Nation Prays.

Freedom is NOT a spectator sport. Learn. Decide. Help. Pray.

# www.givemeliberty.org

Bob Schulz is Chairman of We The People
Foundation For Consitutional Education, Inc.
2458 Ridge Road, Queensbury, NY 12804
518.656.3578

# EXHIBIT B



CONGRESS OF THE UNITED STATES
HOUSE OF REPRESENTATIVES
WASHINGTON, D.C. 20515

ROSCOE G. BARTLETT
MARYLAND

Dan Bryant
Dept. of Justice

20 July 2001

Dear Mr Bryant,

In response to our phone conversation this is a formal request for a meeting on Capitol Hill between Robert Schulz et al of the The People Foundation for Constitutional Education and appropriate representatives of the Dept. of Justice. It will be a Congressional briefing like hearing with appropriate controls.

I will do everything within my power to ensure that the Dept. of Justice will provide appropriate representatives to participate in a congressional briefing hosted by Congressman Bartlett in connection with the above referenced matter   Daniel J Bryant 7/20/01

# EXHIBIT C

# We The People Foundation For Constitutional Education, Inc.

2458 Ridge Road, Queensbury, NY 12804
Telephone: (518) 656-3578  Fax: (518) 656-9724
www.givemeliberty.org

March 16, 2002

Hon. Roscoe G. Bartlett
Member of Congress
2412 Rayburn Building
Washington, DC 20515

Dear Congressman Bartlett:

As you know, on July 20, 2001, DOJ and IRS agreed to attend a recorded, public, congressional-style meeting on Capitol Hill, to answer questions about the allegedly fraudulent jurisdiction of the IRS and the allegedly illegal income tax system. What came to be referred to as the "Citizens' Truth-In-Taxation Hearing" was scheduled for February 27 and 28, 2002, in the House Science Committee Hearing Room.

Last November, as reported in the January 7, 2002 edition of *Tax Notes*, you received a letter from DOJ and IRS informing you that they would not be participating in the forum.

On January 17, 2002 you notified me that you were canceling the forum, that you would post our questions on your web site, that you would obtain answers to our questions from DOJ and IRS, and that you would post the answers from DOJ and IRS on your web site.

On January 22, 2002, I hand carried a letter addressed to you, from me. Attached to the letter was a hard copy of a list of 299 of our questions. As I said in the letter, "These are the preliminary questions that we intend to present to the IRS and DOJ at the February meeting. We are releasing these questions several weeks earlier than planned. We have a number of additional questions currently being prepared that will be released upon completion." Copies of the letter were delivered to Treasury Secretary O'Neil, Attorney General Ashcroft, and Mr. Lindsey.

Attached hereto is a hard copy of our final list of 538 questions, broken down into fifteen "lines of inquiry."

Very truly yours,

Robert L. Schulz, Chairman

cc:  Hon. Lawrence B. Lindsey
      Assistant to the President for Economic Policy
      The White House
      Washington, DC

      Hon. John Ashcroft
      Attorney General of the United States
      Department of Justice
      950 Pennsylvania Ave NW
      Washington, DC 20530

      Hon. Paul O'Neil
      Secretary
      Department of the Treasury
      1500 Pennsylvania Ave NW
      Washington, DC 20220

      Mr. David Cay Johnston
      The New York Times

      Mr. Warren Rojas
      Tax Notes Magazine


Enclosure.

# "The Legal Authority Of The IRS And The Income Tax"

## QUESTIONS TO BE ANSWERED BY
## THE UNITED STATES DEPARTMENT OF JUSTICE
## AND THE INTERNAL REVENUE SERVICE

Submitted to:

Representative Roscoe Bartlett (MD)
Attorney General John Ashcroft
Treasury Secretary Paul O'Neil
Mr. Lawrence Lindsey, Asst. to the President

Submitted by:

Mr. Robert Schulz, Chairman
We The People Foundation for Constitutional Education, Inc.
2458 Ridge Road, Queensbury NY 12805
(518) 656-3578

March 16, 2002

# INDEX

Preface

Letter to Rep. Roscoe Bartlett from Bob Schulz, January 22, 2002

Questions answered under oath at the Citizens' Truth-In-Taxation
Hearing, February 27-28, 2002.  *Questions appear in the order they were asked.*

| <u>Lines of Inquiry</u> | <u>pages</u> |
|---|---|
| **LIABILITY** | 1 – 6 |
| **RIGHT TO LABOR** | 7 - 17 |
| **JURISDICTION** | 18 - 25 |
| **FIFTH AMENDMENT** | 26 – 29 |
| **FIRST AMENDMENT** | 30 – 34 |
| **SIXTEENTH AMENDMENT** | 35 – 56 |
| **FOURTH AMENDMENT** | 57 – 61 |
| **IRS FRAUD:CREATION OF TIME-BARRED ASSESSMENTS** | 62 - 63 |
| **IRS VIOLATES CITIZENS' DUE PROCESS RIGHTS** | 64 – 70 |
| **26 USC 6020(b): SUBSTITUTE RETURNS** | 71 – 74 |
| **THE COURTS ARE CLOSED** | 75 - 76 |

# INDEX    (continued)

Questions which, due to time constraints, were not asked at the Citizens' Truth-In-Taxation Hearing

| Lines of Inquiry | pages |
|---|---|
| PAPERWORK REDUCTION ACT and ADMINISTRATIVE PROCEDURES ACT REGULATIONS | 77 - 80 |
| INDIVIDUAL MASTER FILES (IMFS) | 81 – 82 |
| WORD "INCLUDES" | 83 - 87 |
| TAXABLE SOURCES | 88 - 91 |

# Preface

On July 20, 2001, following the intervention by the Assistant to the President for Economic Policy, Mr. Lawrence Lindsey, the Department of Justice and the IRS agreed that appropriate personnel from their departments would meet with people from the We The People Foundation for Constitutional Education, on Capitol Hill, in a "congressional-style," recorded, public forum, chaired by Congressman Roscoe Bartlett, to answer questions regarding the allegedly fraudulent jurisdiction of the IRS and the allegedly illegal operations of the income tax system. The Foundation agreed to deliver the "first-tier" questions, in writing, a week or two in advance of the event.

What became known as the "Citizens' Truth-In-Taxation Hearing" was eventually scheduled for February 27 and 28, 2002, in the House Science Committee Hearing Room.

In late November, 2002, DOJ and IRS reportedly notified Rep. Bartlett that they would not be participating in the event.

On January 17, 2002, Congressman Bartlett notified the Foundation that he was canceling the hearing, but that he would post the Foundation's questions and the answers from DOJ and IRS on his web site.

On January 22, 2002, the Chairman of the Foundation, Bob Schulz, delivered a written response to Congressman Bartlett, with copies to Ashcroft, O'Neil and Lindsey. Attached to the letter was a preliminary list of 299 questions. A copy of Schulz' January 22, 2002 letter (without the preliminary list of 299 questions) follows this Preface. It provides a chronology of the events leading up to this report.

The Citizens' Truth-In-Taxation Hearing was held on February 27-28, 2002, as planned. The hostile witnesses from DOJ and IRS did not attend. However, expert, credentialed witnesses did attend (including ex-IRS agents, an ex-IRS counsel, tax attorneys, CPAs, a forensic accountant and prominent tax law researchers). They answered, under oath, 460 questions, which were prepared in the form of statements of fact. They supported their answers with evidentiary documents.

A copy of the 460 questions, broken down into eleven lines of inquiry, are included herein, along with 78 questions which were meant to be answered at the hearing, but were not asked due to time constraints.

The 538 questions contained in this report represent the final list of first-tier questions the Foundation had agreed to submit to Congressman Bartlett, to be answered by DOJ and IRS in the recorded, public forum.

# We The People Foundation For
# Constitutional Education, Inc.

2458 Ridge Road, Queensbury, NY 12804
Telephone: (518) 656-3578  Fax: (518) 656-9724
www.givemeliberty.org

January 22, 2002

Hon. Roscoe G. Bartlett
Member of Congress
2412 Rayburn Building
Washington, DC 20515

Dear Congressman Bartlett:

On behalf of myself and the We The People Foundation for Constitutional Education, I want to thank you for all that you have done to support the People's Petition for Redress of our grievances related to the **fraudulent origin of the IRS and unlawful operations of the income tax system**. I thank you for your wisdom, your courage and your independence.  Your steadfast and heroic efforts in defense of the American People's guaranteed constitutional right to have our government answer this historic petition are deeply appreciated by all of us who placed our trust in your integrity and leadership.

I know that you have tried your best in our behalf, and for that I am most thankful. I continue to hold you in high esteem. No matter what the future may hold, I will always remember your courageous defense of our Constitution.

Neither of us has shared with the general public the details of your actions and what happened behind the scenes in the days leading up to July 20, 2001. This was the day Assistant Attorney General Dan Bryant and IRS Commissioner Rossotti, as a result of your personal intervention and persuasion, contracted with the American people to have experts from their departments appear in a recorded, congressional-style, public meeting to answer the people's questions regarding the federal income tax system.

We also have not shared with the public the details of what has been happening behind the scenes since July 20, 2001. Under the present circumstances, it is appropriate that these details be made available to the American people.  Following is a chronology of the facts related to our Petition for Redress of Grievances.

- On June 11, 2001, I personally delivered a letter to President Bush at the White House. Copies of the letter were also hand-delivered to Speaker of the House Hastert and Senate Majority Leader Daschle at the Capitol. The letter recited the numerous requests made by We The People Foundation For Constitutional Education to the Executive and Legislative Branches since May 1999 to answer

our Petition For Redress of Grievances related to the income tax system. The letter also provided a factual account of the government's evasive and unresponsive behavior, which ultimately led to my decision to embark on a hunger strike until either I died or the federal government agreed to meet in a public forum to answer the people's questions regarding **the fraudulent origin of the IRS and the unlawful operations of the income tax system.**

- On July 1, 2001, I delivered a <u>follow-up letter to President Bush</u>, with copies to Speaker Hastert and Senator Daschle.

- On July 18, 2001, Lawrence B. Lindsey, Assistant to the President for Economic Policy and head of the National Economic Council, <u>sent a letter to me</u> which read, **"The President has asked me to thank you for your letters of June 11 and July 1 regarding the income tax system. I understand your concerns and the arguments you make. Your letter of June 11 outlines extensively the concerns of the We The People Foundation for Constitutional Education, Inc. with regard to the efficacy of the current income tax system. While I believe the best way to address your concerns is through the court system, I have taken the liberty of sharing your letters with the Internal Revenue Service for their review. A more substantive response will be forthcoming from this office once the IRS has had the opportunity to assess your grievances. I would be remiss if I did not suggest that you end your fast. Whether or not federal tax experts attend a meeting your organization has scheduled for September 18 will be determined based upon their substantive assessment of your arguments. While your personal commitment to the cause of tax reform is dramatic, I hope that you will not endanger yourself physically in this cause. Please be assured that your letters will receive careful attention at the IRS."**

Note: In reviewing my file and the events of last summer, I must now assume that when Commissioner Rossotti spoke with you by telephone on July 19th, and agreed to have his experts meet with our experts in a recorded public forum to answer our questions, he was responding to Mr. Lindsey's directive.

- On July 9, 2001, I delivered an updated version of the People's <u>Petition for Redress of Grievances</u> to one of President Bush's aides at the White House. I also met with you and three members of your staff, where we first discussed the issues related to **the fraudulent origin and unlawful operations of the IRS**, and you made the decision to help the American People in their quest for a response to this historic Petition.

- On July 17, 2001, you held a <u>press conference on the House Triangle</u> to announce the fact that you had placed top priority on getting the appropriate people in the government to agree to respond to our Petition.

- It is now known that between July 9th and July 18th, 2001, management level personnel at DOJ and IRS were steadfast in their refusal to have their experts meet with representatives of the American People in a recorded public forum. For instance, Floyd Williams, the IRS Director of the Office of Congressional Affairs, stated the IRS would only agree to a private, unrecorded meeting between myself and the IRS Chief Counsel. Karen Wilson (Mr. Williams' counterpart at DOJ) suggested we submit our questions to DOJ and IRS in writing and wait for a response. She said she was otherwise in support of IRS' proposal for a private, unrecorded meeting. You replied that the proposal for a private, unrecorded meeting was totally unacceptable and that the questions had to be answered in a public forum. You emphasized the importance of allowing the public to see and hear the people asking the questions and those answering them. You strongly and effectively argued that to submit the questions in writing to DOJ and IRS would allow for delay, obfuscation and confusion, and would bring to ruin what you considered to be a proper, Constitutional Petition For a Redress of Grievances.

- From July 18th through July 20th you negotiated on the People's behalf, by telephone, with IRS Commissioner Rossotti and with DOJ's Assistant Attorney General Daniel Bryant. They expressed concerns about the security of a public meeting and wanted to know who would be "on the gavel" to control the meeting and keep it professional and orderly. After speaking with me about their concerns, you contacted Dan Bryant and Charles Rossotti and offered to hold the meeting on Capitol Hill and to personally gavel the meeting if Henry Hyde was not available.

- On or about July 19th, in a telephone conversation between you and Commissioner Rossotti, Rossotti agreed to have his experts participate in a recorded, public, congressional-style hearing on Capitol Hill, with appropriate controls. You telephoned me and asked to see me in your office. When I arrived, you told me of Commissioner Rossotti's agreement.

- On July 20th, Assistant Attorney General Dan Bryant also agreed, but told you he needed a formal request from you. He asked that you put your request for the meeting in writing. You telephoned me and asked to see me in your office. When I arrived, you prepared a hand-written letter to Dan Bryant. You then telephoned Mr. Bryant to tell him you had the formal request in hand and asked how soon he could meet with us. Bryant said he would see us right away in his office at the Department of Justice building. We met with Dan Bryant that afternoon. We fully discussed our written Petition for Redress of Grievances (he had previously received a copy of the Petition that was hand-delivered to the White House on April 13, 2000 and again on July 9, 2001). We also reviewed the terms and conditions of your offer to preside over the proposed congressional-style hearing on Capitol Hill. He penned a note at the bottom of your written request, agreeing to **"do everything within my power to ensure that the Dept. of Justice will provide appropriate representatives to participate in a congressional briefing hosted by Congressman Bartlett in connection with the above referenced**

**matter."** Roland Croteau and Burr Deitz (a Director of the WTP Foundation) were also in attendance.

- Later that day, Friday, July 20, 2001, my office issued a <u>press release</u> and posted it on our web site, announcing the details of the agreement. Apparently, the news quickly found its way around the Internet.

- Between Friday, July 20th and Monday, July 23rd, as I would later learn from you, Dan Bryant apparently received a phone call or two from "higher ups," protesting his July 20th commitment to have DOJ answer our questions in a public forum.

- On July 23, 2001, I received an <u>e-mail from your aide, Lisa Wright</u>, which read: {"Congressman Bartlett asked me to contact you to inform you must take URGENT action in order to preserve the agreement as a result of your 7/20 meeting with Dan Bryant at USDOJ. 1) Immediately pull down from the website the previous presentation of the meeting that begins with the subject – "The fast is over". 2) Replace it with a corrected version ASAP and distribute this to your list. Reference to Bryant must be limited explicitly to quoting only his handwritten comments. "I will do everything within my power. . ." Reference to Hyde -- that he will be invited -- NOT EXPECTED. Reference to a date -- to be determined, hopefully in mid to late September. 3) You must call Dan Bryant ASAP and apologize for the inaccuracies in the e-mail. This is his personal number -- 202-514-2141."}

NOTE: On or about July 25th, I placed a call to Dan Bryant. He did not return the call.

- On July 30th, I issued a <u>revised press release</u> and posted it on our web site.

- On July 30th Lisa Wright of your office sent an <u>e-mail to Dan Bryant at DOJ and Floyd Williams at IRS</u>. It read: **"Mr. Bryant and Mr. Williams: Attached is a 7/30/01 news release from We the People Foundation for Constitutional Education which follows up a meeting Congressman Bartlett had on July 20 at DOJ w/ Asst. Atty. Gen. Dan Bryant and Bob Schulz concerning Mr. Schulz's Petition for Redress concerning the tax code and IRS enforcement of the tax code. <u>Congressman Bartlett personally affirmed that this release is an accurate reflection of the July 20 meeting</u>. Congressman Bartlett discussed the request for a public forum at which appropriate IRS representatives would participate in an earlier meeting with Floyd Williams of IRS and Karen Wilson of DOJ and subsequently in a phone conversation with IRS Commissioner Rossotti. Congressman Bartlett hopes that DOJ and IRS officials will contact Mr. Schulz directly concerning coordinating and ironing out the details for the public forum on Capitol Hill. Please feel free to contact Congressman Bartlett if you have any questions and so that we may procure the necessary space for the meeting. "**

- On July 30th Lisa Wright forwarded to me a <u>message from IRS' Floyd Williams</u>. It read: **"Treasury/IRS has not agreed (either verbally or in writing) to participate in a public forum with Bob Schulz."**

- On August 13, 2001, <u>Tax Notes</u> published an article under the heading, <u>"Backroom Deals, Fleeting Promises Put Income Tax Hearing in Jeopardy,"</u> by Warren Rojas. In the article, IRS spokesman Frank Keith is quoted as saying, "As of right now, no final agreements have been made."

- On August 29, 2001, your office issued the following <u>statement;</u> "Congressman Bartlett is continuing to actively pursue and secure participation by representatives of both the Department of Justice and the Internal Revenue Service at the September 25-26 forum organized by We the People," said Lisa Wright, a spokesman for <u>Congressman Roscoe Bartlett.  "He expects Dan Bryant, Assistant Attorney General for the Office of Legislative Affairs at the Department of Justice, and IRS Chairman Charles Rossotti to fulfill their personal commitments to him."</u> (my emphasis).

- In early September, I met in your office with you and three of your aides, including Sallie Taylor and Lisa Wright. You said DOJ and IRS were trying to "wiggle off the hook" and that Sallie and Lisa had an "alternative proposal." Sallie and Lisa proceeded to describe their alternative proposal, which, instead of having the agree-upon public forum, would have me submit the Peoples' questions to you in writing. You would then post the questions on your web site and send them to DOJ and IRS for an answer. The answers would also be posted on your web site. <u>I told Sallie and Lisa that their proposal was unacceptable to me and that you had already argued with DOJ and IRS (successfully) the futility of such an approach.</u> Upon hearing my response you turned to an aide and asked him to call Dick Armey, the House Majority Leader, to request an immediate meeting with him. We were told to proceed to Mr. Armey's office. You, I, Sallie Taylor, and another of your aides (I don't remember his name) met with Dick Armey and one of his aides, who took extensive notes during the meeting. **You told Mr. Armey that DOJ and IRS were trying to wiggle off the hook and break their commitment to answer the People's questions in a public forum. Mr. Armey said it was important to have the hearing proceed as planned and that DOJ and IRS had to be "locked down." Armey said the way to do that would be to show DOJ and IRS that they were running the risk of offending many more Congressman than you if they broke their commitment. Mr. Armey then suggested that you prepare a letter to Attorney General Ashcroft and to Treasury Secretary O'Neil, which would thank them for their commitment to have the appropriate personnel from their departments participate in the income tax hearing and which would be signed by numerous members of the House of Representatives.  Mr. Armey and you discussed a list of House members that both of you believed would sign the letter.**

- On September 12, 2001, I communicated my request to you that the tax hearing be postponed due to the events of September 11th. I posted that message on our web site.

- On October 12, 2001, you delivered a letter to me in which you announced that the event had been rescheduled for February 27 and 28, 2002. Your letter stated **"A letter of support and confirmation signed by myself and other members of Congress has been drafted, circulated, and will be sent to officials at the Department of Justice, Treasury and the IRS, informing them of the dates and times and requiring their attendance. I will personally chair the event and have invited other members of Congress to attend and sit on the panel...You have my word as an elected member of the United States Congress that I will do all within my power that this event go forward, the IRS and DOJ attend as they have promised to do, and are compelled to do by the Constitution."** (My emphasis).

- On January 7, 2002, Tax Notes published an article under the heading, "Schulz Hopes to Bury Tax Code at February Hearing," by Warren Rojas. In the article, Mr. Rojas wrote, "While the IRS has yet to officially confirm or deny its participation in the hearing, **a Bartlett press aide acknowledged receiving a letter from Justice around Thanksgiving stating plainly that the DOJ would not attend any Schulz-related events.**" (my emphasis). Note: I was never told about the "Thanksgiving letter." This was the first time any of the three government officials who were parties to the July 20th contract with the American People had put in writing that they were reneging on their agreement.

- On or about January 8, 2002, I telephoned Lisa Wright to tell her that I had read the Tax Notes article and was very concerned about the Thanksgiving letter from DOJ which informed you that DOJ would not attend the income tax hearing. I called to inform Ms. Wright that it was my intention to bring the February hearing to the attention of tens of millions of Americans, and ask them to wait to file their tax returns until they heard all of the questions and answers at the February hearing. I felt it was now time, as Mr. Armey had previously suggested, to do all I could to "lock the DOJ and IRS down" and demand that they keep their commitment to the American People. It was time to demand that they respond to our questions regarding **the fraudulent origin of the IRS and the unlawful operation of the personal income tax system.** I informed Ms. Wright that many thousands of Americans were already aware of the February hearing and were waiting for the answers to the questions before deciding how to file their tax returns. I explained that if DOJ and IRS were going to renege on their commitments, they were going to have to answer to a very large number of Americans. My call was passed through to Lisa's voice message system where I left a message. I asked her to call me.

- On January 11, 2002, Lisa returned my call. We discussed "Operation Wait to File Until the Trial." After we completed the call Lisa called back to say that if your name was mentioned in the "Wait to File" flyer/ad, she would like to approve the wording. I told her your name, together with those of Dan Bryant and IRS Commissioner Rossotti were mentioned in the first paragraph, which I then read to her. She said my use of the phrase "public hearing" was wrong, that the word "hearing" had a technical meaning on the Hill and that I should use the phrase "public forum." She also said that you did not have the power to force DOJ and IRS to attend the meeting. I replied that I understood that you had no more power at that time than you did on July 20, 2001, when you merely requested that Commissioner Rossotti and Assistant Attorney General Dan Bryant have appropriate personnel from their departments participate in the "public, recorded congressional-style briefing- hearing" on Capitol Hill to answer questions "concerning the legal jurisdiction and authority of the IRS." **At the July 20 meeting both Mr. Rossotti and Mr. Bryant agreed to your request and formally entered into a contract with the American people to have their "appropriate representatives participate in a congressional briefing hosted by Congressman Bartlett."**

- On January 12, 2002, in response to Lisa's one concern, I changed the phrase "public hearing" in the first paragraph of the Wait to File flyer/ad to "congressional-style hearing". We then launched "Operation Wait to File Until the Trial" by posting an article on our web site and by sending that article to our mailing list. The article included the flyer to be published in newspapers and a letter to be direct mailed to about 300,000 individuals.

- On Monday, January 14th I was in Milwaukee working with one of our attorneys on the questions for the hearing. I received word that Lisa had called my office and asked me to return the call. I tried several times on Monday and Tuesday to reach her by phone. I left voice messages on her machine, informing her that I would be returning to my office that afternoon at approximately 3 p.m. While en route from Milwaukee to Albany on Tuesday, January 15th I tried unsuccessfully to reach you by phone. I did manage to speak to Sallie Taylor. I told her to let Lisa and you know that I would be back in my office at 3 p.m. should either of you need to speak to me. I would not hear from anyone in your office until 8:20 p.m. Thursday evening, January 17th.

- On Monday, January 14th, Kim Herb, Legislative Assistant to Congressman John Linder sent an e-mail to "District Directors" which read,

  > **"Recently, it has been stated that there will be a Congressional hearing on the IRS. I wanted to dispel this rumor. There will be NO hearing. I repeat, there will be no Congressional hearing on the IRS in February. In response to a hunger strike by Mr. Robert Schulz, Congressman Roscoe Bartlett agreed to facilitate a meeting on IRS and**

tax topics. Accordingly, Mr. Bartlett arranged for "We the People" to have a public forum on the IRS, at which time "We the People" will debate such questions as the legality of the Sixteenth Amendment and the ratification process. However, no officials from the IRS or Justice Department will attend. Again, for emphasis, NO officials from either the IRS or Justice Department will be in attendance. The administration believes that these questions have been sufficiently addressed, and there is a fair amount of judicial precedence on this issue to confirm that assertion. Congressman Bartlett will likely give an opening statement, however, I understand that his comments will be limited to acknowledging that the "We the People" organization has a right to free speech and to voice their opinion. I recognize and support the Bush Administration's position. We have no interest in pursuing the ratification of the Sixteenth Amendment as a viable and legitimate argument in the fundamental tax reform movement. As such, I do not anticipate that Congressman Linder, as the official sponsor of the FairTax, will have any role in the February public forum organized by "We the People."

- At 3 p.m. Thursday, January 17th, as part of Operation Wait to File Until the Trial, I delivered several thousand letters and flyers to the personal fax machines of the following individuals:
  - o Members of the American Judges Association
  - o Judges of The Federal Circuit
  - o Mayors of Largest U.S. Cities
  - o Federal Tax Court Judges
  - o Supreme Court Justices
  - o Radio Station General Managers
  - o Radio Talk Show Hosts
  - o 550 Partners of the Big Five Accounting Firms
  - o Executive Cabinet Members and Cabinet Legal Advisors
  - o Members of the Association of Copy Editors

- At 8:20 p.m. on Thursday, January 17th I received a call from Lisa Wright. She stated that she had just forwarded via FedEx your letter informing me that you were "canceling the forum," and that you were "dismayed" by the "rhetoric" of the "Wait to File" ad and that you would not be party to any movement that tells people not to pay their federal income taxes. I tried to reason with her, but it was late and she was in no mood to listen.

I hope that you can understand how very disappointed I am with your actions. From the beginning of our discussions, I expected you to encounter great difficulty in holding both Mr. Rossotti and Mr. Bryant to their word regarding the February hearing. At this point,

it is clear that neither DOJ nor IRS ever intended to keep their commitment to you or the American People. **Their refusal to answer these substantive questions regarding the fraudulent origin of the IRS and unlawful operation of the income tax system demonstrates the federal government's pervasive and arrogant disregard for the constitutional rights of the American People.** It is now clear, that on July 20, 2001, their objective was to stop the hunger strike and temporarily mollify the outrage of thousands of Americans who were demanding that our government agree to publicly answer the People's Petition For Redress of Grievances.

However, I shared your faith in our Constitution and your belief that at the top of our government were trustworthy men and women of moral integrity. Like you, I believed that no matter the practical difficulty, there were enough people of honor at the highest levels of our government, that the People's Constitutional Petition For Redress of Grievances would be heard. I did not believe that those who we have trusted to lead our nation would turn their backs on the American People, disregard our Constitution and Bill of Rights, and hold in such low esteem the personal liberty so many of our countrymen have sacrificed and died to defend over the past 225 years. I believed that our highest government officials would honor their oaths of office to defend the United States Constitution, and its guarantee of every American's right to petition our government for a redress of grievances.

Congressman Bartlett, I wish you had told me sooner about the Thanksgiving letter from DOJ, and your apparent decision (if Kim Herb is to be believed) to merely give an opening statement at the February hearing, "limited to acknowledging that the 'We the People' organization has a right to free speech and to voice their opinion." I wish that you had told me then that our Petition was not going to be publicly and officially answered by the government.

You say in your letter to me dated January 17 that the newspaper ad is "misleading" and "has made it impossible for the forum to take place because the Internal Revenue Service (IRS) and the Department of Justice (DOJ) will not participate."

This is most offensive to me. There was no need to misrepresent the facts. As the paragraphs above demonstrate, the ad had nothing to do with the reluctance of DOJ and IRS to participate in the February income tax hearing. We now know that their decision not to participate was put in writing to you last Thanksgiving, nearly two months before the "Wait to File" campaign idea occurred to us. In fact, the Wait to File campaign is a direct result of learning from the January 7th edition of <u>Tax Notes</u> that you had received DOJ's Thanksgiving letter of withdrawal.

In your press release you say, "I will not be a party to advocating the non-payment of federal income taxes." This statement is also highly offensive, for it is nothing more than an unjustifiable, aggressive attack on my reputation and character. Your statement is also a misrepresentation of the facts and reflects a deliberate attempt to paint me and the Foundation as irresponsible law-breakers. In fact, the ad does not advocate the non-

payment of federal income taxes. It suggests people do what the law allows them to do--
wait until February 27th to file their tax returns.

Neither I nor the Foundation have ever advocated, supported or encouraged anyone not to
pay a tax they lawfully owe or to file any tax return documents they are required by law
to file. Ever. As we both know, the purpose of these important hearings is to have the
government show us the law so that all Americans may be guided by specific
requirements for filing.

In your letter and press release you say that you "remain[s] committed to ensuring the
right of Bob Schulz and other citizens to exercise their constitutional rights under the
First Amendment to get answers about federal tax policy from the government," and you
propose, as an alternative to the public forum, that you deliver our questions to DOJ and
IRS and that you post our questions and the answers on your web site. In fact, as you
yourself argued so effectively last July, this would be tantamount to our agreeing not to
have our questions answered.  To use your own words, this approach "would allow for
delay, obfuscation, confusion and to otherwise bring to ruin" what we have so patiently,
intelligently, professionally and rationally developed into a proper petition for a remedy
of the people's grievances.

I now fear for the future of our Constitutional Republic. A constitutional crisis has now
developed. Whether we have a written Constitution that protects our unalienable rights as
Americans is now a question. Whether the Constitution is any more than a piece of paper
is now a question. Whether we have a federal government limited by a Constitution and
Bill of Rights is now a question.

Here is what I have decided must now be done in response to the decision by DOJ and
IRS not to participate in the public, recorded truth-in-taxation hearing on February 27-28,
and also your decision last Thursday to withdraw your commitment to support this public
forum.

First:  Last week I spoke to your aide, Sallie Taylor, to request a meeting with you as
soon as possible. She said your calendar would not allow such a meeting before
Wednesday, January 23rd, and that she would have to speak with you to see if that is what
you wanted to do. My purpose is to respectfully request that you reconsider your decision
to cancel the February meeting.

Second:  We plan to proceed with a recorded, public forum on February 27 and 28 in
Washington DC. Because of the importance of this issue to the American People, we
hope that you will decide to help us hold this event as planned in the secure location of
the Science and Technology Committee Hearing Room. However, in the alternative, we
have booked the Marriott Hotel for the two days.

Third:  I am attaching to this letter our initial set of questions relating to the **fraudulent
origin of the IRS and the unlawful operation of the income tax system**. These are the
preliminary questions that we intend to present to the IRS and DOJ at the February

meeting. We are releasing these questions several weeks earlier than planned. We have a number of additional questions currently being prepared that will be released upon completion. By copy of this letter to Attorney General Ashcroft, Treasury Secretary O'Neil and Mr. Lawrence B. Lindsey, we are demanding that experts from DOJ and IRS be present on February 27 and 28 to answer the questions in a public forum. As you previously stated, the written exchange of questions and answers with DOJ and IRS would be utterly futile.

Fourth:  We are posting the questions on our web site along with an invitation for all learned persons to answer these questions and participate in the February 27 and 28 hearing. We will request that interested parties contact us by e-mail using a prepared form.

Fifth:  We will extend an invitation to the February 27 and 28 event to every organization, large or small, that is concerned about the protection, preservation and enhancement of human liberty in America, and that is interested in limiting the size, scope and costs of the federal government to the enumerated powers of the Constitution.

**It is now imperative to summon all patriots in this cause for liberty and justice. It is time to ask all right thinking Americans to stand united and put a collective foot down against this arrogant disregard for our liberties, rights and freedoms, whether it be an erosion of our right to petition the government for a redress of grievances, our right to privacy, our right to property, our right to firearms, our right to fully-informed juries, our right to honest representation and voting, our right to a truly independent judiciary, our freedom from the influence of the "same hands" in all three branches, our right to honest checks and balances, our right to the fruits of our labor, our right not to have the government waste the fruits of our labor under the pretense of caring for us, our right to laws that do not favor public over private education, our right to home school our children, our right to have the war powers clauses adhered to, our right to have all treaties approved by the Senate, et al.**

If the DOJ and the IRS do attend the event and provide honest, forthright answers to the people's questions relating to the authority of the IRS to force employers to withhold the income tax from the paychecks of their employees and to force most Americans to file a tax return and to pay the tax, we believe the probable outcome will be a more limited federal government, a cleansing of our political system and a restoration of power to the states and the people.

Sixth:  We are calling on all patriotic Americans to help reveal the truth regarding the true limits to the federal taxing powers by standing up for our Country and its founding principles. In light of the decision by DOJ and IRS to ignore the People's fundamental, Constitutional right to petition our government for a redress of these grievances, we are respectfully requesting all Americans to:

1) Demand that the IRS and DOJ attend the February hearing and publicly answer the questions, as they committed to do last July.

2) Wait to file their tax returns at least until February 27th. If IRS and DOJ fail to appear at the citizens' hearing, we will then respectfully request every American citizen and business to defer filing of their tax returns and suspend employee withholding. The American People should not be obligated to pay a tax that the federal government will not, and cannot, publicly defend on lawful or moral grounds.

3) Stand together on the mall in Washington DC on Sunday, March 31, 2002, and peacefully protest the unlawful income tax by filing their blank 1040 forms in metal waste drums.

Congressman Bartlett, do we still have a written Constitution in America? Do we still have a Bill of Rights? Do those documents still memorialize in writing what we believe most deeply in our hearts as Americans? Or have they become mere abstract concepts that have no real bearing on our moral conduct as nation? What good is our Constitution and Bill of Rights if we do not treasure them and protect them?

It has been said that the limits of tyrants are prescribed by the tolerance of those whom they oppress.

I, for one, will not accept the decision by the DOJ and the IRS (our servant government) not to answer the People's questions in a recorded public forum---a decision that continues a longstanding history of unlawful, abusive and unaccountable conduct by our government. The refusal of DOJ and IRS to answer these questions in a public forum can only be interpreted as a glaring admission of the guilt.

Congressman Bartlett, you gave your word to the American People. I respectfully ask that you keep your word to protect and defend our Constitution at this critical moment in America's history.

Wholeheartedly,

Robert L. Schulz
Chairman


cc:  Hon. Lawrence B. Lindsey
     Assistant to the President for Economic Policy
     The White House
     Washington, DC

Hon. John Ashcroft
Attorney General of the United States
Department of Justice
950 Pennsylvania Ave NW
Washington, DC 20530

Hon. Paul O'Neil
Secretary
Department of the Treasury
1500 Pennsylvania Ave NW
Washington, DC 20220

# LIABILITY

**With the assistance of the following series of questions
we will prove that the Internal Revenue Code does not make
most Americans liable to file a tax return and pay an income tax.**

      1.     Admit that the Internal Revenue Code is found at Title 26 of the United States Code.

      2.     Admit that Title 26 of the United States Code is broken down into Subtitles.

      3.     Admit that income taxes are set forth in Subtitle A of Title 26.

      4.     Admit that Subtitle A contains Sections 1 through 1563.

      5.     Admit that estate and gift taxes are set forth in Subtitle B of Title 26.

      6.     Admit that Subtitle B contains Sections 2001 through 2704.

      7.     Admit that employment taxes are set forth in Subtitle C of Title 26.

      8.     Admit that Subtitle C contains Sections 3101 through 3510.

      9.     Admit that miscellaneous excise taxes are set forth in Subtitle D of Title 26.

      10.     Admit that Subtitle D contains Sections 4001 through 5000.

      11.     Admit that alcohol, tobacco, and certain other excise taxes are set forth in Subtitle E of Title 26.

      12.     Admit that Subtitle E contains Sections 5001 through 5882.

13.    Admit that procedures and administration to be followed with respect to the different taxes addressed in Subtitles A through E are set forth in Subtitle F of Title 26.

14.    Admit that Subtitle F contains Sections 6001 through 7873.

15.    Admit that Congress enacted the Privacy Act at 5 U.S.C. ° 552a(e)(3).

16.    Admit that when the Internal Revenue Service requests information from an individual, the Privacy Act requires the IRS to inform each individual whom it asks to supply information, on the form which it uses to collect the information or on a separate form that can be retained by the individual --

(a)  the authority which authorizes the solicitation of the information and whether disclosure of such information is mandatory or voluntary;

(b)  the principal purpose or purposes for which the information is intended to be used;

(c)  the routine uses which may be made of the information, as published pursuant to paragraph (4)(D) of this subsection; and

(c)  the effects on him, if any, of not providing all or any part of the requested
information.

17.    Admit that Congress enacted the Paperwork Reduction Act at 44 U.S.C. 3504(g)(2).

18.    Admit that the Paperwork Reduction Act requires the Director of the Office of Management and Budget to include with any information requests, a statement to inform the person receiving the request why the information is being collected, how it is to be used, and whether responses to the request are voluntary, required to obtain a benefit, or mandatory.

19.    Admit that the Internal Revenue Service complies with the Privacy Act and Paperwork Reduction Act by setting out the required statements on the IRS Form 1040 Instruction Booklet.

2

20.    Admit that the Privacy Act and Paperwork Reduction Act statements which the Internal Revenue Service currently uses with respect to the federal income tax state that: "Our legal right to ask for information is Internal Revenue Code Sections 6001, 6011, 6012(a) and their regulations. They say that you must file a return or statement with us for any tax you are liable for. Your response is mandatory under these sections."

21.    Admit that Internal Revenue Code Section 6001 states: "Every person liable for any tax imposed by this title, or for the collection thereof, shall keep such records, render such statements, make such returns, and comply with such rules and regulations as the Secretary may from time to time prescribe. Whenever in the judgment of the Secretary it is necessary, he may require any person, by notice served upon such person or by regulations, to make such returns, render such statements, or keep such records as the Secretary deems sufficient to show whether or not such person is liable for tax under this title. The only records which an employer shall be required to keep under this section in connection with charged tips shall be charge receipts, records necessary to comply with Section 6053(c) and copies of statements furnished by employees under Section 6053(a)."

22.    Admit that Internal Revenue Code Section 6011 states: "(a) General Rule. When required by regulations prescribed by the Secretary any person made liable for any tax imposed by this title, or for the collection thereof, shall make a return or statement according to the forms and regulations prescribed by the Secretary. Every person required to make a return or statement shall include therein the information required by such forms or regulations . . .(g) Income, estate and gift taxes. For requirement that returns of income, estate, and gift taxes be made whether or not there is tax liability, see subparts B and C."

23.    Admit that subparts B and C referred to at Internal Revenue Code Section 6011(g) contain Internal Revenue Code Sections 6012 through 6017a.

24.    Admit that Congress displayed its knowledge of how to make someone "liable for" a tax at 26 U.S.C. 5005, which states that: "(a) The distiller or importer of distilled spirits shall be liable for the taxes imposed thereon by section 5001(a)(1)."

25.    Admit that Congress displayed its knowledge of how to make someone liable for a tax at 26 U.S.C. 5703, which states that: "(a)(1) The

3

manufacturer or importer of tobacco products and cigarette papers and tubes shall be liable for the taxes imposed therein by section 5701."

26. Admit that the persons made liable at Internal Revenue Code Sections 5005 and 5703, for the taxes imposed at Internal Revenue Code Sections 5001(a)(1) and 5701, respectively, are the persons described at Sections 6001 and 6011 required to make returns and keep records.

27. Admit that Section 1461 is the only place in Subtitle A of the Internal Revenue Code where Congress used the words: "liable for.'

28. Admit that the person made liable by Congress at Section 1461 is a withholding agent for nonresident aliens.

29. Admit that there is a canon of statutory construction, "expressio unius est exclusio alterius", which means the express mention of one thing means the implied exclusion of another.

30. Admit that Congress could have, but did not, make anyone else other than the withholding agent referred to in Section 1461, "liable for" any income tax imposed in Subtitle A.

31. Admit that up until 1986, the statement required by the Privacy and Paperwork Reduction Acts set out in the IRS Form 1040 instruction booklet, mentioned only Internal Revenue Code Sections 6001 and 6011 as the authority to request information.

32. Admit that the United States Supreme Court has held in *C.I.R. v. Acker*, 361 U.S. 87, 89 (1959), and in *U.S. v. Calamaro*, 354 U.S. 351, 358-359 (1957), that a regulation that purports to create a legal requirement not imposed by Congress in the underlying statute is invalid.

32a. Admit that the 26 CFR 1.1-1 uses the following phrase:

**"...all citizens of the United States, wherever resident, and all resident alien individuals are liable to the income taxes imposed by the Code whether the income is received from sources within or without the United States."**

4

32b.  Admit that the statute the above regulation, 26 CFR §1.1-1 implements, which is 26 U.S.C. §1, nowhere uses the word "liable" to describe the taxes imposed in that section 1.

32c.  Admit that because the corresponding statute in 26 U.S.C. §1 *does not* use the word "liable" or "liable to", then the implementing regulation for the section, 26 CFR §1.1-1 cannot, which makes the implementing regulation imposing the otherwise nonexistent liability invalid and unenforceable.

32d.  Admit that there is no statute anywhere in Subtitle A of the Internal Revenue Code which makes any person *liable* for the tax imposed in 26 U.S.C. §1 or 26 U.S.C. §871.

32e.  Admit that 26 CFR §1.1441-1 defines the term "individual" to mean the following:

**26 CFR 1.1441-1 Requirement for the deduction and withholding of tax on payments to foreign persons.**

(c ) Definitions

(3) Individual.

(i) Alien individual.

> **The term alien individual means an individual who is not a citizen or a national of the United States. See Sec. 1.1-1(c).**

(ii) Nonresident alien individual.

The term nonresident alien individual means a person described in section 7701(b)(1)(B), an alien individual who is a resident of a foreign country under the residence article of an income tax treaty and Sec. 301.7701(b)-7(a)(1) of this chapter, or an alien individual who is a resident of Puerto Rico, Guam, the Commonwealth of Northern Mariana Islands, the U.S. Virgin Islands, or American Samoa as determined under Sec. 301.7701(b)-1(d) of this chapter. An alien individual who has made an election under section 6013 (g) or (h) to be treated as a resident of the United States is nevertheless treated as a nonresident alien individual for purposes of withholding under chapter 3 of the Code and the regulations there under.

32f.  Admit that there is no other place anywhere in the Internal Revenue Code or 26 CFR where the word "individual" is defined.

32g.  Admit that 26 CFR §1.1441-1 is the definition for the term "individual" that appears at the top of the IRS form 1040 in the phrase "U.S. Individual Income Tax Return".

32h.  Admit that IRS form 1040NR is the form required to be used by nonresident aliens.

32i.  Admit that if Form 1040NR is used for nonresident aliens, the only thing left that an "individual" appearing in 26 U.S.C. §7701(a)(1) can be is an "alien" based on 26 CFR §1.1441-1.

32j.  Admit that the term "citizen of the United States" is defined as follows in 26 CFR:

26 CFR §31.3121(e) State, United States, and citizen.

(b)...The term 'citizen of the United States' includes a citizen of the Commonwealth of Puerto Rico or the Virgin Islands, and, effective January 1, 1961, a citizen of Guam or American Samoa.

<u>42 Questions: 1 – 31, 32a – 32j</u>

## RIGHT TO LABOR

**With the assistance of the following series of questions
we will prove that the income tax is a slave tax,
prohibited by the 13th Amendment.**

122.   Admit that it was the intent of Congress to require "individuals" to make income tax returns based upon receipt of more than a threshold amount of gross income even if the individual ends up  not "liable for" a tax on that gross income.

123.   Admit that the "gross income" mentioned in Section 6012 of the Internal Revenue Code is the "gross income" as set forth at Section 61(a) of the Internal Revenue Code.

124.   Admit that Section 61(a) of the Internal Revenue Code defines "gross income" as "all income" from whatever source derived, but does not define "income."

125.   Admit that in *Eisner v. Macomber*, 252 U.S. 189, 206 (1920), the United States Supreme Court held that Congress cannot by any definition it may adopt conclude what "income" is, since it cannot by legislation alter the Constitution, from which alone it derives its power to legislate, and within whose limitations alone that power can be lawfully exercised.

126.   Admit that the definition of income as it appears in Section 61(a) is based upon the 16th Amendment and that the word is used in its constitutional sense.

127.   Admit that the United States Supreme Court has defined the term income for purposes of all income tax legislation as:  The gain derived from capital, from labor or from both combined, provided it include profit gained through a sale or conversion of capital assets.

127a.  Admit that the United States Supreme Court defined "income" to mean the following:

"...Whatever difficulty there may be about a **precise scientific definition of 'income**,' it imports, as used here, something entirely distinct from principal or capital either as a subject of taxation or as a measure of the tax; **conveying rather the idea of gain or increase arising from corporate activities**."

"This court had decided in the Pollock Case that the income tax law of 1894 amounted in effect to a direct tax upon property, and was invalid because not apportioned according to populations, as prescribed by the Constitution. The act of 1909 avoided this difficulty by imposing not an income tax, but an **excise tax upon the conduct of business in a corporate capacity**, measuring, however, the amount of tax by the income of the corporation...**Flint v. Stone Tracy Co.**, 220 U.S. 107, 55 L.Ed. 389, 31 Sup.Ct.Rep. 342, Ann. Cas."

127b.  Admit that the term "corporation" as used above infers a federally chartered and not a state chartered corporation.

127c.  Admit that the United States Government is defined as a federal corporation:
United States Code
TITLE 28 - JUDICIARY AND JUDICIAL PROCEDURE
PART VI - PARTICULAR PROCEEDINGS
CHAPTER 176 - FEDERAL DEBT COLLECTION PROCEDURE
SUBCHAPTER A - DEFINITIONS AND GENERAL PROVISIONS
Sec. 3002. Definitions
(15) **"United States" means** -
(A) **a Federal corporation**;
(B) an agency, department, commission, board, or other entity of the United States; or
(C) an instrumentality of the United States.

127d.  Admit that individuals as defined in Subtitle A of the Internal
Revenue Code and in 26 CFR §1.1441-1 are not federal corporations, and therefore
cannot have "profit" or "gain" as constitutionally defined above.

128.   Admit that in the absence of gain, there is no "income."

129.   Admit that there is a difference between gross receipts and gross
income.

130.   Admit that the United States Supreme Court recognizes that one's
labor constitutes property.

131.   Admit that the United States Supreme Court stated in *Butchers' Union
Co. v. Crescent City Co.*, 111 U.S. 746, 757 (concurring opinion of Justice Fields)
(1883), that:

> It has been well said that, "The property which every
> man has in his own labor, as it is the original foundation
> of all other property, so it is the most sacred and
> inviolable."

132.   Admit that the United States Supreme Court recognizes that contracts
of employment constitute property.

133.   Admit that the United States Supreme Court stated in *Coppage v.
Kansas*, 236 U.S. 1, 14 (1914) that: "The principle is fundamental and vital.
Included in the right of personal liberty and the right of private property--partaking
of the nature of each--is the right to make contracts for the acquisition of property.
Chief among such contracts is that of personal employment, by which labor and
other services are exchanged for money
    or other forms of property."

134.   Admit that the United States Supreme Court recognizes that a contract
for labor is a contract for the sale of property.

135.   Admit that the United States Supreme Court has stated in *Adair v.
United States*, 208 U.S. 161, 172 (1908) that:

> In our opinion that section, in the particular mentioned, is an invasion
> of the personal liberty, as well as of the right of property, guaranteed

by that Amendment (5th Amendment).  Such liberty and right
embraces the right to make contracts for the purchase of the labor of
others and equally the right to make contracts for the sale of one's
own labor.

136.   Admit that Congress recognizes at Section 64 of the Internal Revenue
Code that "ordinary income" is a gain from the sale or exchange of property.

137.   Admit that Internal Revenue Code Sections 1001, 1011 and 1012
provide the method Congress has set forth for determining the gain derived from
the sale of property.

138.   Admit that Section 1001(a) states that:  "The gain from the sale or
other disposition of property shall be the excess of the amount realized there from
over the adjusted basis provided in section 1011 for determining gain . . . ."

139.   Admit that Section 1001(b) states that:  "The amount realized from
the sale or other disposition of property shall be the sum of any money received
plus the fair market value of the property (other than money) received."

140.   Admit that Section 1011 states that:  "The adjusted basis for
determining the gain or loss from the sale or other disposition of property,
whenever acquired, shall be the basis (determined under section 1012...), adjusted
as provided in section 1016."

141.   Admit that Section 1012 states that:  "The basis of property shall be
the cost of such property . . . ."

142.   Admit that the cost of property purchased under contract is its fair
market value as evidenced by the contract itself, provided neither the buyer nor
seller were acting under compulsion in entering into the contract, and both were
fully aware of all of the facts regarding the contract.

143.   Admit that in the case of the sale of labor, none of the provisions of
Section 1016 of the Internal Revenue Code are applicable.

144.   Admit that when an employer pays the employee the amount agreed
upon by their contract, there is no excess amount realized over the adjusted basis,
and thus no gain under Section 1001 of the Internal Revenue Code.

145.   Admit that if one has no gain, one would have no income in a constitutional sense.

146.   Admit that if one has no income, one would have no "gross income."

147.   Admit that in the absence of "gross income," one would not be required to make a return under Section 6012 of the Internal Revenue Code.

148.   Admit that Section 6017 of the Internal Revenue Code requires individuals, other than nonresident alien individuals, to make a return if they have net earnings from self-employment of $400 or more.

149.   Admit that the term "net earnings from self-employment" is defined at Section 1402(a) of the Internal Revenue Code as follows:

> "The term 'net earnings from self-employment' means the gross income derived by an individual from any trade or business carried on by such individual . . . ."

150.   Admit that in the absence of "gross income," one would not have more than $400 of "net earnings from self-employment." (*See* 26 U.S.C. ° 1402(a).) (Ex. 085.)

151.   Admit that the "taxable income" upon which the income tax is imposed in Section 1 of the Internal Revenue Code is defined at Section 63 of the Internal Revenue Code.

152.   Admit that the term "taxable income" is defined differently for those who itemize deductions and those who don't itemize deductions.

153.   Admit that for those who do itemize deductions, the term "taxable income" means "gross income" minus the deductions allowed by Chapter 1 of the Internal Revenue Code, other than the standard deduction.

154.   Admit that for those who do not itemize deductions, the term "taxable income" means "adjusted gross income" minus the standard deduction and the deduction or personal exemptions provided in section 151 of the Internal Revenue Code.

155.   Admit that for individuals, the term "adjusted gross income" means gross income minus certain deductions.

156.   Admit that in the absence of "gross income" an individual would have no "adjusted gross income" and no "taxable income."

157.   Admit that in the absence of taxable income, no tax is imposed under Section 1 of the Internal Revenue Code.

158.   Admit that employment taxes are contained in Subtitle C of the Internal Revenue Code.

159.   Admit that the taxes imposed in Subtitle C of the Internal Revenue Code are different than the taxes imposed in Subtitle A of the Internal Revenue Code.

160.   Admit that The Federal Insurance Contributions Act (FICA) tax contained in Subtitle C at Section 3101 of the Internal Revenue Code is imposed on the individual's "income."

161.   Admit that the rate of the tax set out at Section 3101 of the Internal Revenue Code is a percentage of the individual's wages.

162.   Admit that the term "income" as used at Section 3101 of the Internal Revenue Code is the same income as used in Subtitle A of the Internal Revenue Code.

163.   Admit that if one has no income, one is not subject to the tax imposed at Section 3101 of the Internal Revenue Code.

164.   Admit that The Federal Insurance Contributions Act (FICA) tax on employers contained in Subtitle C at Section 3111 of the Internal Revenue Code is an excise tax on employers with respect to their having employees.

165.   Admit that at Section 3402 of the Internal Revenue Code, employers are directed to withhold from wages paid to employees, a tax determined in accordance with tables prescribed by the Secretary of the Treasury.

166.   Further admit that Congress does not identify the Section 3402 "tax determined" as either a direct tax, an indirect tax, and/or an "income" tax.

167.   Admit that Congress made the employer liable for the Section 3402 tax at Section 3403 of the Internal Revenue Code.

168.   Admit that at Section 3501 of the Internal Revenue Code, Congress directed the Secretary of the Treasury to collect the taxes imposed in Subtitle C and pay them into the Treasury of the United States as internal revenue collections.

169.   Admit that Congress has not anywhere imposed the tax described at Section 3402 of the Internal Revenue Code.

170.   Admit that at Section 31 of the Internal Revenue Code, the amount of the Section 3402 tax on wages is allowed as a credit against the income tax imposed in Subtitle A.

171.   Admit that if one does not have any tax imposed at Subtitle A for any reason whatsoever, the law enacted by Congress at Section 3402(n) of the Internal Revenue Code constitutes an exemption of the tax described at Section 3402(a) of the Internal Revenue Code.

172.   Admit that a typical American family works until noon of every working day just to pay its alleged tax obligations.

173.   Admit that the typical American family pays more in taxes than they spend on food, clothing, and housing combined.

174.   Admit that there are currently over 480 tax forms.

175.   Admit that the federal tax code contains over 7 million words.

176.   Admit that over 1/2 of Americans are paying some sort of tax professional to help them comply with alleged tax law requirements.

177.   Admit that each year the Internal Revenue Service sends out approximately 8 billion pages of tax forms and instructions, generating enough paper to stretch 28 times around the Earth.

178.   Admit that Americans spend approximately 5.4 billion labor hours and $200 billion dollars per year attempting to comply with alleged tax

requirements, which is more time and money than it takes to produce every car, truck, and van each year in the United States.

179.   Admit that in 1913, the average American family had to work only until January 30th before earning enough to pay all alleged tax obligations.

180.   Admit that the average American family had to work all the way through May 12th in order to pay their alleged federal, state, and local tax bills for the year 2000.  (

181.   Admit that economist Daniel J. Mitchell recently observed that: "[Medieval serfs] only had to give the lord of the manor a third of their output and they were considered slaves.  So what does that make us?"

182.   Admit that the average Wisconsin citizen had to work until May 9th this year to pay all alleged tax obligations.

183.   Admit that Americans own less of their labor than feudal serfs.

184.   Admit that the 13th Amendment to the U.S. Constitution states: "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.  Congress shall have power to enforce this article by appropriate legislation."

185.   Admit that if Congress can constitutionally tax a man's labor at the rate of 1%, then Congress is free, subject only to legislative discretion, to tax that man's labor at the rate of 100%.

186.   Admit that "peonage" is a condition of servitude compelling a man or woman to perform labor in order to pay off a debt.

186a.  Admit that the Federal Reserve Act was passed in 1913, within a few months of the ratification of the Sixteenth Amendment that allegedly authorized a tax on the incomes of most Americans.

186b.  Admit that the Federal Reserve Act allowed the U.S. government to borrow large sums of money from private banking institutions at interest, and thereby potentially create a large public debt.

186c.  Admit that U.S. Congress' inability to balance the federal budget or lack of fiscal discipline could create large volumes of public debt to the Federal Reserve.

186d.  Admit that the result of increasing public debt must be an increase in income tax revenues to pay off the debt in order to maintain solvency of the federal government.

186e.  Admit that an increase in income tax revenues would require a larger percentage of the wage (labor) income of average Americans to be extracted as income tax, because more than half of federal income tax revenues derive from personal income taxes rather than corporate income taxes.

186f.  Admit that there is an incentive for politicians to buy votes with borrowed money that will be paid off by unborn children at interest.

186g.  Admit that requiring unborn children of tomorrow paying off extravagances of today at interest amounts to taxation without representation, which was the very reason our country rebelled from Great Britain to become an independent nation.

186h.  Admit that Thomas Jefferson, one of our founding fathers and author of our Declaration of Independence, said the following

> "I sincerely believe... that banking establishments are more dangerous than standing armies, and that the principle of spending money to be paid by posterity under the name of funding is but swindling futurity on a large scale." --Thomas Jefferson to John Taylor, 1816. ME 15:23

> "Funding I consider as limited, rightfully, to a redemption of the debt within the lives of a majority of the generation contracting it; every generation coming equally, by the laws of the Creator of the world, to

the free possession of the earth He made for their subsistence, unencumbered by their predecessors, who, like them, were but tenants for life." --Thomas Jefferson to John Taylor, 1816. ME 15:18

"[The natural right to be free of the debts of a previous generation is] a salutary curb on the spirit of war and indebtment, which, since the modern theory of the perpetuation of debt, has drenched the earth with blood, and crushed its inhabitants under burdens ever accumulating." --Thomas Jefferson to John Wayles Eppes, 1813. ME 13:272

"We believe--or we act as if we believed--that although an individual father cannot alienate the labor of his son, the aggregate body of fathers may alienate the labor of all their sons, of their posterity, in the aggregate, and oblige them to pay for all the enterprises, just or unjust, profitable or ruinous, into which our vices, our passions or our personal interests may lead us. But I trust that this proposition needs only to be looked at by an American to be seen in its true point of view, and that we shall all consider ourselves unauthorized to saddle posterity with our debts, and morally bound to pay them ourselves; and consequently within what may be deemed the period of a generation, or the life of the majority." --Thomas Jefferson to John Wayles Eppes, 1813. ME 13:357

"It is incumbent on every generation to pay its own debts as it goes. A principle which if acted on would save one-half the wars of the world." --Thomas Jefferson to A. L. C. Destutt de Tracy, 1820. FE 10:175

"To preserve [the] independence [of the people,] we must not let our rulers load us with perpetual debt. We must make our election between economy and liberty, or profusion and servitude. If we run into such debts as that we must be taxed in our meat and in our drink, in our necessaries and our comforts, in our labors and our amusements, for our callings and our creeds, as the people of England are, our people, like them, must come to labor sixteen hours in the twenty-four, give the earnings of fifteen of these to the government

for their debts and daily expenses, and the sixteenth being insufficient to afford us bread, we must live, as they now do, on oatmeal and potatoes, have no time to think, no means of calling the mismanagers to account, but be glad to obtain subsistence by hiring ourselves to rivet their chains on the necks of our fellow-sufferers." --Thomas Jefferson to Samuel Kercheval, 1816. ME 15:39

187i.   Admit that with an unlimited source of credit in the Federal Reserve, and an ability to claim any percentage of the income of the Average American in income taxes, the growth of the federal government and the smothering and complete extinguishment of liberty is inevitable given the vagaries and weaknesses of the humankind who occupy public office.

187.   Admit that "peonage" is a form of involuntary servitude prohibited by the Thirteenth Amendment to the Constitution of the United States.

188.   Admit that the U.S. Congress abolished peonage in 1867.

189.   Admit that holding or returning any person to a condition of peonage is a crime under 18 U.S.C. ° 1581.

190.   Admit that involuntary servitude means a condition of servitude in which the victim is forced to work for another by use or threat of physical restraint or injury, or by the use or threat of coercion through law or legal process.

191.   Admit that if an American stops turning over the fruits of his or her labor to the federal government in the form of income tax payments, he suffers under the risk of possible criminal prosecution and incarceration.

**82 Questions: 1 2 2 - 127,  12 7a – 1 27d,  128 – 186, 1 86a – 1 86i, 187 - 191**

## JURISDICTION

**With the assistance of the following series of Questions, we will prove that Congress lacks the Authority to legislate an income tax on the people except in the District Of Columbia, the US Territories and in those geographic areas within any of the 50 states where the States have specifically authorized it, in writing.**

33.   Admit that at Section 7608(a) of the Internal Revenue Code, Congress set forth the authority of internal revenue officers with respect to enforcement of Subtitle E and other laws pertaining to liquor, tobacco, and firearms.

34.   Admit that at Section 7608(b) of the Internal Revenue Code, Congress set forth the authority of internal revenue officers with respect to enforcement of laws relating to internal revenue other than Subtitle E.

34a.   Admit that the only persons authorized to enforce Subtitle A are special agents and investigators.

35.   Admit that the term "person" as that term is used in Internal Revenue Code Section 6001 and 6011 is defined at Section 7701(a)(1).

36.   Admit that Internal Revenue Code Section 7701(a)(1) states: "The term person shall be construed to mean and include an individual, a trust, estate, partnership, association, company or corporation."

37.   Admit that trusts, estates, partnerships, associations, companies and corporations do not have arms and legs, do not get married, do not eat, drink and sleep, and are not otherwise included in what one not trained in the law would recognize as a "person."

38.   Admit that Internal Revenue Code Section 6012(a) states that: "(a) General Rule. Returns with respect to income taxes under subtitle A shall be made by the following: (1)(A) Every individual having for the taxable year gross income which equals or exceeds the exemption amount or more . . . ."

39.   Admit that Internal Revenue Code Section 1 imposes a tax on the taxable income of certain "persons" who are "individuals" and "estates and trusts."

40.   Admit that the "individual" mentioned in Internal Revenue Code Section 6012 is the same individual as mentioned in Internal Revenue Code Section 1.

41.   Admit that the "individual" mentioned by Congress in Internal Revenue Code Section 6012 and Internal Revenue Code Section 1 is not defined anywhere in the Internal Revenue Code.

42.   Admit that 26 C.F.R. 1.1-1 is the Treasury Regulation that corresponds to Internal Revenue Code Section 1.

43.   Admit that at 26 C.F.R. 1.1-1(a)(1), the individuals identified at Section 1 of the Internal Revenue Code are those individuals who are either citizens of the United States, residents of the United States, or non-resident aliens.

44.   Admit that the "residents" and "citizens" identified in 26 C.F.R. 1.1-1(a)(1) are mutually exclusive classes.

45.   Admit that as used in 26 C.F.R. Sec. 1.1-1, the term "resident" means an alien.

46.   Admit that 26 C.F.R. 1.1-1(c) states that: "Every person born or naturalized in the United States, and subject to its jurisdiction, is a citizen."

47.   Admit that a person who is born or naturalized in the United States but not subject to its jurisdiction, is not a citizen within the meaning of 26 C.F.R. 1.1-1.

48.   Admit that on April 21, 1988, in the United States District Court, Southern District of Indiana, Evansville Division, in the case of *United States v. James I. Hall*, Case No. EV 87-20-CR, IRS Revenue Officer Patricia A. Schaffner, testified under penalties of perjury that the terms "subject to its jurisdiction" as used at 26 C.F.R. 1.1-1(c) meant being subject to the laws of the country, and that meant the "legislative jurisdiction" of the United States.

49.    Admit that in the same case, Patricia A. Schaffner testified under oath the term "subject to its jurisdiction" could have no other meaning than the "legislative jurisdiction" of the United States.

50.    Admit that when Patricia A. Schaffner was asked to tell the jury what facts made Mr. Hall subject to the "legislative jurisdiction" of the United States, the prosecutor, Assistant United States Attorney Larry Mackey objected, and the court sustained the objection.

51.    Admit that the Internal Revenue Service is never required by the Federal courts to prove facts to establish whether one is subject to the jurisdiction of the United States.

52.    Admit that the United States Department of Justice and United States Attorneys, and their assistants, always object when an alleged taxpayer demands the Government prove that they are subject to the jurisdiction of the United States, and the federal courts always sustain those objections, which means that the federal courts routinely prohibit the introduction of potentially exculpatory evidence in tax crime trials.

52(a). Admit that the IRS has been directed to maintain a system of financial records on all federal judges, all IRS Criminal Investigation Division Special Agents, and all U.S. Attorneys, which records cannot be accessed by the subject(s) under the FOIA or Privacy Act.

53.    Admit that unless specifically provided for in the United States Constitution, the federal government does not have legislative jurisdiction in the states.

53a.  Admit that 40 U.S.C. §255 identifies the only method by which the federal government may acquire legislative jurisdiction over a geographic area within the outer limits of a state of the Union, which is by state cession *in writing*.

54.    Admit that on December 15, 1954, an interdepartmental committee was commissioned on the recommendation of the Attorney General of the United States, Herbert Brownell, Jr., and approved by President Eisenhower and his cabinet, named the Interdepartmental Committee for the Study of Jurisdiction Over Federal Areas Within the States, and charged with the duty of studying and

reporting where the United States had legal authority to make someone subject to its jurisdiction.

55.     Admit that in June of 1957, the "Interdepartmental Committee for the Study of Jurisdiction over Federal Areas Within the States" issued "Part II" of its report entitled "Jurisdiction Over Federal Areas Within the States."

56.     Admit that the Report makes the following statements:

a.      "The Constitution gives express recognition to but one means of Federal acquisition of legislative jurisdiction -- by State consent under Article I, section 8, clause 17… Justice McLean suggested that the Constitution provided the sole mode for transfer of jurisdiction, and that if this mode is not pursued, no transfer of jurisdiction can take place."

b.      "It scarcely needs to be said that unless there has been a transfer of jurisdiction (1) pursuant to clause 17 by a Federal acquisition of land with State consent, or (2) by cession from the State to the Federal Government, or unless the Federal Government has reserved jurisdiction upon the admission of the State, the Federal Government possesses no legislative jurisdiction over any area within a State; such jurisdiction being for exercise by the State, subject to non- interference by the State with Federal functions,"

c.      "The Federal Government cannot, by unilateral action on its part, acquire legislative jurisdiction over any area within the exterior boundaries of a State,"

d.      "On the other hand, while the Federal Government has power under various provisions of the Constitution to define, and prohibit as criminal, certain acts or omissions occurring anywhere in the United States, it has no power to punish for various other crimes, jurisdiction over which is retained by the States under our Federal-State system of government, unless such crime occurs on areas

21

as to which legislative jurisdiction has been vested in the Federal Government."

57.    Admit that the phrase "subject to their jurisdiction" as used in the Thirteenth Amendment means subject to both the jurisdiction of the several states of the union and the United States.

58.    Admit that the "subject to its jurisdiction" component of the definition of citizen set out at 26 C.F.R. 1.1-1(c) has a different meaning than the phrase "subject to their jurisdiction" as used in the Thirteenth Amendment to the Constitution of the United States.

58a.  Admit that the term "foreign" is nowhere defined in the Internal Revenue Code.

58b.  Admit that the term "foreign" means anything outside of the legislative jurisdiction of the Congress, which means anything outside of federal property ceded, in most cases, to the federal government by the states as required by 40 U.S.C. §255.

59.    Admit that a Treasury Regulation cannot create affirmative duties not otherwise imposed by Congress in the underlying statute, corresponding Internal Revenue Code section.

60.    Admit that Congress defined a "taxpayer" at Section 7701(a)(14) of the Internal Revenue Code, as any person subject to any Internal Revenue tax.

60a.  Admit that "subject to" is defined in Black's Law Dictionary, Sixth Edition, page 1425 as:

"Liable, subordinate, subservient, inferior, obedient to; governed or affected by; provided that; provided; answerable for." Homan v. Employers Reinsurance Corp., 345 Mo. 650, 136 S.W.2d 289, 302

22

60b.  Admit that based on the above definition of "subject to", use of the term "taxpayer" in describing anyone creates a presumption of liability for tax on the part of the person being referred to.

60c.  Admit that the IRS uses the term "taxpayer" to refer to *everyone*, including those not necessarily subject to or liable for Subtitle A income taxes.

60d.  Admit that in *Botta v. Scanlon*, 288 F.2d. 504, 508 (1961), a federal court said:

> *"A reasonable construction of the taxing statutes does not include vesting any tax official with absolute power of assessment against individuals not specified in the states as a person liable for the tax without an opportunity for judicial review of this status before the appellation of 'taxpayer' is bestowed upon them and their property is seized..."*

60e.  Admit that, based on the above, it is a violation of due process and a violation of delegated authority for any IRS tax official to refer to any person as a "taxpayer" who does not first identify him or herself as such *voluntarily*.

60f.  Admit that the federal courts, in the case of ***Long v. Rasmussen***, 281 F. 236 (1922) stated at 238:

> "The revenue laws are a code or system in regulation of tax assessment and collection. They relate to taxpayers, and not to nontaxpayers. The latter are without their scope. No procedure is prescribed for nontaxpayers, and no attempt is made to annul any of their rights and remedies in due course of law. With them Congress does not assume to deal, and they are neither of the subject nor of the object of the revenue laws..."

> "The distinction between persons and things within the scope of the revenue laws and those without is vital."

61.    Admit that one who is not a citizen, resident, or non-resident alien, is not an individual subject to the tax imposed by Section 1 of the Internal Revenue Code.

62.    Admit that an individual who is not subject to the tax imposed by Section 1 of the Internal Revenue Code, is not an individual required to make a return under the Requirement of Internal Revenue Code Section 6012.

62a.   Admit that the Supreme Court, in a dissenting opinion of Judge Harlan in the case of *Downes v. Bidwell*, 182 U.S. 244 (1901), stated:

> "The idea prevails with some, indeed it has found expression in arguments at the bar, that we have in this country substantially two national governments; one to be maintained under the Constitution, with all of its restrictions; the other to be maintained by Congress outside the independently of that instrument, by exercising such powers [of absolutism] as other nations of the earth are accustomed to…I take leave to say that, if the principles thus announced should ever receive the sanction of a majority of this court, a radical and mischievous change in our system of government will result.  We will, in that event, pass from the era of constitutional liberty guarded and protected by a written constitution into an era of legislative absolutism. It will be an evil day for American liberty if the theory of a government outside the supreme law of the land finds lodgment in our constitutional jurisprudence.  No higher duty rests upon this court than to exert its full authority to prevent all violation of the principles of the Constitution."

62b. Admit that the jurisdiction that Honorable Justice Harlan above was referring to where "legislative absolutism" would or could reign was in areas subject to the legislative jurisdiction of the U.S. government, which includes the District of Columbia, federal enclaves within the states, and U.S. territories and possessions.

62c.  Admit that the Internal Revenue Manual says the following, in section 4.10.7.2.9.8 (05-14-1999):

24

**Importance of Court Decisions**

1. Decisions made at various levels of the court system are considered to be interpretations of tax laws and may be used by either examiners or taxpayers to support a position.

2. Certain court cases lend more weight to a position than others. A case decided by the U.S. Supreme Court becomes the law of the land and takes precedence over decisions of lower courts. The Internal Revenue Service must follow Supreme Court decisions. For examiners, Supreme Court decisions have the same weight as the Code.

3. **Decisions made by lower courts, such as Tax Court, District Courts, or Claims Court, are binding on the Service only for the particular taxpayer and the years litigated.** Adverse decisions of lower courts do not require the Service to alter its position for other taxpayers.

62d.  Admit that the Internal Revenue Service, in its responsive letters to tax payers, routinely and chronically violates the above requirements by citing cases below the Supreme Court level, which do not apply to more than the individual taxpayer in question according to the above.

**45 Questions:33-34a,35-52a,53-53a,54-58,58a-58b,59-60,60a-60f,61-62,62a-62d**

# FIFTH AMENDMENT

## With the assistance of the following series of questions we will prove that there is no income tax exception to the 5th Amendment's guarantee of the Peoples' unalienable right not to be compelled to be a witness against themselves.

281.   Admit that 26 U.S.C. ° 6001 requires the keeping of records.

282.   Admit that 26 U.S.C. 7203 makes it a federal crime not to keep the records required under section 6001.

283.   Admit that the records required under 26 U.S.C. 6001 contain information that will appear on the tax returns pertaining to federal income taxes.

284.   Admit that the Fifth Amendment prohibits the government from compelling an American to be a witness against himself.

285.   Admit that the IRS currently uses the following: Non-Custodial Miranda warning:

"In connection with my investigation of your tax liability I would like to ask you some questions. However, first I advise you that under the fifth Amendment to the Constitution of the United States I cannot compel you to answer any questions or to submit any information. If such answers or information might tend to incriminate you in any way, I also advise you that anything which you say and any documents which you submit may be used against you in any criminal proceeding which may be undertaken. I advise you further that you may, if you wish, seek the assistance of an attorney before responding."

286.    Admit that the Privacy Act and Paperwork Reduction Act notices currently used by the IRS provides that the information provided in the preparation of a tax return can go to the Department of Justice who prosecutes criminal cases against the filers of tax returns.

287a.  Admit that the United States Attorneys' Bulletin, April 1998 edition, contained an article written by Joan Bainbridge Safford, Deputy United States Attorney, Northern District of Illinois, entitled: "Follow That Lead!  Obtaining and Using Tax Information in a Non-Tax Case," hereinafter "Follow that Lead!".

287b.  Further admit that the article states the following:

"In any criminal case where financial gain is the prominent motive, tax returns and return information can provide some of the most significant leads, corroborative evidence, and cross-examination material obtainable from any source."

287c.  Further admit that the article states the following:

"In even the most straightforward fraud case, the usefulness of tax returns should be apparent . . . the tax return information provides a statement under penalty of perjury which may either serve as circumstantial evidence of the target' misrepresentation of his economic status or as helpful cross-examination material . . . Disclosure of tax returns may also provide critical leads and impeachment material."

288.    Admit that the Disclosure, Privacy Act, and Paperwork Reduction Act Notice set out in the IRS Form 1040 Instruction Booklet states the following:

"[W]e may disclose your tax information to the Department of Justice, to enforce the tax laws, both civil and criminal, and to cities, states, the District of Columbia, U.S. Commonwealths or possessions, and certain foreign governments to carry out their tax laws."

289.   Admit that tax returns are used by the IRS to develop civil and criminal cases against the filers of the tax returns.

290.   Admit that tax returns of a filer are used as evidence against the filer in both civil and criminal income tax cases.

291.   Admit that the United States Supreme Court has held that a fifth amendment privilege exists against requiring a person to admit or deny he has documents which the government believes is related to the federal income tax.

292.   Admit that the Fifth Amendment provides an absolute defense to tax crimes.

292a.  Admit that the U.S. Court of Appeals for the 10th Circuit took the position in *U.S. v. Conklin*, (1994), WL 504211, that the filing of an income tax return (Form 1040) is not compelled and, therefore, the principle that no one may be forced to waive their 5th Amendment rights in order to comply with a law is not applicable to federal income tax returns.

293.   Admit that the Supreme Court has held that if one wants to assert the Fifth Amendment to an issue pertaining to a federal income tax return, one must make that claim on the form itself.

294.   Admit that if one claims Fifth Amendment protection on an income tax form, that act can result in criminal prosecution for failure to file income tax returns, income tax evasion, or conspiracy to defraud.

295a.  Admit that the Paperwork Reduction Act Notice (the "Notice") set out in the IRS Form 730 states that:

"You must file Form 730 and pay the tax on wagers under section 4401(a) if you:  Are in the business of accepting wagers, or Conduct a wagering pool or lottery."

295b.  Further admit that the Notice states the following:

[C]ertain documents related to wagering taxes and information obtained through them that relates to wagering taxes may not be used

against the taxpayer in any criminal proceeding.  See section 4424 for more details.

296.   Admit that in 1997, 5,335 tax audits resulted in criminal investigations of those tax filers.

297.   Admit that Judge Learned Hand stated that:

Logically, indeed, he (the taxpayer) is boxed in a paradox for he must prove the criminatory character of what it is his privilege to suppress just because it is criminatory. The only practicable solution is to be content with the door's being set a little ajar, AND WHILE AT TIMES THIS NO DOUBT PARTIALLY DESTROYS THE PRIVILEGE, ...nothing better is available.

298.   Admit that the Constitution is the Supreme Law of the Land.

299.   Admit that the American people do not have to tolerate an income tax system in which the federal government requires a citizen to give up any constitutional rights.

**22 Questions: 281- 286,287a- 287c,288-292,292a,293-294 ,295a-295 b,296-299**

# FIRST AMENDMENT

**With the following questions we will show that
personal income taxes polarize and divide an otherwise
united nation and promote class warfare
and mistrust of our government.**

458.  Admit that the second plank in the Communist Manifesto calls for a heavy, progressive (graduated) income tax not unlike what we have now with the IRS form 1040, which punishes the rich so that wealth may be redistributed to the poor.

459. Admit that the U.S. Constitution requires that all income taxes must be uniform as follows, from in Article 1, Section 8, clause 1 of the U.S. Constitution, which says:

> "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States;"

460.  Admit that to be uniform, a tax must apply equally to all persons similarly situated and all property of the same type or class being taxed must be taxed at the same percentage rate, no matter where people live, where the property is, or how much taxable income the person makes.  Otherwise, the tax discriminates against the rich.

461.  Admit that the Supreme Court stated in the case of *Pollack v. Farmer's Loan and Trust Company*, 157 U.S. 429, 158 U.S. 601 (1895) that:

> "Congress has the exclusive power of selecting the class. It has regulated that particular branch of commerce which concerns the bringing of alien passengers,' and that taxes shall be levied upon such

property as shall be prescribed by law. ***The object of this provision was to prevent unjust discriminations. It prevents property from being classified, and taxed as classed, by different rules.*** All kinds of property must be taxed uniformly or be entirely exempt. The uniformity must be coextensive with the territory to which the tax applies.

Mr. Justice Miller, in his lectures on the constitution, 1889-1890 ( pages 240, 241), said of taxes levied by congress: '***The tax must be uniform on the particular article; and it is uniform, within the meaning of the constitutional requirement, if it is made to bear the same percentage over all the United States.*** That is manifestly the meaning of this word, as used in this clause. The framers of the constitution could not have meant to say that the government, in raising its revenues, should not be allowed to discriminate between the articles which it should tax.' In discussing generally the requirement of uniformity found in state constitutions, he said: 'The difficulties in the way of this construction have, however, been very largely obviated by the meaning of the word [157 U.S. 429, 595] 'uniform,' which has been adopted, holding that the uniformity must refer to articles of the same class; that is, different articles may be taxed at different amounts, provided the rate is uniform on the same class everywhere, with all people, and at all times.'

One of the learned counsel puts it very clearly when he says that the correct meaning of the provisions requiring duties, imposts, and excises to be 'uniform throughout the United States' is that the law imposing them should 'have an equal and uniform application in every part of the Union.'

***If there were any doubt as to the intention of the states to make the grant of the right to impose indirect taxes subject to the condition that such taxes shall be in all respects uniform and impartial, that doubt, as said by counsel, should be resolved in the interest of justice, in favor of the taxpayer.'***

462.   Admit that the article being taxed in the case of Subtitle A income taxes is dollar bills, or "income" as constitutionally defined.

463.  Admit that in order to meet the uniformity requirement, every dollar bill (the article being taxed) taxed must be taxed at the *same rate* and not in a way that is based on the income of the person receiving it, because this would amount to discrimination according to the Supreme Court as listed above.

464.  Admit that because graduated income taxes violate the uniformity requirement of the Constitution, they must be voluntary, because the government cannot by legislation compel its citizens to violate the Constitution.

465.  Admit that the Supreme Court stated the following about the nature of income taxes in general, and that neither of these two cases has ever been overruled:

> "To lay with one hand the power of government on the property of the citizen, and with the other to bestow it on favored individuals.. is none the less robbery because it is.. called taxation."
> **Loan Association v. Topeka,** 20 Wall. 655 (1874)

> "A tax, in the general understanding of the term and as used in the constitution, signifies an exaction for the support of the government. The word has never thought to connote the expropriation of money from one group for the benefit of another." **U.S. v. Butler**, <u>297 U.S. 1</u> (1936)

466.  Admit that all entitlement programs, including Welfare, Social Security, FICA, etc, fall into the class of taxes identified in **U.S. v. Butler** that are "expropriations of money from one group for the benefit of another."

467.  Admit that using income taxes to redistribute income or property between social classes or persons within society makes the U.S. into a socialist country:

> **"socialism  1.** : any of various economic political theories advocating collective or governmental ownership and administration of the means of production and distribution of goods. **2. a**: a system of society or group living in which there is no private property b: a system or condition of society in which the means of production are owned and controlled [partially or wholly] by the state **3**: **a stage of society in Marxist theory transitional between capitalism and**

**communism** and distinguished by unequal distribution of goods and pay according to work done."
[Webster's Ninth New Collegiate Dictionary, 1983, Merriam-Webster, p. 1118]

468.  Admit that the Supreme Court, in *Pollock v. Farmers Loan and Trust*, 157 U.S. 429 (1895), stated about the very first income tax instituted by Congress that:

> "The present **assault upon capital** is but the beginning.  **It will be but the stepping stone to others larger and more sweeping**, until our political contest will become war of the poor against the rich; a war of growing intensity and bitterness.
>
> …
>
> The legislation, in the discrimination it makes, is class legislation.  **Whenever a distinction is made in the burdens a law imposes or in the benefits it confers on any citizens by reason of their birth, or wealth, or religion, it is class legislation, and leads inevitably to oppression and abuses, and to general unrest and disturbance in society**."

469.  Admit that the payment of social benefits to persons not associated with the government under entitlement programs such as Social Security and Welfare invites and encourages the kind of class warfare described above in *Pollock v. Farmers Loan and Trust*, 157 U.S. 429 (1895).

470.  Admit that compelled charity is not charity at all, but slavery disguised as charity.

471.  Admit that  Social Security is not insurance and are is not a contract as ruled by the Supreme Court in *Helvering v. Davis*, 301 U.S. 619 (1937) and *Flemming v. Nestor*, 363 U.S. 603 (1960).

472.  Admit that Social Security is Socialism, and that socialism *must be* voluntary *at all times* in a free country if liberty is to be preserved.

473.  Admit that  for the Social Security program to be called voluntary, a participant should be able or at least know how to quit a program at all times and that the agency should not constrain or restrict those who quit or refuse to provide information about how to quit.

474. Admit that the Social Security Administration has no documented means to quit the Social Security program on their website or in any of their publications, and that they will not tell you how to do so if you call their 800 number.

475. Admit that absent an ability to leave the Social Security program at any time, the program constructively becomes a *compulsory/involuntary* program for those joined because they are not allowed to quit.

476. Admit that the application for joining Social Security does not indicate that the choice to join in *irrevocable*.

477. Admit that most persons who allegedly joined the Social Security program did so when they were not competent adults, and joining was done by the parents and without the consent or assent of the child joining.

478. Admit that persons whose parents applied for Social Security on their behalf are not offered a choice, upon reaching adulthood, to rescind the application so that their participation is entirely voluntary.

479. Admit that the Enumeration at Birth Program of the Social Security Administration creates the impression at hospitals where babies are born that the obtaining of Social Security numbers for their children is mandatory, and that they make it inconvenient and awkward to refuse receiving a number for their child.

480. Admit that even though income tax returns require listing social security numbers for children who are dependents in order to claim them as deductions, parents may provide other proof such as a birth certificate in lieu of a social(ist) security number to claim the deduction.

481. Admit that a majority of employers will insist that their employees obtain a Social Security Number as a precondition of employment, and that this makes joining the program compulsory and not mandatory for all practical purposes.

482. Admit that using the government to plunder the assets of the rich to support the poor using the force of the law is no less extortion or theft because it is called "taxation".

25 Questions: 458 – 482

# SIXTEENTH AMENDMENT

**With the assistance of the following series of questions we will prove that the IRS, the Courts and even the NY Times cite the 16th Amendment as government's authority to impose an income tax directly on the People's labor, but that the 16th Amendment did not come close to being ratified but was fraudulently declared to have been ratified by Philander Knox.**

66.    Admit that pursuant to the United States Constitution, Congress is authorized to impose two different types of taxes: direct taxes and indirect taxes.

67.    Admit that the constitutionality of the 1894 income tax act was in question in the case of *Pollock v. Farmers' Loan & Trust Co.*, 157 U.S. 429, aff. reh., 158 U.S. 601 (1895), and that in this case, the Supreme Court found that Congress could tax real and personal property only by means of an apportioned, direct tax. Finding that the income from real and personal property was part of the property itself, the Court concluded in this case that a federal income tax could tax such income only by means of an apportioned tax. Further finding that as this particular tax was not apportioned, it was unconstitutional.

68.    Admit that for Congress to tax today real or personal property, the tax would have to be apportioned among the states.

69.    Admit that for Congress to tax income from real and personal property without the authority of the 16th Amendment, such taxes would have to be apportioned among the states.

62a.    Admit that the IRS says it is the 16th Amendment that gives it the authority to impose the income tax directly on the working people of America.

62b.    Admit that the New York Times says the 16th Amendment is the government's authority to impose the income tax directly on the working people of America.

62c.   Admit that the federal courts have said the 16th Amendment is the government's authority to impose the income tax directly on the working people of America.

62d. Admit that findings, published in "The Law That Never Was," make a compelling case that the 16th Amendment (the "income tax amendment") was not legally ratified and that Secretary of State Philander Knox was not merely in error, but committed fraud when he declared it ratified in February 1913.

63.   Admit that the U.S. Court of Appeals, in *U.S. v. Stahl* (1986), 792 F2d 1438, ruled that the claim that ratification of the 16th Amendment was a fraudulently certified was a political question for Congress to decide because the court could not reach the merits of the claim without expressing a lack of respect due the Congress and the Executive branches of the government.

63a.   Admit that in 1985, the Congressional Research Service issued a Report, at the request of Congressmen, to address the claim by Bill Benson that the 16th Amendment was a fraud.

63b.   Admit that the Ripey Report was very specific in its declaration that it was not going to address the specific factual allegations detailed in Benson's book, "The Law That Never Was."

63c.   Admit that the Ripy Report then went on to assert that the actions of a government official must be presumed to be correct and cannot be judged or overturned by the courts.

63d.   Admit that when it comes to amending the Constitution the government appears to do whatever it wants to do, making up the rules regarding the ratification process as it goes along, while ignoring the spirit, if not the letter, of Article V of the Constitution.

63e.   Admit, for instance, that the 27th Amendment was proposed by Congress on September 25, 1789 and that the states were allowed 202 years within which to have 3/4th of the states ratify it, with Maryland ratifying it on December 19, 1789 and New Jersey on 1992

64.   Admit that in 1921, in the case of *Dillon v. Gloss*, 256 U.S. 368, 374-375, the Supreme Court concluded:

We do not find anything in the article which suggests that
an amendment once proposed is to be open to ratification
for all time, or that ratification in some of the states may
be separated from that in others by many years and yet be
effective. We do find that which strongly suggests the
contrary. First, proposal and ratification are not treated as
unrelated acts, but as succeeding steps in a single
endeavor, the natural inference being that they are not to
be widely separated in time. Secondly, it is only when
there is deemed to be a necessity therefore that
amendments are to be proposed, the reasonable
implication being that when proposed they are to be
considered and disposed of presently. Thirdly, as
ratification is but the expression of the approbation of the
people and is to be effective when had in three- fourths of
the states, there is a fair implication that it must be
sufficiently contemporaneous in that number of states to
reflect the will of the people in all sections at relatively
the same period, which of course ratification scattered
through a long series of years would not do. These
considerations and the general purport and spirit of the
article lead to the conclusion expressed by Judge
Jameson 'that an alteration of the Constitution proposed
to-day has relation to the sentiment and the felt needs of
to-day, and that, if not ratified early while that sentiment
may fairly be supposed to exist, it ought to be regarded as
waived, and not again to be voted upon, unless a second
time proposed by Congress.' That this is the better
conclusion becomes even more manifest when what is
comprehended in the other view is considered; for,
according to it, four amendments proposed long ago-two
in 1789, one in 1810 and one in 1861-are still pending
and in a situation where their ratification in some of the
states many years since by representatives of generations
now largely forgotten may be effectively supplemented
in enough more states to make three-fourths by
representatives of the present or some future generation.
To that view few would be able to subscribe, and in our
opinion it is quite untenable. We conclude that the fair

inference or implication from article 5 is that the
ratification must be within some reasonable time after the
proposal.

65.   Admit that the date of September 25, 1789, when the 27th
Amendment was first proposed, is "widely separated in time" from the date of
March 6, 1978, when Wyoming ratified this amendment.

70.   Admit that in 1913, the following law, Revised Statutes  205, was in
effect:

"Sec. 205. Whenever official notice is received at the
Department of State that any amendment proposed to the
Constitution of the United States has been adopted,
according to the provisions of the Constitution, the
Secretary of State shall forthwith cause the amendment to
be published in the newspapers authorized to promulgate
the laws, with his certificate, specifying the States by
which the same may have been adopted, and that the
same has become valid, to all intents and purposes, as a
part of the Constitution of the United States."

71.   Admit that Revised Statutes Section 205 provided that "official
notice" of a State's ratification of an amendment must be received at the State
Department.

72.   Admit that on or about July 31, 1909, Senate Joint Resolution 40
proposing the ratification of the 16th Amendment was deposited with the
Department of State and the same was published at 36 Stat. 184, and that this
resolution read as follows:

SIXTY-FIRST CONGRESS OF THE UNITED STATES
OF AMERICA AT THE FIRST SESSION

Begun and held at the City of Washington on Monday,
the fifteenth day of March, one thousand nine hundred
and nine.

JOINT RESOLUTION.

Proposing an amendment to the Constitution of the
United States.

Resolved by the Senate and House of Representatives
of the United States of America in Congress assembled
(two-thirds of each House concurring therein), That the
following article is proposed as an amendment to the
Constitution of the United States, which, when ratified by
the legislatures of three-fourths of the several states, shall
be valid to all intents and purposes as a part of the
Constitution:

"Article XVI. The Congress shall have power to lay and
collect taxes on incomes, from whatever source derived,
without apportionment among the several States, and
without regard to any census or enumeration."

> J.C. CANNON,
> Speaker of the House of Representatives.

> J.S. SHERMAN,
> Vice-President of the United States, and
> President of the Senate.

73.    Admit that on July 27, 1909, the same Congress adopted Senate
Concurrent Resolution 6, which read as follows:

CONCURRENT RESOLUTION

Resolved by the Senate (the House of Representatives
concurring), That the President of the United States be
requested to transmit forthwith to the executives of the
several States of the United States copies of the article of
amendment proposed by Congress to the State
legislatures to amend the Constitution of the United
States, passed July twelfth, nineteen hundred and nine,

39

respecting the power of Congress to lay and collect taxes
on incomes, to the end that the said States may proceed
to act upon the said article of amendment; and that he
request the executive of each State that may ratify said
amendment to transmit to the Secretary of State a
certified copy of such ratification.

> Attest: Charles G. Bennett
> Secretary of the Senate
>
> A. McDowell
> Clerk of the House of Representatives

74.   Admit that not only did this resolution request that certified copies of
favorable State ratification resolutions be sent to Washington, D.C., the States were
expressly informed to do so by Secretary of State Philander Knox, who sent the
following "form" letter to the governors of the 48 States then in the Union:

> "Sir:
>
> "I have the honor to enclose a certified copy of a
> Resolution of Congress, entitled 'Joint Resolution
> Proposing an Amendment to the Constitution of the
> United States,' with the request that you cause the same
> to be submitted to the Legislature of your State for such
> action as may be had, and that a certified copy of such
> action be communicated to the Secretary of State, as
> required by Section 205, Revised Statutes of the United
> States. (See overleaf.)
>
> An acknowledgment of the receipt of this communication
> is requested.
>
> I have the honor to be, Sir,
>
> Your obedient servant,
> P.C. Knox"

74a.   Admit that in 1909, there were 48 states and that three-fourths, or 36, of them were required to give their approval in order for it to be ratified.

74b.   Admit that Philander Knox declared the 16th amendment ratified on February 25, 1913, naming the following 38 states as having approved it: Alabama, Kentucky, South Carolina, Illinois, Mississippi, Oklahoma, Maryland, Georgia, Texas, Ohio, Idaho, Oregon, Washington, California, Montana, Indiana, Nevada, North Carolina, Nebraska, Kansas, Colorado, North Dakota, Michigan, Iowa, Missouri, Maine, Tennessee, Arkansas, Wisconsin, New York, South Dakota, Arizona, Minnesota, Louisiana, Delaware, Wyoming, New Jersey and New Mexico.

75.   Admit the following facts:

a.  When California provided uncertified copies of its resolution to Secretary of State Philander Knox, Knox wrote the following to California Secretary of State Frank Jordan: "I have the honor to acknowledge the receipt of your letter of the 27th ultimo, transmitting a copy of the Joint Resolution of the California Legislature ratifying the proposed Amendment to the Constitution of the United States, and in reply thereto I have to request that you furnish a certified copy of the Resolution under the seal of the State, which is necessary in order to carry out the provisions of Section 205 of the Revised Statutes of the United States".

b.  When Wyoming Governor Joseph Carey telegraphed Philander Knox news that the Wyoming legislature had ratified the 16th Amendment on February 3, 1913, Philander Knox telegraphed in return as follows: "Replying to your telegram of 3rd you are requested to furnish a certified copy of Wyoming's ratification of Income Tax Amendment so there may be no question as to the compliance with Section 205 of Revised Statutes."

76.    Admit that on February 15, 1913, a State department attorney, J. Rueben Clarke, informed Secretary of State Philander Knox, in reference to the State of Minnesota, "the secretary of the Governor merely informed the Department that the state legislature had ratified the proposed amendment."

77.    Admit that, in the official records deposited in the Archives of the United States, there is no certified copy of the resolution of the Minnesota legislature ratifying the 16th Amendment.

78.    Admit that in the documents possessed by the Archives of the United States, there are no certified copies of the resolutions ratifying the 16th Amendment by California and Kentucky.

78a.   Admit that the Kentucky Senate voted 22 to 9 against ratification of the 16th Amendment.

79.    Admit that Mr. John Ashcroft is currently the Attorney General of the United States.

80.    Admit that when Mr. Ashcroft was Governor of Missouri, the Missouri Supreme Court rendered the following decision in a case involving Mr. Ashcroft, that case being *Ashcroft v. Blunt*, 696 S.W.2d 329 (Mo. banc 1985), where the Missouri Supreme Court held:

> The senate and the house must agree on the exact text of any bill before they may send it to the governor. There may not be the slightest variance. The exact bill passed by the houses must be presented to and signed by the governor before it may become law (laying aside as not presently material alternative procedure by which a bill may become law without the governor's signature.) The governor has no authority to sign into law a bill which varies in any respect from the bill passed by the houses.

81.   Admit that during hearings regarding the ratification of the 16th Amendment in Massachusetts, Mr. Robert Luce made the following statement to the Massachusetts Committee on Federal Relations: "Question by the committee: Are we able to change it? Mr. Luce: No, you must either accept or reject it."

82.   Admit that on February 11, 1910, Kentucky Governor Augustus Wilson wrote a letter to the Kentucky House of Representatives wherein he stated as follows:

> This resolution was adopted without jurisdiction of the joint resolution of the Congress of the United States which had not been transmitted to and was not before the General Assembly, and in this resolution the words "on incomes" were left out of the resolution of the Congress, and if transmitted in this form would be void and would subject the Commonwealth to unpleasant comment and for these reasons and because a later resolution correcting the omission is reported to have passed both Houses, this resolution is returned to the House of Representatives without my approval.

83.   Admit that no State may change the wording of an amendment proposed by Congress.

84.   Admit that on February 15, 1913, J. Reuben Clarke, an attorney employed by the Department of State, drafted a memorandum to Secretary Knox wherein the following statements were made: "The resolutions passed by twenty-two states contain errors only of capitalization or punctuation, while those of eleven states contain errors in the wording" (page 7). "Furthermore, under the provisions of the Constitution a legislature is not authorized to alter in any way the amendment proposed by Congress, the function of the legislature consisting merely in the right to approve or disapprove the proposed amendment."

85.   Admit that the Sixteenth Amendment reads as follows: "Article XVI. The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration."

86.   Admit that the Sixteenth Amendment does not read as follows:

"Article 16: The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several states, and from any census or enumeration."

87.    Admit that the Sixteenth Amendment does not read as follows: "Article XVI. Congress shall have power to lay and collect taxes on incomes from whatever source derived without apportionment among the several states, and without regard to census enumeration."

88.    Admit that the Sixteenth Amendment does not read as follows: "Article XVI. The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several states, and without regard to any census or renumeration."

89.    Admit that the Sixteenth Amendment does not read as follows: "Article XVI. The Congress shall have power to lay and collect taxes from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration."

90.    Admit that the Sixteenth Amendment does not read as follows: "The Congress shall have power to levy and collect taxes on income from whatever sources derived without apportionment among the several States, and without regard to any census or enumeration, which amendment was approved on the ---- day of July, 1909."

91.    Admit that the Sixteenth Amendment does not read as follows: "Article XVI. The Congress shall have power to lay and collect taxes on incomes from whatever source derived without apportionment among the several states, and without regard to any census of enumeration."

92.    Admit that the Sixteenth Amendment does not read as follows: "Article XVI. The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, with-out apportionment among the several states, and without regard to any census of enumeration:"

93.    Admit that the Sixteenth Amendment does not read as follows: "Article XVI. The congress shall have power to levy and collect taxes on incomes, from whatever source derived, without apportionment among the several states, and without regard to any census or enumeration, and did submit the same to the legislatures of the several states for ratification;"

94.    Admit that state officials who prepare and send "official notice" of ratification of constitutional amendments to federal officials in Washington, D.C., do not have any authority to change the wording of the ratification resolution actually adopted by the State legislature.

94a.    Admit that the following states were included on Knox's list of 38 states: Arizona, Arkansas, California, Colorado, Georgia, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, Montana, New Jersey, New Mexico, North Dakota, Tennessee, Texas, Washington, and Wyoming.

94b.    Admit that the proposed 16th (income tax) Amendment was never properly and legally approved by the Georgia State Senate.

94c.    Admit that the actions taken by the state legislatures of Arizona, Arkansas, California, Colorado, Georgia, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, Montana, New Jersey, New Mexico, North Dakota, Tennessee, Texas, Washington, and Wyoming, in acting on the proposed 16th Amendment, were violative of certain provisions of their state constitutions, which were in effect AND CONTROLLING at the time those states purportedly ratified the 16th Amendment.

94d.    Admit that the state of Tennessee violated Article II, Section 32 of the Tennessee Constitution by denying the people an opportunity to vote for their state legislators between the time the proposed 16th (income tax) Amendment to the U.S. Constitution was submitted to the Tennessee legislature and the time the legislature voted to approve the amendment.

94e.    Admit that the state legislature of Tennessee violated Article II, Section 18 of the Tennessee Constitution by failing to read (and pass), on three different days, the bill containing the proposed 16th (income tax) Amendment to the U.S. Constitution.

94f.    Admit that in voting to approve the income tax Amendment the Tennessee state legislature violated Article II, Sections 28 and 29 of the Tennessee Constitution, which prohibited the legislature from voting to impose an income tax on the people of Tennessee.

94g.   Admit that in voting to approve the income tax Amendment the Arizona state legislature violated Article IX, Section 9 of the State Constitution, which prohibited the legislature from voting to pass any bill, which imposed a tax on the people of Arizona unless the amount of the tax was fixed in the bill.

94h.   Admit that the state Senate of Arizona violated Article IV, Part 2, Section 12 of the State Constitution by failing to read, on three different days, the bill containing the proposed 16th (income tax) Amendment to the U.S. Constitution.

94i.   Admit that the presiding officer of the state Senate of Arizona violated Article IV, Part 2, Section 15 of the State Constitution by failing to sign, in open session, the bill containing the proposed 16th (income tax) Amendment to the U.S. Constitution.

94j.   Admit that in voting to approve the income tax Amendment the Arkansas state legislature violated Article XVI, Section 11 of the State Constitution, which prohibited the legislature from voting to pass any bill, which imposed a tax on the people of Arkansas, unless the bill specified the specific purpose to which the tax to be imposed under that bill would be applied.

94k.   Admit that the state Senate of Arkansas violated Article V, Section 22 of the State Constitution by failing to read, on three different days, the bill containing the proposed 16th (income tax) Amendment to the U.S. Constitution.

94l.   Admit that after the Governor vetoed the bill approving the proposed 16th (income tax) Amendment the Arkansas state legislature did not take the matter up again.

94m.   Admit that the state Senate of California violated Article 4, Section 15 of the State Constitution by failing to read, on three different days, the bill containing the proposed 16th (income tax) Amendment to the U.S. Constitution.

94n.   Admit that the state Assembly of California violated Article 4, Section 15 of the State Constitution by failing to record the Yeas and Nays on the vote on the bill containing the proposed 16th (income tax) Amendment to the U.S. Constitution.

94o.   Admit that the Senate and the House of the Colorado legislature violated Article V, Section 22 of the State Constitution by failing to read, on three different days, the bill containing the proposed 16th (income tax) Amendment to the U.S. Constitution.

94p   Admit that the state Senate of Idaho violated Article III, Section 15 of the State Constitution by failing to read, section by section, just prior to the vote, the bill containing the proposed 16th (income tax) Amendment to the U.S. Constitution.

94q.   Admit that the state legislature of Idaho violated Article VI, Section 10 of the State Constitution by failing to send to the Governor the "approved" bill containing the  proposed 16th (income tax) Amendment to the U.S. Constitution.

94r.   Admit that in voting to approve the 16th (income tax) Amendment the Illinois state Senate violated Article IV, Section 13 of the State Constitution, by failing to print the bill containing the proposed 16th (income tax) Amendment before the final vote was taken and by failing to read the bill on three different days.

94s.   Admit that in voting to approve the income tax Amendment the Kansas state legislature violated Article 11, Section 205 of the State Constitution, which prohibited the legislature from voting to pass any bill, which imposed a tax on the people of Kansas, unless the bill specified the specific purpose to which the tax to be imposed under that bill would be applied.

94t.   Admit that in voting to approve the income tax Amendment the Kansas state Senate violated Article 2, Section 128 of the State Constitution, by failing to record the vote on the bill containing the proposed 16th (income tax) Amendment to the U.S. Constitution.

94u.   Admit that in voting to approve the income tax Amendment the Kansas state House of Representatives violated Article 2, Section 133 of the State Constitution, by failing to read, section by section, the bill containing the proposed 16th (income tax) Amendment to the U.S. Constitution.

94v.   Admit that in voting to approve the income tax Amendment the Louisiana state legislature violated Articles 224 and 227of the Louisiana

47

Constitution, which prohibited the legislature from voting to impose a federal income tax on the people of Louisiana.

94w.   Admit that in voting to approve the income tax Amendment the Michigan state legislature violated Article X, Section 6 of the State Constitution, which prohibited the legislature from voting to pass any bill, which imposed a tax on the people of Michigan unless the bill specified the specific purpose to which the tax to be imposed under that bill would be applied.

94x.   Admit that in voting to approve the 16th (income tax) Amendment the Mississippi state House of Representatives violated Article IV, Section 59 of the State Constitution, by failing to read, three times on three different days, the bill containing the proposed 16th (income tax) Amendment to the U.S. Constitution.

94y.   Admit that in voting to approve the 16th (income tax) Amendment the Mississippi state Senate violated Article IV, Section 59 of the State Constitution, by failing to read the bill, in full, immediately before the vote on its final passage.

94z.   Admit that in voting to approve the income tax Amendment the Missouri state legislature violated Article X, Section 1 of the Missouri Constitution, which prohibited the legislature from voting to impose a federal income tax on the people of Missouri.

94aa.   Admit that the Missouri state legislature violated Article V, Section 14 of the Missouri Constitution, which required the legislature to submit to the governor, the bill "approving" the proposed 16th (income tax) Amendment.

94bb.   Admit that in voting to approve the 16th (income tax) Amendment the Montana state House of Representatives violated Article V, Section 22 of the State Constitution by failing to print the bill containing the proposed 16th (income tax) Amendment to the U.S. Constitution, prior to the vote on its passage.

94cc.   Admit that in voting to approve the 16th (income tax) Amendment the presiding officer of the Montana state Senate violated Article V, Section 27 of the State Constitution by failing to publicly read, in open session, the bill containing the proposed 16th (income tax) Amendment to the U.S. Constitution, just prior to signing the bill.

94dd. Admit that in voting to approve the 16th (income tax) Amendment the New Mexico state legislature (both the Senate and the House), violated Article IV, Section 20 of the State Constitution requiring enrollment and engrossment, public reading in full, signing by the presiding officers and the recording of all those acts in the journals.

94ee. Admit that in voting to approve the 16th (income tax) Amendment the New Mexico state House of Representatives violated Article IV, Section 15 of the State Constitution, by failing to read, three times on three different days, the bill containing the proposed 16th (income tax) Amendment to the U.S. Constitution.

94ff. Admit that in voting to approve the 16th (income tax) Amendment the North Dakota state legislature (both the Senate and the House), violated the Article II, Section 64 of the State Constitution, which requires re-enactment and publication of amendments .

94gg. Admit that in voting to approve the 16th (income tax) Amendment the North Dakota state legislature (both the Senate and the House), violated the Article II, Section 63 of the State Constitution, which required three readings of the bill, at length, on three separate days.

94hh. Admit that in voting to approve the 16th (income tax) Amendment the Texas House of Representatives violated Article III, Section 37 of the State Constitution by voting on the bill before the bill was reported out of a Committee.

94ii. Admit that in voting to approve the income tax Amendment the Texas state legislature violated Article III, Section 48 of the Texas Constitution, which prohibited the legislature from voting to impose a federal income tax on the people of Texas.

94jj. Admit that in voting to approve the 16th (income tax) Amendment the presiding officer of the Texas Senate violated Article III, Section 38 of the State Constitution by failing to publicly read, in open session, the bill containing the proposed 16th (income tax) Amendment to the U.S. Constitution, just prior to signing the bill.

94kk. Admit that in voting to approve the 16th (income tax) Amendment the Texas state legislature violated Article III, Section 33 of the State Constitution, which required the House to act first on all money bills.

94ll.  Admit that in voting to approve the 16th (income tax) Amendment the Washington state legislature violated Article VII, Section 2 of the State Constitution, which prohibited the legislature from imposing a tax upon the people of the state unless the tax was a uniform and equal rate of taxation.

94mm. Admit that the Washington state legislature violated Articles III, Section 12 of the Washington Constitution, which required the legislature to submit to the governor, the bill "approving" the proposed 16th (income tax) Amendment.

94nn. Admit that in voting to approve the 16th (income tax) Amendment the Wyoming state legislature violated Article XV, Section 13 of the State Constitution, which prohibited the legislature from voting to pass any bill, which imposed a tax on the people of Wyoming unless the bill specified the specific purpose to which the tax to be imposed under that bill would be applied.

94oo. Admit that in voting to approve the 16th (income tax) Amendment the Wyoming state legislature violated Article III, Section 20 of the State Constitution, by voting only on the title of the bill.

95.    Admit that the "income" tax at subtitle A of the Internal Revenue Code cannot be lawfully and constitutionally collected if the 16th Amendment is not a valid amendment to the Constitution of the United States.

96.    Admit that the income taxes imposed by Subtitle A are not apportioned, so if the 16th Amendment was not ratified, the taxes imposed by Subtitle A are not constitutional under *Pollock v. Farmers Loan & Trust*, 158 U.S. 601 (1895).

97.    Admit that in 1913, Congress passed the following income tax act:

A. Subdivision 1. That there shall be levied, assessed, collected and paid annually upon the entire net income arising or accruing from all sources in the preceding

calendar year to every citizen of the United States,
whether residing at home or abroad, and to every person
residing in the United States, though not a citizen thereof,
a tax of 1 per centum . . . and a like tax shall be assessed,
levied, collected, and paid annually upon the entire net
income from all property owned and of every business,
trade, or profession carried on in the United States by
persons residing elsewhere.

98.   Admit that Mr. Brushaber challenged this income tax as being
unconstitutional.

99.   Admit that in the *Brushaber* decision, the United States Supreme
Court held that the tax on income was an excise tax.  (

100.   Admit that in the *Brushaber* decision, the United States Supreme
Court held that the purpose of the 16th Amendment was to prevent the income tax
from being taken out of the class of excise taxes where it rightly belonged.

101.   Admit that in the *Brushaber* decision, the United States Supreme
Court discarded the notion that a direct tax could be relieved from apportionment,
because to so hold would destroy the two great classifications of taxes.

102.   Admit that the Union Pacific Railroad was a United States
Corporation located in the Utah Territory.

103.   Admit that the privilege of operating as a corporation can be taxed as
an excise.

104.   Admit that in *Eisner v. Macomber*, 252 U.S. 189, 205-206 (1920), the
United States Supreme Court held a tax on income was a direct tax, but could be
imposed without apportionment because the 16th Amendment gave Congress the
power to lay and collect taxes on incomes, from whatever source derived, without
apportionment among the several States, and without regard to any census or
enumeration.

105.   Admit that the United States Supreme Court stated in *Eisner*:

a.     The Sixteenth Amendment must be construed in connection with the taxing clauses of the original Constitution and the effect attributed to them before the Amendment was adopted. In *Pollock v. Farmers' Loan and Trust Co.*, 158 U.S. 601, under the Act of August 27, 1894, c. 349, section 27, 28 Stat. 509, 553, it was held that taxes upon rents and profits of real property were in effect direct taxes upon the property from which such income arose, imposed by reason of ownership; and that Congress could not impose such taxes without apportioning them among the States according to population, as required by Art. I, section 2, cl.3, and section 9, cl.4, of the original Constitution.

b.     Afterwards, and evidently in recognition of the limitation upon the taxing power of Congress thus determined, the Sixteenth Amendment was adopted, in words lucidly expressing the object to be accomplished: "The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration." As repeatedly held, this did not extend the taxing power to new subjects, but merely removed the necessity which otherwise might exist for an apportionment among the States of taxes laid on income. (Citing *Brushaber v. Union Pacific R.R. Co.*, 240 U.S. at 17-19) (other citations omitted).

c.     A proper regard for its genesis, as well as its very clear language, requires also that this Amendment shall not be extended by loose construction, so as to repeal or modify, except as applied to income, those provisions of the Constitution that require an apportionment according to population for direct taxes upon property, real and personal. This limitation still has an appropriate and important function, and is not to be over ridden by Congress or disregarded by the courts.

d.    In order, therefore, that the clauses cited from Article I of the Constitution may have proper force and effect, save only as modified by the Amendment, and that the latter also may have proper effect, it becomes essential to distinguish between what is and what is not "income" as the term is there used; and to apply the distinction, as cases arise, according to truth and substance, without regard to form. Congress cannot by any definition it may adopt conclude the matter, since it cannot by legislation alter the Constitution, from which alone it derives its power to legislate, and within whose limitations alone that power can be lawfully exercised.

105a.  Admit that the U.S. Supreme Court, in the Sims case, declared that wages and salaries are property.

105b.  Admit that the last time the U.S. Supreme Court addressed the question of whether the income tax was a direct tax or an indirect tax was in the *Eisner* case.

105c.  Admit that the U.S. Supreme Court, in *Eisner*, declared the income tax to be a direct tax.

105d.  Admit that the 5th Circuit Court of Appeals, in the *Parker* case, ruled that, "The sixteenth Amendment merely eliminates the requirement that the direct income tax be apportioned among the states...The sixteenth amendment was enacted for the express purpose of providing for a direct income tax."

105e.  Admit that the 7th Circuit Court of Appeals, in the Coleman case, held that an argument that the income tax was an excise tax was frivolous on its face and that the court declared, " The power thus long predates the Sixteenth Amendment, which did no more than remove the apportionment requirement."

105f.  Admit that the 8th Circuit Court of Appeals, in the Francisco case, held that, "The cases cited by Francisco clearly establish that the income tax is a direct tax...."

105g. Admit that the 10th Circuit Court of Appeals, in the Lawson case, ruled that, "The Sixteenth Amendment removed any need to apportion income taxes among the states that otherwise would have been required by Article I, Section 9, clause 4."

106.   Admit that Judges in the Courts of Appeal for the Second Circuit take the position that the income tax is an indirect tax.

107.   Admit that Judges in the Courts of Appeal for the Fifth Circuit take the position that the income tax is a direct tax.

110.   Admit that when a law is ambiguous, it is unconstitutional and cannot be enforced under the "void for vagueness doctrine" because it violates due process protections guaranteed by the Fifth and Sixth Amendments as described by the Supreme Court in the following decisions:

- Origin of the doctrine (*See Lanzetta v. New Jersey*, 306 U.S. 451) (Ex. 59)

- Development of the doctrine (*See Screws v. United States*, 325 U.S. 91, *Williams v. United States*, 341 U.S. 97, and *Jordan v. De George*, 341 U.S. 223). (Ex. 59a) (Ex. 59b) (Ex. 59c)

110a. Admit that the "void for vagueness doctrine" of the Supreme Court was described in U.S. v. DeCadena as follows:

> **"The essential purpose** of the "void for vagueness doctrine" with respect to interpretation of a criminal statute, **is to warn individuals of the criminal consequences of their conduct**. ... Criminal statutes which fail to give due notice that an act has been made criminal before it is done are unconstitutional deprivations of due process of law."

111.   Admit that in 1894, the United States Constitution recognized two classes of taxes, direct taxes and indirect taxes.

112.   Admit that in 1894, the United States Constitution, at Art. 1, Sec. 2, Clause 3 and Art. 1, Sec. 9, Clause 4, required apportionment of all direct taxes.

113.   Admit that in 1894, the United States Constitution, at Art. 1, Sec. 8, Clause 1, required all indirect taxes to be uniform.

114.   Admit that in 1894, no one doubted that an excise tax was an indirect tax as opposed to a direct tax.

115.   Admit that in 1894 Congress passed the following income tax act:

> Sec. 27. That from and after the first day of January, eighteen hundred and ninety-five, and until the first day of January, nineteen hundred, there shall be assessed, levied, collected, and paid annually upon the gains, profits, and income received in the preceding calendar year by every citizen of the United States, whether residing at home or abroad, and every person residing therein, whether said gains, profits, or income be derived from any kind of property rents, interest, dividends, or salaries, or from any profession, trade, employment, or vocation carried on in the United States or elsewhere, or from any other source whatever, a tax of two per centum on the amount so derived over and above four thousand dollars, and a like tax shall be levied, collected, and paid annually upon the gains, profits, and income from all property owned and of every business, trade, or profession carried on in the United States. And the tax herein provided for shall be assessed, by the Commissioner of Internal Revenue and collected, and paid upon the gains, profits and income for the year ending the thirty-first day of December next preceding the time for levying, collecting, and paying said Tax.

116.   Admit that Mr. Pollock, a citizen of the State of Massachusetts, challenged the 1894 income tax on the grounds that the tax imposed was a direct tax that was not apportioned.

117.   Admit that the majority of the justices of the United States Supreme Court found that the 1894 tax at Sec. 27 was a direct tax.

118.   Admit that the minority of the justices of the United States Supreme Court in the *Pollock* case believed the 1894 tax at Sec. 27 was an indirect tax.

119.   Admit that the United States Supreme Court held the 1894 income tax was unconstitutional as being in violation of the apportionment requirements for direct taxes.

120.   Admit that in 1909, President Taft called a special session of Congress for the purpose of amending the apportionment requirement of income taxes.

121.   Admit that during the congressional debate on the income tax amendment, it was stated that the income tax would not touch one hair of a working man's head.

**113 Questions:66-69,62a-62d,63,63a-63e,64-65,70-74,74a-74b,75-78,78a,79-94, 94a-94oo,95-105,105a-105g,106-107,11 0-110a,111 -121**

# FOURTH AMENDMENT

**With the assistance of the following questions
we will prove  that the IRS routinely violates 4th Amendment
due process protections of Americans by seizing assets
without lawful authority or a court order**

400. Admit that 26 U.S.C. §6331 is the alleged authority by which distraint in the collection of Subtitle A income taxes against individuals is instituted.

401.Admit that 26 U.S.C. §6331(a) identifies the only entities against whom distraint may be instituted.

402. Admit that 26 U.S.C. §6331(a) identifies that levy may be made against only the following individuals:

> (a)...Levy may be made upon the accrued salary or wages of any officer, employee, or elected official, of the United States, the District of Columbia, or any agency or instrumentality of the United States or the District of Columbia, by serving a notice of levy on the employer (as defined in section 3401(d)) of such officer, employee, or elected official.

403.  Admit that 26 CFR §31.3401(c ) identifies the definition of "employee" as: "...the term [employee] *includes* officers and employees, whether elected or appointed, of the United States, a [federal] State, Territory, Puerto Rico or any political subdivision, thereof, or the District of Columbia, or any agency or instrumentality of any one or

more of the foregoing. The term 'employee' also includes an **officer of a corporation**."

404. Admit that the IRS Form 668-A(c)(DO) is the Notice of Levy form routinely delivered to private, nongovernmental employers by the IRS to institute distraint against their employees.

405. Admit that the reverse side of IRS Form 668-A(c)(DO) shows 26 U.S.C. §6331 but has paragraph (a) removed.

406. Admit that the removal of 26 U.S.C. §6331(a) from the reverse side of IRS Form 668-A(c)(DO) could lead private employers who do not employ federal "employees" to incorrectly honor a Notice of Levy.

407. Admit that inclusion of 26 U.S.C. §6331(a) on the reverse side of the IRS Form 668-A(c)(DO) would make it less likely to cause private employers to misinterpret or misapply the law in processing an IRS Notice of Levy.

408. Admit that the Fourth Amendment requires that all seizures of property by the U.S. government must be preceded by service of a warrant upon the party whose property is to be seized.

409. Admit that the Fourth Amendment requires that the person who signs or issues the warrant authorizing seizure must be a neutral magistrate as indicated in the annotated Fourth Amendment:

> **Issuance by Neutral Magistrate** .--In numerous cases, the Court has
> referred to the necessity that warrants be issued by a "judicial officer"
> or a "magistrate."1[1] "The point of the Fourth Amendment, which
> often is not grasped by zealous officers, is not that it denies law
> enforcement the support of the usual inferences which reasonable
> men draw from evidence. Its protection consists in requiring that

those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers."2[2]  These cases do not mean that only a judge or an official who is a lawyer may issue warrants, but they do stand for two tests of the validity of the power of the issuing party to so act. "He must be neutral and detached, and he must be capable of determining whether probable cause exists for the requested arrest or search."3[3]  The first test cannot be met when the issuing party is himself engaged in law enforcement activities,4[4] but the Court has not required that an issuing party have that independence of tenure and guarantee of salary which characterizes federal judges. 5[5]  And in passing on the second test, the Court has been essentially pragmatic in assessing whether the issuing party possesses the capacity to determine probable cause. 6[6]

410. Admit that the IRS routinely seizes property from citizens without first litigating to obtain a warrant from a neutral magistrate.

411.  Admit that the Supreme Court said that persons are entitled to a due process hearing prior to the seizing of property as follows:

"The right to a prior hearing has long been recognized by this Court [Supreme Court] under the Fourteenth and Fifth Amendments…[T]he court has traditionally insisted that, whatever its form, opportunity for that hearing must be provided before the deprivation at issue takes place."

--------

***Bell v. Burson***, 402 U.S. 535, 542, Wisconsin v. Constantineau, 400 U.S. 433, Goldberg v. Kelly, 397 U.S. 254, Armstrong v. Manzo, 380 U.S. 551, United States v. Illinois Central R. Co.

412.  Admit that the due process hearing prior to seizure <u>must</u> occur at the point where the seizure of property can be prevented as follows:

"If the right to notice and a hearing is to serve its full purpose, it is clear that it must be granted at a time when the deprivation can still be prevented.  At a later hearing, an individual's possessions can be returned to him if they were unfairly or mistakenly taken in the first place.  Damages may even be awarded him for wrongful deprivation.  But no later hearing and no damage award can undo the fact that the arbitrary taking that was subject to the right of due process has already occurred.  This Court [the Supreme Court] has not embraced the general proposition that a wrong may be done if it can be undone." **Stanley v. Illinois**, 405 U.S. 645, 647, 31 L.Ed.2d 551, 556,.Ct. 1208 (1972).

413.  Admit that 26 U.S.C. §7805(a) authorizes and empowers the Secretary of the Treasury as follows:

Sec. 7805. - Rules and regulations

(a) Authorization

Except where such authority is expressly given by this title to any person other than an officer or employee of the Treasury Department, **the Secretary shall prescribe all needful rules and regulations for the enforcement of this title,** including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue.

414.  Admit that there are no implementing regulations applicable to Part 1 of Title 26 of the Code of Federal Regulations which authorize assessment of the tax imposed under 26 U.S.C. §1 or 26 U.S.C. §871 by other than the taxpayer filling out the form.

415.  Admit that there are no implementing regulations applicable to Part 1 of Title 26 of the Code of Federal Regulations which require record keeping for the tax imposed under 26 U.S.C. §1 or 26 U.S.C. §871 by other than the taxpayer filling out the form.

416.  Admit that there are no implementing regulations applicable to Part 1 of Title 26 of the Code of Federal Regulations which authorize IRS collection of the tax imposed under 26 U.S.C. §1 or 26 U.S.C. §871.

417.  Admit that there are no implementing regulations applicable to Part 1 of Title 26 of the Code of Federal Regulations which authorize imposition by the government of penalties or interest for nonpayment of the tax imposed under 26 U.S.C. §1 or 26 U.S.C. §871.

**19 Questions: 400 - 417**

# IRS FRAUD: TIME-BARRED ASSESSMENTS

**With the following series of questions and evidence, we will prove willful and intentional manual manipulation of taxpayers' Individual Master Files for the purpose of creating time-barred assessments, creating and providing fraudulent certificates of official records to the court to support illegal assessments, manipulating master files to short pay taxpayers legal interest owed by the government, collecting social security from taxpayers via levy in direct violation of the law, willful and intentional creation of fraudulent penalty and interest against taxpayers, and willful and intentional violation of taxpayers rights to due process.**

231a. Admit the IRS is placing levies on taxpayers federal social security benefits in direct violation of the law.

231b. Admit the IRS is exceeding the 15% lawful restriction on collection of continuing levies.

231c. Admit that the IRS is making illegal time barred assessments and concealing those assessments by placing fraudulent information on taxpayer master files.

231d. Admit that the IRS is submitting fraudulent CERTIFICATES OF OFFICIAL RECORDS to the courts to substantiate lawful assessments.

231e. Admit that the IRS illegally transfers taxpayer payments from their master file to an account called "excess collections" for the purpose of creating fraudulent penalty and interest charges against the taxpayer.

231f. Admit that IRS collection division agents put accounting hold codes on taxpayers' accounting modules which forces all entry of data to be inputted manually by the agents and prevents the computer from performing the taxpayers' accounting according to its programming.

231g. Admit the IRS is short-paying taxpayers' lawful interest owed to them by placing wrongful dates and codes on taxpayers' master files

**7 Questions:  231a – 231g**

# IRS VIOLATES CITIZENS' DUE PROCESS RIGHTS

## With The Next Line Of Inquiry We Will Prove That The IRS Routinely Violates The Due Process Rights Of The People In Its Day-To-Day Administrative Procedures.

256a. Admit that after IRS has audited a taxpayer, and there is disagreement, the Code of Federal Regulations requires IRS to take certain procedural steps to ensure the TAXPAYER administrative level action for hearings on those disagreements, including an examination of the audit with the agent, followed by a meeting with the IRS' agent's supervisor, followed by a 30 day letter which sets out the IRS's disputed items with the TAXPAYER and an administrative appeal of the IRS' decision on the audit.

256b. Admit that that the purpose of these administrative steps is to afford the TAXPAYER an opportunity to have his disputed audit resolved at the administrative level? In other words, that these are pre-court or pre-litigation steps, which are designed to help the People avoid the expensive procedure known as Tax Court?

256c. Admit that if the dispute is not resolved at the administrative level, the taxpayer is forced into Tax Court.

256d. Admit that IRS Publication 1, IRS Publication 5 and IRS Publication 556, are all given to the taxpayer during the audit through appeals procedure and that these publications state that these administrative, procedural (due process) steps are available to the TAXPAYER.

256f. Admit that Tax Court is an extremely expensive remedy for the individual TAXPAYER.

256g. Admit that the IRS is the only party that benefits as taxpayers are forced into Tax Court.

256h. Admit that the Tax Court, in *Minahan v Commissioner 88 T.C. 492*, found that the taxpayer's right to attorney's fees on favorable outcome is jeopardized if the administrative procedures are not exhausted.

256i. Admit that the *Reform and Restructuring Act of 1998* requires the TAXPAYER to go through these administrative, procedural (due process) steps in order to prove his "cooperativeness" with IRS, and to shift the burden of proof to the IRS during the administrative hearing and at trial. (*See* Reform and Restructuring Act of 1998, Section 3001).

256j. Admit that the IRS routinely ignores the Peoples' demands for their procedural, due process, statutory rights, ignoring IRS publications 1, 5, and 556, the regulations they are supposed to use in making their determination and the underlying statutes.

256k. Admit that there is no penalty for the IRS agents if they violate the income tax statutes by denying the People their due process rights, but the statutes contain a multitude of penalties for the People if they violate the income tax statutes, and those penalties are almost always imposed.

256l. Admit that the IRS will often deny a person his administrative, statutory, due process rights because the statute of limitation (26 *I.R.C. 6501 et. seq.*) is running out for them to get the statutory Notice of Deficiency (*26 I.R.C. 6212*) out and they are in fear of losing the whole year of taxation from that person.

256m. Admit that the IRS races to issue a STATUTORY NOTICE OF DEFICIENCY, *26 I. R. C. 6212*, rather than give the People their due process rights to administrative level resolution under *C.F.R. 601.605, 601.606*, because the IRS has greater resources and power in TAX COURT.

256n. Admit that a Notice of Deficiency is, in most cases, completely erroneous, and always greatly in favor of the IRS.

256o. Admit that many people default on their Notice of Deficiency because they don't have the money to get to Tax Court.

256p. Admit that IRS often uses erroneous figures for Income when they send out a Notice of Deficiency.

256q. Admit that there are other ways that the IRS uses figures that it knows are false on its Notice of Deficiencies under *26 I.R.C. 6212*.

256r. Admit that the result of this the fact that the TAXPAYER is often sent an entirely false Notice of Deficiency.

256s.  Admit that *26 I.R.C. 6211* is used to determine how a deficiency is made and it does not allow for "o" deductions when the TAXPAYER has claimed deductions.

256t.  Admit that the Tax Court has, however, ruled that the use of "o" line deduction in IRS issued Notices of Deficiency is permissible, even if the taxpayer has claimed deductions.

256u. Admit that the law (*26 I.R.C. 6211* Definition of Deficiency) does not permit the "bank deposit analysis" method of determining gross income of a person.

256v. Admit that the IRS routinely issues Notices of Deficiency that are based on  assessments that the IRS makes without following its own procedures and manuals.

256w. Admit that the issuance of a Notice of Deficiency or "90 day Notice" letter is the triggering event and a person so receiving such a letter must file his case in Tax Court within 90 days or forever be held to the often totally false liability assessed in the grossly false Notice of Deficiency.

256x. Admit that this is why the administrative, statutory due process steps are so important.

256y. Admit that the federal district court has refused to reach the merits of a claim that Tax Court lacks subject matter jurisdiction in those cases where the IRS has issued Notices of Deficiency after denying the taxpayers their administrative, statutory due process rights.


256z. Admit that the IRS Handbook for Examination of Returns reads in part, "Examiners are responsible for determining the correct tax liability as prescribed by the Internal Revenue Code. It is imperative that examiners can identify the applicable law, correctly interpret its meaning in light of congressional intent, and, in a fair and impartial manner, correctly apply the law based on the facts and circumstances of the case.

256aa. Admit that the IRS Handbook for Examination of Returns also reads in part, " Conclusions reached by examiners must reflect correct application of the law, regulations, court cases, revenue rulings, etc. Examiners must correctly determine the meaning of statutory provisions and not adopt strained interpretation."

256bb. Admit that when a taxpayer requests what regulations and statutes the examiner used in making his determination of tax liability, the IRS refuses to cite the law.

256cc. Admit that without an assessment there can be no liability.

256dd. Admit that the IRS disclosure officers are making the assessments.

256ee. Admit that that there is no law in which a disclosure officer is authorized to make an assessment.

256ff. Admit that an assessment made by a disclosure officer is invalid as a matter of law.

256gg. Admit that that there are over 100 regulations that apply to Form 1040 cross referenced by OMB #1545-0074, and that the IRS refuses to identify which ones they use in making determinations that a citizen is liable to file a Form 1040 and is liable to pay the tax.

256hh. Admit that a lien arises at the time an assessment is made.

256ii. Admit that the evidence underlying the entries on the Certificate of Assessments and Payments is relevant to the issue of whether an assessment was made.

256jj. Admit that without an assessment there is no liability.

Note: On appeal the government did not provide underlying evidence in support of its tax assessments and the case was remanded back to the district court for the government to prove its tax assessments.

256kk. Admit that the TAXPAYER is helpless as he tries to exercise his statutory (due process) rights to these lower level administrative remedies to

resolve his audit difference without going to tax court.

257.   Admit that the tax imposed upon individuals required to make a return under Section 6012(a) of the Internal Revenue Code is imposed upon the individual's "taxable income."

258.   Admit that the Section 6020(b) requirement for the Secretary to make the required Section 6012(a) return is to require the Secretary to compute the taxpayers taxable income so the correct amount of tax owed can be calculated.

259.   Admit that when an individual required to make a return under Section 6012(a) of the Internal Revenue Code fails to make the required return, and the Internal Revenue Service issues a notice of deficiency, the amount of tax claimed as due by the Secretary is not based upon the taxable income, but is computed without regard to the requirements of Sections 62 and 63 of the Internal Revenue Code from which adjusted gross income and taxable income are computed from gross income.

260.   Admit that the IRS attempts to obtain assessments of more tax than would otherwise be required by law as an unauthorized additional penalty on those who are required to, but do not, make federal income tax returns.

261.   Admit that the word "shall" as contained in Section 6001 of the Internal Revenue Code imposes a mandatory duty on those to whom the statute applies to keep records, render statements, make returns and to comply with rules and regulations promulgated by the Secretary of the Treasury.

262.   Admit that the word "shall" as contained in Section 6011 of the Internal Revenue Code imposes a mandatory duty on those to whom the statute applies to make a return or statement according to the forms and regulations prescribed by the Secretary of the Treasury.

263.   Admit that the word "shall" as contained in Section 6012 of the Internal Revenue Code imposes a mandatory duty on those to whom the statute applies to make returns.

264.   Admit that the word "shall" as contained in Section 6020(b) of the Internal Revenue Code imposes a mandatory duty on those to whom the statute applies to make returns.

265.   Admit that Section 6020(b) of the Internal Revenue Code states:

If any person fails to make any return required by an internal revenue law or regulation made there under at the time prescribed therefore, or makes, willfully or otherwise, a false or fraudulent return, the Secretary shall make such return from his own knowledge and from such information as he can obtain through testimony or otherwise.

266.   Admit that nowhere in the Internal Revenue Code has Congress indicated that the word "shall" as used in Section 6020(b) of the Internal Revenue Code has a different meaning than as used in Sections 6001, 60011 and/or 6012 of the Internal Revenue Code.

267.   Admit that in the absence of a Congressionally declared distinction for a word used in the same Code (here the Internal Revenue Code), in the same subtitle (here Subtitle F), in the same Chapter (here Chapter 61) and in the same Subchapter (here subchapter A) to be given a different meaning, the same word is to be given the same meaning.

268.   Admit that if an individual required to make a return under Section 6012(a) of the Internal Revenue Code fails to make the required return, the Secretary of the Treasury does not make the return mandated by Section 6020(b) of the Internal Revenue Code.

269.   Admit that the IRS computer system, the IDRS (Integrated Data Retrieval Systems) was programmed to require a tax return to be filed in order to create a tax module for each taxable year.

270.   Admit that if an individual required to make and file a return under Section 6012(a) fails to file such a return, that the Secretary creates a "dummy return" showing zero tax due and owing.

271.   Admit that this "dummy return" sets forth no financial data from which the gross income, adjusted gross income or taxable income can be computed.

272.   Admit that this "dummy return" is not signed.

273.    Admit that a "dummy return" is physically created on the IRS Form 1040.

274.    Admit that Congress has not authorized the Internal Revenue Code or Treasury Regulations that authorizes the creation of "dummy returns".

275.    Admit that if an individual required to make a return under Section 6012(a) files a return that does not contain the financial information necessary to allow the IRS to compute gross income, adjusted gross income and/or taxable income, the IRS calls such a return a "zero return."

276.    Admit that if an individual required to make a return under Section 6012(a) files a return that does not contain the financial information necessary to allow the IRS to compute gross income, adjusted gross income and/or taxable income, the IRS takes the position that no return has been filed.

277.    Admit that if an individual required to make a return under Section 6012(a) files a return that does not contain the financial information necessary to allow the IRS to compute gross income, adjusted gross income and/or taxable income, the IRS takes the position that the return is "frivolous" and imposes a $500 penalty.

278.    Admit that if an individual required to make a return under Section 6012(a) files a return that does not contain a signature made under penalty of perjury, the IRS takes the position that no return has been filed.  (*See* 26 U.S.C. 6065).

279.    Admit that if an individual required to make a return under Section 6012(a) files a return that does not contain a signature under penalties of perjury, the IRS takes the position that the return is "frivolous" and imposes a $500 penalty.

280.    Admit that an IMF record bearing the code "SFR 150" indicates that a fully paid IRS Form 1040a was filed. (*See* LEM III 3(27)(68)0-34)  (Ex. 178.)

**60 Questions: 256a-256d, 256f- 256kk, 257-280**

# 26 USC 6020(b): SUBSTITUTE RETURNS

**With the assistance of the following series of questions
we intend to prove that there is no legal way for the IRS to prepare a tax
return for a person if that person does not file a tax return, but that does not
stop the IRS – they prepare "dummy" returns illegally.**

The next 16 questions relate , <u>Lesson 23 Section IRC 6020(b),</u> used by the IRS to
train future Revenue Officers during their Phase One training:to will arise from an
inspection of this lesson.

301.  Admit that on page 23-1, under <u>REFERENCES</u>, "Circular E" is listed
and that besides the Circular E, there are no other reference materials listed?

302.  Admit that "Circular E", more fully known as <u>Circular E, Employer's
Tax Guide,</u> is also designated by IRS as Publication 15, and that "Circular E" deals
essentially with employer withholding requirements and Form 941, Employer's
Quarterly Federal Tax Return?

303.  Admit that in Lesson 23 page 23-1, under <u>CONTENTS</u>, three types of
tax returns are listed: Employment Tax Returns, The Partnership Return, and
Excise Tax Returns and that Income Tax Returns are <u>not</u> included?

304.  Admit that in Lesson 23 page 23-1, under <u>INTRODUCTION,</u> the
purpose of this Lesson 23 is to instruct the revenue officer trainee about how to
deal with situations involving the occasional taxpayer who refuses to voluntarily
file returns, using an important administrative tool referred to as 6020(b)
procedure?

305.  Admit that in Lesson 23, <u>Figure 23-1</u> on page 23-2 is a reprint of
Internal Revenue Code Section 6020(b) and the Regulation at Section 301.6020-1?

306.  Admit that in Lesson 23, Figure 23-2, on page 23-3, contains a reprint
of Delegation Order 182, and that the Order lists revenue agents and revenue
officers as having delegated authority to execute returns under the authority of
6020(b)?

307. Admit that the Internal Revenue Manual restricts the broad delegation of Delegation Order No.182 to employment, excise, and partnership taxes?

308. Admit that the Secretary has recognized that the delegation authority of D.O. No. 182 is restricted to employment, excise, and partnership taxes <u>because of constitutional issues</u>?

309. Admit that the Internal Revenue Manual lists the following tax returns **Form 940**, Employer's Annual Federal Unemployment Tax Return; **Form 941**, Employer's Quarterly Federal Tax Return; **Form 942**, Employer's Quarterly Tax Return for Household Employees; **Form 943**, Employer's Annual Tax Return for Agricultural Employees; **Form 720**, Quarterly Federal Excise Tax Return; **Form 2290**, Federal Use Tax Return on Highway Motor Vehicles; **Form CT-1**, Employer's Annual Railroad Retirement Tax Return; **Form 1065**, U.S. Partnership Return of Income - as being appropriate for action under 6020(b)?

310. Admit that Form 1040, U.S. Individual Income Tax Return is NOT included in IRM 5.18.2.3 as a return appropriate for action under 6020(b)?

311. Admit that when recommending assessments under 6020(b) the revenue officer will <u>prepare</u> all the necessary <u>returns</u>?

312. Admit that the balance of <u>Lesson 23 IRC SECTION 6020(B)</u> for Revenue Officer Phase One training explains the 6020(b) procedures for computing the tax for Employment, Excise, and Partnership returns?

313. Admit that <u>Lesson 23 IRC SECTION 6020(B)</u> does <u>not</u> contain any references to preparing <u>income</u> tax returns <u>under 6020(b)</u>?

314. Admit that <u>Lesson 23 IRC SECTION 6020(B)</u> makes the statement to the revenue officer trainee, "You have already studied audit <u>referrals</u> <u>as a means to enforce</u> compliance on <u>income</u> tax returns?"

315. Admit that the trainee is told that by the end of the lesson he will be able to identify situations when action under IRC section 6020(b) is appropriate?

316. Admit that if the revenue officer is expected to identify situations when action under IRC 6020(b) is appropriate the revenue officer would also be expected to identify situations when action under IRC 6020(b) would <u>not</u> be

appropriate, and that <u>Lesson 23 IRC SECTION 6020(B)</u> made it clear that it is <u>not</u> appropriate to use 6020(b) for income tax, Form 1040 non-filers?

317.  Admit that there are no training instructions within Lesson 23 that pertain to using 6020(b) to prepare and assess Form 1040, U.S. Individual Income Tax Return?

318.  Admit that Lesson 23 points to Lesson 25 <u>REFERRALS</u> for instructions on dealing with <u>income tax</u> non-filers?

319.  The language of IRC 6020(b)(1) is very broad, "…if any person fails to make any return…" Does the IRS purport that there are ways (plural) to resolve cases for nonfilers with different situations, different types of taxes and different types of tax returns?

320.  Does IRS make a distinction in the procedures for dealing with nonfilers of income tax returns as opposed to employment, partnership and excise tax returns?

321.  Is it true that IRS uses "6020(b) procedures" to enforce compliance of nonfilers of employment, excise, and partnership returns, and uses "Referral to Exam" procedures to enforce compliance of income tax nonfilers?

322.  Do you agree that the stated focus of <u>Lesson 25 REFERRALS</u> is *the referral process*?

323.  Do you agree that an objective of Lesson 25 is for the trainee to be able to select which cases should be referred to the Examination Division?

324.  Do you recall that <u>Lesson 23 IRC SECTION 6020(B)</u> made it clear that the revenue officer is <u>not</u> to use 6020(b) for enforcing compliance of income tax nonfilers, but instead is to use the referral process in?

325.  In Lesson 25, the reference materials to be used for the lesson are listed under <u>REFERENCES</u>, and the lone item listed is IRM 52(10) 0.  Do you agree that there is no reference to any statute or any internal revenue code section?

326.  In Lesson 25, page 25-3, under <u>OBJECTIVES</u>, would you agree that the trainee is told that after completing this lesson he will be able to select those cases which should be referred to the Examination Division?

327.  Lesson 25 pages 25-4 through 25-9 contain instructions, with examples, showing the trainee how to complete referral forms.  This section of the lesson on the subject of making referrals to Exam <u>for income tax non-filers</u> concluded with the statement, "Remember: Refusal to file cases involving Forms 940, 941, 942, 943, 720, 1065, 2290, or CT-1 will <u>not</u> be referred to Exam.  These returns should be prepared under authority of IRC Section 6020(b)."  Clearly, IRC section 6020(b) is to be utilized to enforce compliance of <u>specified business master file returns</u>.  In this lesson, is there mention anywhere of the statute that authorizes IRS preparation of Form 1040 U.S. Individual Income Tax Returns?

329.  IRC 6020(b)(1) is written in very broad language and if taken literally it seems to give authorization to IRS to make <u>any return</u> for any person who fails to make one.  However, we have seen how the statute is, in fact restricted in its application.  Revenue officers, and specified other IRS employees <u>do</u> have delegated authority to make returns under 6020(b).  But, we have seen that the delegated authority limits the types of returns that can be prepared under 6020(b).  We have seen that the exclusion includes income tax returns, corporate or individual.  Since 6020(b) does not permit preparation of income tax returns, and, since the SFR program is merely a program, with no basis in law, what is the authority for IRS to make an income tax return when a citizen fails to make his own?

330.  It is well settled in law that government employees need proper delegated authority to operate in their capacities.  Do IRS employees have delegated authority to make "Substitute for Returns"?

<u>31 Questions: 301-327, 329-330</u>

# THE COURTS ARE CLOSED

**With the following series of questions we will prove that the courts are biased, arbitrary and capricious and discriminate against those that question the validity of the federal tax laws**

232.   Admit that 26 U.S.C. 7203 purportedly imposes a penalty for the crime of wilful failure to file a tax return.

233.   Admit that Congress enacted 26 U.S.C. 7203 in August, 1954.

234.   Admit that the United States Supreme Court in *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329 (1998) stated:  "[w]e assume that Congress is aware of existing law when it passes legislation."

235.   Admit that Congress enacted 44 U.S.C. 3512 in 1980.

236.   Admit that 44 U.S.C. 3512 states that:

> (a) Notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information that is subject to this subchapter if--
>
> (1) the collection of information does not display a valid control number
> assigned by the Director in accordance with this subchapter;  or
>
> (2) the agency fails to inform the person who is to respond to the collection of information that such person is not required to respond to the collection of information unless it displays a valid control number.
>
> (b) The protection provided by this section may be raised in the form of a complete defense, bar, or otherwise at any time during the agency administrative process or judicial action applicable thereto.

237.   Admit that United States Supreme Court Chief Judge Taney in 1863 protested the constitutionality of the income tax as applied to him.

238.   Admit that United States District Court Judge Walter Evans, in 1919 protested the constitutionality of the income tax as applied to him.

239.   Admit that United States Circuit Court Judge Joseph W. Woodrough in 1936 protested the constitutionality of the income tax as applied to him.

240.   Admit that United States District Court Judge Terry J. Hatter and other federal court judges in the 1980s protested the constitutionality of taxes as applied to them.

241.   Admit that even in criminal cases where a loss of freedom can be the result, American citizens who are not judges are precluded by the federal judiciary, and with the express approval and consent of the Department of Justice and U.S. Attorney, from arguing the constitutionality of the income tax as applied to them.

242.   Admit that the Executive and Judicial branches of the federal government label Americans who challenge the legality of the federal income tax as "tax protesters."

243.   Admit that United States Supreme Court Chief Judge Taney submitted his protest in a letter to the Secretary of the Treasury.

244.   Admit that letters of protest written to the Secretary of the Treasury by American Citizens are used by the Executive branch of government, and accepted by the Judicial branch of government, as proof of income tax evasion and conspiracy against those who write the letters.

255.   Admit that if an individual required to make a return under Section 6012(a) of the Internal Revenue Code fails to make the required return, the statutory procedure authorized by Congress for the determination of the amount of tax due is the "deficiency" procedure set forth at subchapter B of Chapter 63 of the Internal Revenue Code, commencing at Section 6211.

**14 Questions: 232-244, 255**

## PAPERWORK REDUCTION ACT and
## ADMINISTRATIVE PROCEDURES ACT REGULATIONS

### With the assistance of the following series of questions
### we intend to prove that ...

192.   Admit that the Paperwork Reduction Act, 44 U.S.C. 3501, et seq., mandates that forms and regulations of federal agencies that require the provision of information must bear and display OMB control numbers.

193.   Admit that 1 C.F.R. 21.35 requires that OMB control numbers shall be placed parenthetically at the end of a regulation or displayed in a table or codified section.

194.   Admit that the following tax regulations contain OMB control numbers at the end of these regulations:

| | |
|---|---|
| 26 C.F.R. 1.860-2 | (Exhibit 115) |
| 26 C.F.R. 1.860-4 | (Exhibit 116) |
| 26 C.F.R. 1.897-1 | (Exhibit 117) |
| 26 C.F.R. 1.901-2 | (Exhibit 118) |
| 26 C.F.R. 1.1445-7 | (Exhibit 119) |
| 26 C.F.R. 1.6046-1 | (Exhibit 122) |
| 26 C.F.R. 1.6151-1 | (Exhibit 124) |
| 26 C.F.R. 1.6152-1 | (Exhibit 125) |
| 26 C.F.R. 1.9200-2 | (Exhibit 126) |
| 26 C.F.R. 31.3401(a)(8)(A)-1 | (Exhibit 127) |
| 26 C.F.R. 31.3501(a)-1T | (Exhibit 128) |
| 26 C.F.R. 301.6324A-1 | (Exhibit 129) |
| 26 C.F.R. 301.7477-1 | (Exhibit 130) |

195.   Admit that 26 U.S.C. 6012 does not specify where tax returns are to be filed.

196.   Admit that 26 U.S.C. 6091 governs the matter of where tax returns are to be filed.

197.   Admit that by the plain language of Section 6091, regulations must be promulgated to implement this statute.

198.   Admit that in 5 U.S.C. ° 551, a "rule" is defined as:

"(4) 'rule' means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency . . . ."

199.   Admit that 5 U.S.C. 552 describes in particular detail various items which must be published by federal agencies in the Federal Register, as follows:

"(1)  Each agency shall separately state and currently publish in the Federal Register for the guidance of the public--

(A) descriptions of its central and field organization and the established places at which, the employees (and in the case of a uniformed service, the members) from whom, and the methods whereby, the public may obtain information, make submittals or requests, or obtain decisions;

(B) statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal and informal procedures available;

(C) rules of procedure, descriptions of forms available or the places at which forms may be obtained, and instructions as to the scope and content of all papers, reports, or examinations;

(D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency; and

(E) each amendment, revision or repeal of the foregoing."

200.   Admit that the Department of the Treasury as well as the IRS acknowledge the publication requirements of the Administrative Procedure Act in 31 C.F.R. 1.3 and 26 C.F.R. 601.702.

201.   Admit that the Commissioner of Internal Revenue promulgated the Treasury Regulation set out at 26 C.F.R. 602.101 to collect and display the control numbers assigned to collections of information in Internal Revenue Service regulations by the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1980.

202.   Admit that the Internal Revenue Service intended that 26 C.F.R. 602.101 comply with the requirements of OMB regulations implementing the Paperwork Reduction Act of 1980, for the display of control numbers assigned by OMB to collections of information in Internal Revenue Service regulations.

203.   Admit that 26 C.F.R. 602.101(c) displays a table (the "Table") which on the left side lists the CFR part or section where the information to be collected by the Internal Revenue Service is identified and described, and on the right side, lists the OMB control number assigned to the OMB-approved form to be used to collect the information so identified and described.

204.   Admit that the Table displayed at 26 C.F.R. 602.101 in the 1994 version of the Code of Federal Regulations lists 1.1-1 as a CFR part or section that identifies and describes information to be collected by the Internal Revenue Service.

205.   Admit that 26 C.F.R. 1.1-1 relates to the income tax imposed on individuals by 26 U.S.C. ° 1.

206.   Admit that the OMB control number assigned to the form to be used to collect the information identified and described at 26 C.F.R. 1.1-1 is 1545-0067.

207.   Admit that the OMB control number 1545-0067 is assigned to the IRS Form 2555.

208.   Admit that the IRS Form 2555 is titled "Foreign Earned Income".

209.   Admit that the IRS Form 2555 is used to collect information regarding foreign earned income.

210.   Admit that the OMB control number assigned to the IRS Form 1040 Individual Income Tax Return is 1545-0074.

211.   Admit that the Table set out at 26 C.F.R. 602.101 has never displayed the OMB control number 1545-0074 as being assigned to the collection of individual income tax information identified and described by 26 C.F.R. 1.1-1.

212.   Admit that the OMB has not approved the IRS Form 1040 U.S. Individual Income Tax Return as the proper form on which to make the return of individual income tax information identified and described at 26 C.F.R. ° 1.1-1.

213.   Admit that the Table displayed at 26 C.F.R. 602.101 in the 1995 version of the Code of Federal Regulations does not list 1.1-1 as a CFR part or section that identifies and describes information to be collected by the Internal Revenue Service.

214.   Further admit that the Internal Revenue Service caused the entry for 1.1-1 to be deleted from 26 C.F.R. 602.101, by publishing the deletion at 59 FR 27235, on May 26, 1994. *See* 26 C.F.R. 602.101; 59 FR 27235.) (Ex. 006, 140.)

215. Further admit that the published deletion was accomplished under the supervision of Internal Revenue Service employee Cynthia E. Grigsby, Chief, Regulations Unit, Assistant Chief Counsel (Corporate).

**23 Questions: 192-215**

## INDIVIDUAL  MASTER FILES (IMFS)

**With the assistance of the following series of questions
we intend to prove that …**

216.   Admit that the Internal Revenue Service tracks every working American through a computer-based records system.

217.   Admit that Treasury System of Records 24.030 is titled as follows: "Individual Master File (IMF); Returns and Information Processing.  D:D:R-- Treasury/IRS".

218.   Admit that the Individual Master File relates to:  "Taxpayers who file federal individual income tax returns (i.e., forms 1040, 1040A) and power of attorney notifications for individuals."

219.   Admit that the Privacy Act codified at 5 U.S.C. 552a(e)(5) states that: "Each agency that maintains a system of records shall. . . maintain all records which are used by the agency in making any determinations about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination .. . ."

220.   Admit that the Privacy Act codified at 5 U.S.C.  552a(e)(6) states that: "Each agency that maintains a system of records shall . . . prior to disseminating any record about an individual to any person other than an agency, unless the dissemination is made pursuant to subsection (b)(2) of this section, make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes . . ."

221.   Admit that the Internal Revenue Service is subject to the Privacy Act requirements codified at 5 U.S.C. 552a(e)(5) and (6), which requirements are set out in relevant part at paragraphs 219-20, above.

222.   Admit that the Individual Master File computer records use various

codes to represent agency actions, determinations, and transactions regarding taxpayers.

223.   Admit that Document 6209 is the IRS reference guide which describes the meaning of most of the codes used on the Individual Master File record.

224.   Admit that the Law Enforcement Manual 3(27)(68)0 is the underpinning authority for the Document 6209.

225.   Admit that the taxpayer's IMF account number is the taxpayer's social security number.

226.   Admit that all returns and transactions processed on the Individual Master File must contain the taxpayer's correct social security number.

227.   Admit that an account freeze is placed on an Individual Master File record to indicate that the social security number on the record is invalid.

228.   Admit that no transactions can be posted to an Individual Master File entity module which is identified by an invalid social security number.

229.   Admit that a "VAL-1" code posted on an Individual Master File record means an invalid social security number freeze has been released.

230.   Admit that the "VAL-1" invalid social security number freeze release indicator is effective only during the calendar year to which it has been posted.

231.   Admit that the "VAL-1" invalid social security number freeze release indicator allows the Internal Revenue Service to post transactions to an Individual Master File record which has been frozen because the social security number on that IMF record is invalid.

**16 Questions: 216-231**

# WORD "INCLUDES"

**With the assistance of the following series of
questions we intend to show that...**

418.  Admit that the word "includes" is defined in 26 U.S.C. §7701(c) as
follows:

TITLE 26 > Subtitle F > CHAPTER 79 > Sec. 7701.

Sec. 7701. - Definitions

(c) Includes and including

The terms "includes" and "including" when used in a definition
contained in this title shall not be deemed to exclude other things
otherwise within the meaning of the term defined.

419.  Admit that the word "includes" is defined by the Treasury in the
Federal Register as follows:

**Treasury Definition 3980**, Vol. 29, January-December, 1927, pgs.
64 and 65 defines the words includes and including as:

"(1) To comprise, comprehend, or embrace...(2) To enclose within;
contain; confine...**But granting that the word 'including' is a term
of enlargement, it is clear that it only performs that office by
introducing the specific elements constituting the enlargement.  It
thus, and thus only, enlarges the otherwise more limited,
preceding general language**...The word 'including' is obviously
used in the sense of its synonyms, comprising; comprehending;
embracing."

420.Admit that the definition of the word "includes" found in Black's Law
Dictionary, Sixth Edition, page 763 is as follows:

"**Include**. (Lat. Inclaudere, to shut in. keep within.) To confine within, hold as an inclosure. Take in, attain, shut up, contain, inclose, comprise, comprehend, embrace, involve. Term may, according to context, express an enlargement and have the meaning of and or in addition to, or merely specify a particular thing already included within general words theretofore used. "Including" within statute is interpreted as a word of enlargement or of illustrative application as well as a word of limitation. Premier Products Co. v. Cameron, 240 Or. 123, 400 P.2d 227, 228."

421.   Admit that if the meaning of the word "includes" as used in the Internal Revenue Code is "and" or "in addition to" as described above, then the code cannot define or confine the precise meaning of the following words that use "include" in their definition:

- "State" found in 26 U.S.C. §7701(a)(10) and 4 U.S.C. §110
- "United States" found in 26 U.S.C. §7701(a)(9)
- "employee" found in 26 U.S.C. §3401(c ) and 26 CFR §31.3401(c )-1 Employee
- "person" found in 26 CFR 301.6671-1 (which governs who is liable for penalties under Internal Revenue Code)

422.   Admit that if the meaning of "includes" as used in the definitions above  is "and" or "in addition to", then the code cannot define any of the words described, based on the definition of the word "definition" found in Black's Law Dictionary, Sixth Edition, page 423:

**definition**: (Black's Law Dictionary, Sixth Edition, page 423) A description of a thing by its properties; an explanation of the meaning of a word or term.  **The process of stating the exact  meaning of a word by means of other words**.  Such a description of the thing defined, including all essential elements and excluding all nonessential, as to distinguish it from all other things and classes."

423.        Admit that absent concrete definitions of the above critical words identified in question 417, the meaning of the words becomes ambiguous, unclear, and subjective.

424. Admit that when the interpretation of a statute or regulation is unclear or ambiguous, then the by the rules of statutory construction, the doubt should be resolved in favor of the taxpayer as indicated in the cite from the Supreme Court below:

> "In view of other settled rules of statutory construction, which teach that a law is presumed, in the absence of clear expression to the contrary, to operate prospectively; that, **if doubt exists as to the construction of a taxing statute, the doubt should be resolved in favor of the taxpayer...**" Hassett v. Welch., 303 US 303, pp. 314 - 315, 82 L Ed 858. (1938) (emphasis added)

425.   Admit that in the majority of cases, doubts about the interpretation of the tax code are not resolved in favor of the taxpayer by any federal court as required by the Supreme Court above.

426.   Admit that an ambiguous meaning for a word violates the requirement for due process of law by preventing a person of average intelligence from being able to clearly understand what the law requires and does not require of him, thus making it impossible at worst or very difficult at best to know if he is following the law.

427.   Admit that Black's Law Dictionary, Sixth Edition, page 500, under the definition of "due process of law" states the following:

> The concept of **"due process of law" as it is embodied in Fifth Amendment demands that a law shall not be unreasonable, arbitrary, or capricious** and that the means selected shall have a reasonable and substantial relation to the object being sought.

428. Admit that if the definition of the word "includes" means that it is used synonymously with the word "and" or "in addition to", then it violates the requirement for due process of law found in the Fifth Amendment.

429. Admit that the violation of due process of law created by the abuse of the word "includes" found in the preceding question creates uncertainty, mistrust, and fear of citizens towards their government because of their inability to comprehend what the law requires them to do.

430.   Admit that the violation of due process caused by the abuse of the word "includes" (in this case, making it mean "and" or "in addition to") identified above could have the affect of extending the perceived jurisdiction and authority of the federal government to tax beyond its clear limits prescribed in the U.S. Constitution.

431.   Admit that an abuse of the word "includes" to mean "and" or "in addition to" indicated above could have the affect of increasing and possibly even maximizing income tax revenues to the U.S. government through the violation of due process, confusion, and fear that it creates in the citizenry.

432.   Admit that fear and confusion on the part of the citizenry towards their government and violation of due process by the government are characterized by most rational individuals as evidence of tyranny and treason against citizens.

433.   Admit that the U.S. Constitution provides the following definition for "treason":

> **U.S. Constitution, Article III, Section 3, Clause 1:**
> **"Treason against the United States shall consist only of levying war against them, or adhering to their enemies…"**

434.   Admit that Black's Law Dictionary, Sixth Edition, page 1583, provides the following definition for "war":

> *"Hostile contention by means of armed forces, carried on between nations, states, or rulers, or between citizens in the same nation or state."*

435.   Admit that agents of the IRS involved in seizures of property use guns and arms and against citizens, making the confrontation an armed confrontation.

436.   Admit that IRS seizures can and do occur without court orders, warrants, or due process required by the Fourth Amendment and at the point of a gun.

437.   Admit that property seizures as described above amount to an act of war of the government against the citizens.

438.   Admit that acts of war against citizens, when not based on law, are treasonable offenses punishable by execution.

439.  Admit that violation of due process produces *injustice* in society, which is why the founding fathers required us to have a Fifth Amendment.

440.  Admit that the purpose of the government is to write laws to *prevent*, rather than *promote*, injustice in society, and thereby protect the right to life, liberty, property, and pursuit of happiness of *all citizens equally*.

**23 Questions: 418-440**

# TAXABLE SOURCES

## With the following series of questions we
## Intend to prove that...

441.  Admit that the term "from whatever source derived" as used in the Sixteenth Amendment does *not* mean that the source of income or the situs for taxation is *irrelevant or inconsequential in determining taxable income*.

442.  Admit that interpreting the phrase "from whatever source derived" to mean that the source or situs is irrelevant, makes the federal income tax applicable to any country or location in the world and renders 26 U.S.C. §861 and 26 U.S.C. §862 irrelevant and unnecessary, which clearly is an irrational and nonsensical conclusion to reach.

443.  Admit that the federal income tax applies only to taxable income, which, generally speaking, is "gross income" minus allowable deductions.

444.  Admit that the federal income tax regulations generally define "gross income" to mean "all income from whatever source derived, unless excluded by law." as follows:

26 CFR § 1.61-1(a):

(a) General definition. Gross income means all income from whatever source derived, unless excluded by law. Gross income includes income realized in any form, whether in money, property, or services. Income may be realized, therefore, in the form of services, meals, accommodations, stock, or other property, as well as in cash. Section 61 lists the more common items of gross income for purposes of illustration. For purposes of further illustration, Sec. 1.61-14 mentions several miscellaneous items of

gross income not listed specifically in section 61. Gross income, however, is not limited to the items so enumerated.

445.   Admit that there are certain types of income which Congress has exempted by statute as identified in 26 CFR §1.61-1(a).

446.   Admit that there are other types of income not enumerated above which are not exempted by statute, but are nonetheless excluded by law, for income tax purposes, because they are excluded from taxation by the Constitution itself.

26 CFR § 39.21-1 (1956):

(a) The tax imposed by chapter 1 is upon income. Neither income exempted by statute or fundamental law, nor expenses incurred in connection therewith, other than interest, enter into the computation of net income as defined by section 21.

26 CFR § 39.22(b)-1 (1956):

Certain items of income specified in section 22(b) are exempt from tax and may be excluded from gross income. These items, however, are exempt only to the extent and in the amount specified. No other items may be excluded from gross income except (a) those items of income which are, under the Constitution, not taxable by the Federal Government; (b) those items of income which are exempt from tax on income under the provisions of any act of Congress still in effect; and (c) the income excluded under the provisions of the Internal Revenue Code (see particularly section 116).

447.   Admit that the phrase "fundamental law" indicated above in the older regulations means the U.S. Constitution.

448.   Admit that the above older regulation, 26 CFR §39.21-1 (1956) and 26 CFR § 39.22(b)-1 (1956) has never been explicitly repealed or superceded by newer regulations and is still in force.

449. Admit that the regulations under 26 U.S.C. §863 state:

26 CFR § 1.863-1(c)

"**Determination of taxable income**. The taxpayer's taxable income from sources **within or without** the United States **will be determined under the rules of Secs. 1.861-8 through 1.861-14T** for determining taxable income from sources **within** the United States."

450.  26 USC § 61 lists some of the more common "items" of income which are taxable, such as compensation for services, interest, and dividends, among others.  Admit that section 1.861-8(d)(2) of the federal income tax regulations are to be consulted in determining in which situations these "items" of income are excluded for federal income tax purposes?

26 CFR § 1.861-8(d)(2)
(2) Allocation and apportionment to exempt, excluded, or eliminated income. [Reserved] For guidance, see Sec. 1.861-8T(d)(2).

451. Admit that 26 CFR § 1.861-8T(d)(2) of the regulations lists several types of income which are, quote, not considered to be exempt, eliminated, or excluded income, end quote as follows:

26 CFR § 1.861-8T(d)(2)(iii)
(iii) Income that is not considered tax exempt. The following items are not considered to be exempt, eliminated, or excluded income and, thus, may have expenses, losses, or other deductions allocated and apportioned to them:
   (A) In the case of a foreign taxpayer (including a foreign sales corporation (FSC)) computing its effectively connected income, gross income (whether domestic or foreign source) which is not effectively connected to the conduct of a United States trade or business;
   (B) In computing the combined taxable income of a DISC or FSC and its related supplier, the gross income of a DISC or a FSC;
   (C) For all purposes under subchapter N of the Code, including the computation of combined taxable income of a possessions corporation and its affiliates under section 936(h), the gross income of a possessions corporation for which a credit is allowed under section 936(a); and
   (D) Foreign earned income as defined in section 911 and the

regulations thereunder (however, the rules of Sec. 1.911-6 do not require the allocation and apportionment of certain deductions, including home mortgage interest, to foreign earned income for purposes of determining the deductions disallowed under section 911(d)(6)).

452.   Admit that only income derived from certain activities related to international or foreign commerce are included on that list of non-exempt types of income appearing in 26 CFR § 1.861-8T(d)(2)(iii) above.

453.  Admit that the domestic income of most U.S. citizens is absent, and therefore excluded, from the list appearing in 26 CFR § 1.861-8T(d)(2)(iii).

454.   Admit that 26 USC § 861(b), and the related regulations beginning at 26 CFR § 1.861-8, the sections to use to determine one's taxable income from sources within the United States, regardless of citizenship and residency.

455.   Admit that for U.S. citizens living and working exclusively in the 50 states and receiving all income from within the 50 states, that 26 U.S.C. §861(b) and related regulations beginning at 26 CFR §1.861-8 do not show such income to be taxable.

456.   Admit that "items" of income are identified in 26 U.S.C. §61 while "sources" of income are identified in 26 U.S.C. §861 and 26 U.S.C. §862.

**16 Questions: 442-**

# EXHIBIT D

**U.S. Department of Justice**

Office of Legislative Affairs

---

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

APR 1 0 2002

Honorable Roscoe Bartlett
U.S. House of Representatives
Washington, D.C. 20515

Dear Congressman Bartlett:

We are responding to your letter of January 30, 2002, transmitting questions submitted to you by Robert Schultz on behalf of the We The People Foundation (WTP).

When the Senate Finance Committee held its hearing on tax schemes, scams, and cons, the Committee appropriately declined to offer WTP a forum to advocate defiance of the tax laws. WTP is not an advocate of tax reform. Instead, it advocates violations of the existing tax laws, raises frivolous arguments to excuse illegal conduct, and has exhibited disrespect for the Judiciary, the Congress, the Executive Branch, and the Constitution. WTP's supposed "questions" have been answered many times. WTP will continue to rephrase and reiterate its questions because it does not like the clear answers it receives in court. WTP's arguments consistently are rejected in Federal courts.

The Department of Justice is responsible for prosecuting Federal tax crimes and litigating Federal civil tax cases. The Department's Tax Division will continue to bring appropriate legal action to uniformly enforce the tax laws Congress enacts. It would not be appropriate for the Department to lend credibility to the WTP group and their frivolous claims. For the reasons set out below, we respectfully decline to answer the individual questions posed by WTP.

Although WTP is capable of formulating countless questions, its claims fall into a few categories. WTP advocates disobedience of the tax laws and justifies its claims by questioning the authority of all branches of government, in the following general ways:

- Federal judges have acted illegally when they have sustained the constitutionality of the income tax laws, concluded that the enforcement powers given to the IRS are lawful, and rejected various interpretations of the internal revenue laws supported by WTP;

- Congress has acted illegally in adopting every income tax law since 1913;

- The Executive Branch has acted illegally in enforcing these laws and collecting income taxes.

Federal courts.  WTP's positions on the constitutionality and interpretation of the internal revenue laws have, time and again, been raised in the Federal courts by tax protesters.  There is no ambiguity in the law or in the views of the courts on these issues.  In opinions sustaining criminal tax convictions, affirming the assessment of civil tax penalties, and imposing sanctions, the courts have uniformly rejected those claims as frivolous.  As explained by Judge Easterbrook in *Coleman v. Commissioner*, 791 F.2d 68, 69 (7th Cir. 1986):

> Some people believe with great fervor preposterous things that just happen to coincide with their self-interest.  "Tax protesters" have convinced themselves that wages are not income, that only gold is money, that the Sixteenth Amendment is unconstitutional, and so on.  These beliefs all lead – so tax protesters think – to the elimination of their obligation to pay taxes.  The government may not prohibit the holding of these beliefs, but it may penalize people who act on them.

As Judge Easterbrook observed, the claimed beliefs of tax protestors are generally consistent with their personal self-interest.  Even if these beliefs were sincerely held, it would not make them correct.  In the United States of America, the Federal judiciary decides what the law means.

Congress.  Congress has likewise considered and exposed as completely without merit the constitutional and statutory interpretations cited by WTP in support of its theories.  The Congressional Research Service carefully studied these issues and refuted the baseless interpretations that the WTP continues to press.  *See* CRS Report for Congress, *Frequently Asked Questions Concerning the Federal Income Tax* (Updated May 7, 2001).

On April 5, 2001, the Senate Finance Committee, under the chairmanship of Senator Charles Grassley, held a hearing specifically to warn taxpayers about illegal tax schemes, scams, and cons.  At that hearing, newspaper advertisements published by the WTP group urging taxpayers to defy the tax laws were prominently displayed as *examples* of illegal tax schemes and as a warning that those who follow such advice may be subjecting themselves to criminal prosecution, penalties and judicially-imposed sanctions.  The Chairman and members of the Finance Committee strongly urged the IRS to be more aggressive in attacking illegal tax schemes, scams, and cons.

Executive Branch.  The Justice Department and the IRS have intensified their efforts to bring to justice people who defy the tax laws and raise frivolous theories to justify their conduct.  The Department's efforts include criminal prosecutions and injunction suits to shut down tax scams.  We are working with the IRS to increase its referral of cases and bring more such tax cheaters to justice.

-2-

In two cases brought by the Justice Department, the courts recently granted injunctions against unscrupulous individuals and corporations, including Harold E. Hearn, Atlanta, Georgia, and Joseph N. Sweet, Bradenton, Florida. One case involved the promotion of tax scams, and the second concerned baseless legal positions taken on returns prepared for others. Injunction suits are also pending against two individuals whose actions are prominently mentioned in WTP's advertising material, David Bosset, Clearwater, Florida, and Thurston Bell, Hanover, Pennsylvania, for their actions in promoting illegal tax schemes.

In addition to investigating those who defy the tax laws and promoters of tax scams, the IRS has published a series of Tax Fraud Alerts to explain the falsity of claims made by tax scammers. www.ustreas.gov/irs/ci/ As these Tax Fraud Alerts explain, people who violate the tax laws face both civil and criminal penalties.

Many people who defraud honest American taxpayers by using the scams and schemes promoted by WTP have been convicted by juries of their peers and sentenced to serve time in prison. The IRS web site chronicles many examples of such criminal prosecutions.

On the legislative front, the President in his recent budget message asked Congress to enact several proposals to further deter tax violations of the sort advocated by WTP. The legislation requested by the President would raise the frivolous return penalty from $500 to $5,000 and would impose a penalty of $5,000 for making a frivolous collection due process hearing request or submitting a frivolous offer in compromise or a frivolous request for an installment payment agreement.

The We the People Foundation and other promoters of tax fraud schemes are free to advocate tax reform, but they are obligated to comply with the existing tax laws.

Please do not hesitate to contact this office if we can be of assistance in the future.

Sincerely,

Daniel J. Bryant
Assistant Attorney General

-3-

# EXHIBIT E

[109th Congress Public Law 432]
[From the U.S. Government Printing Office]


[DOCID: f:publ432.109]

[[Page 2921]]

            TAX RELIEF AND HEALTH CARE ACT OF 2006

[[Page 120 STAT. 2922]]

Public Law 109-432
109th Congress

                            An Act


    To amend the Internal Revenue Code of 1986 to extend expiring
    provisions, and for other purposes. <<NOTE: Dec. 20, 2006 -  [H.R.
                            6111]>>

    Be it enacted by the Senate and House of Representatives of the
United States of America in Congress <<NOTE: Tax Relief and Health Care
Act of 2006. 26 USC 1 note.>> assembled,

SECTION 1. SHORT TITLE, ETC.

    (a) Short Title.--This Act may be cited as the ``Tax Relief and
Health Care Act of 2006''.
    (b) Table of Contents.--The table of contents for this Act is as
follows:

Sec. 1. Short title, etc.

    DIVISION A--EXTENSION AND EXPANSION OF CERTAIN TAX RELIEF PROVISIONS,
                      AND OTHER TAX PROVISIONS

Sec. 100. Reference.

        TITLE I--EXTENSION AND MODIFICATION OF CERTAIN PROVISIONS

Sec. 101. Deduction for qualified tuition and related expenses.
Sec. 102. Extension and modification of new markets tax credit.
Sec. 103. Election to deduct State and local general sales taxes.
Sec. 104. Extension and modification of research credit.
Sec. 105. Work opportunity tax credit and welfare-to-work credit.
Sec. 106. Election to include combat pay as earned income for purposes
              of earned income credit.
Sec. 107. Extension and modification of qualified zone academy bonds.
Sec. 108. Above-the-line deduction for certain expenses of elementary
              and secondary school teachers.
Sec. 109. Extension and expansion of expensing of brownfields
              remediation costs.
Sec. 110. Tax incentives for investment in the District of Columbia.
Sec. 111. Indian employment tax credit.
Sec. 112. Accelerated depreciation for business property on Indian
              reservations.
Sec. 113. Fifteen-year straight-line cost recovery for qualified
              leasehold improvements and qualified restaurant property.
Sec. 114. Cover over of tax on distilled spirits.
Sec. 115. Parity in application of certain limits to mental health
              benefits.
Sec. 116. Corporate donations of scientific property used for research
              and of computer technology and equipment.
Sec. 117. Availability of medical savings accounts.
Sec. 118. Taxable income limit on percentage depletion for oil and
              natural gas produced from marginal properties.
Sec. 119. American Samoa economic development credit.

Sec. 120. Extension of period to elect exclusion for certain qualified Gulf
          Opportunity Zone property.
Sec. 121. Authority for undercover operations.
Sec. 122. Disclosures of certain tax return information.
Sec. 123. Special rule for elections under expired provisions.

                    TITLE II--ENERGY TAX PROVISIONS

Sec. 201. Credit for electricity produced from certain renewable
          resources.
Sec. 202. Credit to holders of clean renewable energy bonds.
Sec. 203. Performance standards for sulfur dioxide removal in advanced
          coal-based generation technology units designed to use
          subbituminous coal.

[[Page 120 STAT. 2923]]

Sec. 204. Deduction for energy efficient commercial buildings.
Sec. 205. Credit for new energy efficient homes.
Sec. 206. Credit for residential energy efficient property.
Sec. 207. Energy credit.
Sec. 208. Special rule for qualified methanol or ethanol fuel.
Sec. 209. Special depreciation allowance for cellulosic biomass ethanol
          plant property.
Sec. 210. Expenditures permitted from the Leaking Underground Storage
          Tank Trust Fund.
Sec. 211. Treatment of coke and coke gas.

                    TITLE III--HEALTH SAVINGS ACCOUNTS

Sec. 301. Short title.
Sec. 302. FSA and HRA terminations to fund HSAs.
Sec. 303. Repeal of annual deductible limitation on HSA contributions.
Sec. 304. Modification of cost-of-living adjustment.
Sec. 305. Contribution limitation not reduced for part-year coverage.
Sec. 306. Exception to requirement for employers to make comparable
          health savings account contributions.
Sec. 307. One-time distribution from individual retirement plans to fund
          HSAs.

                    TITLE IV--OTHER PROVISIONS

Sec. 401. Deduction allowable with respect to income attributable to
          domestic production activities in Puerto Rico.
Sec. 402. Credit for prior year minimum tax liability made refundable
          after period of years.
Sec. 403. Returns required in connection with certain options.
Sec. 404. Partial expensing for advanced mine safety equipment.
Sec. 405. Mine rescue team training tax credit.
Sec. 406. Whistleblower reforms.
Sec. 407. Frivolous tax submissions.
Sec. 408. Addition of meningococcal and human papillomavirus vaccines to
          list of taxable vaccines.
Sec. 409. Clarification of taxation of certain settlement funds made
          permanent.
Sec. 410. Modification of active business definition under section 355
          made permanent.
Sec. 411. Revision of State veterans limit made permanent.
Sec. 412. Capital gains treatment for certain self-created musical works
          made permanent.
Sec. 413. Reduction in minimum vessel tonnage which qualifies for
          tonnage tax made permanent.
Sec. 414. Modification of special arbitrage rule for certain funds made
          permanent.
Sec. 415. Great Lakes domestic shipping to not disqualify vessel from
          tonnage tax.
Sec. 416. Use of qualified mortgage bonds to finance residences for
          veterans without regard to first-time homebuyer requirement.
Sec. 417. Exclusion of gain from sale of a principal residence by
          certain employees of the intelligence community.
Sec. 418. Sale of property by judicial officers.

Sec. 419. Production flexibility contracts.
Sec. 420. Modification of refunds for kerosene used in aviation.
Sec. 421. Regional income tax agencies treated as States for purposes of
          confidentiality and disclosure requirements.
Sec. 422. Designation of wines by semi-generic names.
Sec. 423. Modification of railroad track maintenance credit.
Sec. 424. Modification of excise tax on unrelated business taxable
          income of charitable remainder trusts.
Sec. 425. Loans to qualified continuing care facilities made permanent.
Sec. 426. Technical corrections.

        DIVISION B--MEDICARE AND OTHER HEALTH PROVISIONS

Sec. 1. Short title of division.

        TITLE I--MEDICARE IMPROVED QUALITY AND PROVIDER PAYMENTS

Sec. 101. Physician payment and quality improvement.
Sec. 102. Extension of floor on Medicare work geographic adjustment.
Sec. 103. Update to the composite rate component of the basic case-mix
          adjusted prospective payment system for dialysis services.
Sec. 104. Extension of treatment of certain physician pathology services
          under Medicare.
Sec. 105. Extension of Medicare reasonable costs payments for certain
          clinical diagnostic laboratory tests furnished to hospital
          patients in certain rural areas.

[[Page 120 STAT. 2924]]

Sec. 106. Hospital Medicare reports and clarifications.
Sec. 107. Payment for brachytherapy.
Sec. 108. Payment process under the competitive acquisition program
          (CAP).
Sec. 109. Quality reporting for hospital outpatient services and
          ambulatory surgical center services.
Sec. 110. Reporting of anemia quality indicators for Medicare part B
          cancer anti-anemia drugs.
Sec. 111. Clarification of hospice satellite designation.

        TITLE II--MEDICARE BENEFICIARY PROTECTIONS

Sec. 201. Extension of exceptions process for Medicare therapy caps.
Sec. 202. Payment for administration of part D vaccines.
Sec. 203. OIG study of never events.
Sec. 204. Medicare medical home demonstration project.
Sec. 205. Medicare DRA technical corrections.
Sec. 206. Limited continuous open enrollment of original medicare fee-
          for-service enrollees into Medicare Advantage non-
          prescription drug plans.

        TITLE III--MEDICARE PROGRAM INTEGRITY EFFORTS

Sec. 301. Offsetting adjustment in Medicare Advantage Stabilization
          Fund.
Sec. 302. Extension and expansion of recovery audit contractor program
          under the Medicare Integrity Program.
Sec. 303. Funding for the Health Care Fraud and Abuse Control Account.
Sec. 304. Implementation funding.

        TITLE IV--MEDICAID AND OTHER HEALTH PROVISIONS

Sec. 401.  Extension of Transitional Medical Assistance (TMA) and
          abstinence education program.
Sec. 402. Grants for research on vaccine against Valley Fever.
Sec. 403. Change in threshold for Medicaid indirect hold harmless
          provision of broad-based health care taxes.
Sec. 404. DSH allotments for fiscal year 2007 for Tennessee and Hawaii.
Sec. 405. Certain Medicaid DRA technical corrections.

        DIVISION C--OTHER PROVISIONS

Sec. 101. Short title.
Sec. 102. Definitions.
Sec. 103. Offshore oil and gas leasing in 181 Area and 181 south Area of
          Gulf of Mexico.
Sec. 104. Moratorium on oil and gas leasing in certain areas of Gulf of
          Mexico.
Sec. 105. Disposition of qualified outer Continental Shelf revenues from
          181 Area, 181 south Area, and 2002-2007 planning areas of
          Gulf of Mexico.

    TITLE II--SURFACE MINING CONTROL AND RECLAMATION ACT AMENDMENTS OF 2006

Sec. 200. Short title.

               Subtitle A--Mining Control and Reclamation

Sec. 201. Abandoned Mine Reclamation Fund and purposes.
Sec. 202. Reclamation fee.
Sec. 203. Objectives of Fund.
Sec. 204. Reclamation of rural land.
Sec. 205. Liens.
Sec. 206. Certification.
Sec. 207. Remining incentives.
Sec. 208. Extension of limitation on application of prohibition on
          issuance of permit.
Sec. 209. Tribal regulation of surface coal mining and reclamation
          operations.

               Subtitle B--Coal Industry Retiree Health Benefit Act

Sec. 211. Certain related persons and successors in interest relieved of
          liability if premiums prepaid.
Sec. 212. Transfers to funds; premium relief.
Sec. 213. Other provisions.

    TITLE III--WHITE PINE COUNTY CONSERVATION, RECREATION, AND DEVELOPMENT

Sec. 301. Authorization of appropriations.

[[Page 120 STAT. 2925]]

Sec. 302. Short title.
Sec. 303. Definitions.

                     Subtitle A--Land Disposal

Sec. 311. Conveyance of White Pine County, Nevada, land.
Sec. 312. Disposition of proceeds.

                     Subtitle B--Wilderness Areas

Sec. 321. Short title.
Sec. 322. Findings.
Sec. 323. Additions to National Wilderness Preservation System.
Sec. 324. Administration.
Sec. 325. Adjacent management.
Sec. 326. Military overflights.
Sec. 327. Native American cultural and religious uses.
Sec. 328. Release of wilderness study areas.
Sec. 329. Wildlife management.
Sec. 330. Wildfire, insect, and disease management.
Sec. 331. Climatological data collection.

               Subtitle C--Transfers of Administrative Jurisdiction

Sec. 341. Transfer to the United States Fish and Wildlife Service.
Sec. 342. Transfer to the Bureau of Land Management.
Sec. 343. Transfer to the Forest Service.
Sec. 344. Availability of map and legal descriptions.

Subtitle D--Public Conveyances

Sec. 351. Conveyance to the State of Nevada.
Sec. 352. Conveyance to White Pine County, Nevada.

        Subtitle E--Silver State Off-Highway Vehicle Trail

Sec. 355. Silver State off-highway vehicle trail.

  Subtitle F--Transfer of Land to Be Held in Trust for the Ely Shoshone
                                Tribe.

Sec. 361. Transfer of land to be held in trust for the Ely Shoshone
            Tribe.

        Subtitle G--Eastern Nevada Landscape Restoration Project.

Sec. 371. Findings; purposes.
Sec. 372. Definitions.
Sec. 373. Restoration project.

Subtitle H--Amendments to the Southern Nevada Public Land Management Act
                              of 1998

Sec. 381. Findings.
Sec. 382. Availability of special account.

  Subtitle I--Amendments to the Lincoln County Conservation, Recreation,
                    and Development Act of 2004

Sec. 391. Disposition of proceeds.

              Subtitle J--All American Canal Projects

Sec. 395. All American Canal Lining Project.
Sec. 396. Regulated storage water facility.
Sec. 397. Application of law.

              TITLE IV--OTHER PROVISIONS

Sec. 401. Tobacco personal use quantity exception to not apply to
            delivery sales.
Sec. 402. Ethanol Tariff Schedule.
Sec. 403. Withdrawal of certain Federal land and interests in certain
            Federal land from location, entry, and patent under the
            mining laws and disposition under the mineral and geothermal
            leasing laws.
Sec. 404. Continuing eligibility for certain students under District of
            Columbia School Choice Program.
Sec. 405. Study on Establishing Uniform National Database on Elder
            Abuse.
Sec. 406. Temporary duty reductions for certain cotton shirting fabric.
Sec. 407. Cotton Trust Fund.

[[Page 120 STAT. 2926]]

Sec. 408. Tax court review of requests for equitable relief from joint
            and several liability.

  DIVISION D--TEMPORARILY MODIFY CERTAIN RATES OF DUTY AND MAKE OTHER
TECHNICAL AMENDMENTS TO THE TRADE LAWS, EXTEND CERTAIN TRADE PREFERENCE
                PROGRAMS, AND OTHER PURPOSES

Sec. 1. Table of contents.

              TITLE I--TARIFF PROVISIONS

Sec. 1001. Reference; expired provisions.

            Subtitle A--New Duty Suspensions and Reductions

Chapter 1--New Duty Suspensions

Sec. 1111. Diethyl sulfate.
Sec. 1112. Sorafenib.
Sec. 1113. Prohexadione calcium.
 c. 1114. Methyl methoxy acetate.
Sec. 1115. Methoxyacetic acid.
Sec. 1116. N-Methylpiperidine.
Sec. 1117. Quinclorac technical.
Sec. 1118. Pyridaben.
Sec. 1119. Certain rubber or plastic footwear.
Sec. 1120. Sodium ortho-phenylphenol.
Sec. 1121. Certain chemical.
Sec. 1122. Baypure CX.
Sec. 1123. Isoeicosane.
Sec. 1124. Isododecane.
Sec. 1125. Isohexadecane.
Sec. 1126. Aminoguanidine bicarbonate.
Sec. 1127. o-Chlorotoluene.
Sec. 1128. Bayderm bottom DLV-N.
Sec. 1129. 2,3-Dichloronitrobenzene.
Sec. 1130. 1-Methoxy-2-propanol.
Sec. 1131. Basic Red 1 dye.
Sec. 1132. Basic Red 1:1 dye.
Sec. 1133. Basic Violet 11 dye.
Sec. 1134. Basic Violet 11:1 dye.
Sec. 1135. N-Cyclohexylthiophthalimide.
Sec. 1136. 4,4'-Dithiodimorpholine.
Sec. 1137. Tetraethylthiuram disulfide.
Sec. 1138. Certain tetramethylthiuram disulfide.
Sec. 1139. Certain aerosol valves.
Sec. 1140. 4-Methyl-5-n-propoxy-2,4-dihydro-1,2,4-triazol-3-one.
Sec. 1141. Ethoxyquin.
Sec. 1142. Tricholorobenzene.
Sec. 1143. Benzoic acid, 3,4,5-trihydroxy-, propyl ester.
Sec. 1144. 2-Cyanopyridine.
Sec. 1145. Mixed xylidines.
Sec. 1146. Certain reception apparatus not containing a clock or clock
           timer, incorporating only AM radio.
Sec. 1147. Pigment Yellow 219.
Sec. 1148. Pigment Blue 80.
Sec. 1149. 1-Oxa-3, 20-diazadispiro-[5.1.11.2] heneicosan-21-one
           2,2,4,4-tetramethyl-,hydrochloride, reaction products with
           epichloro-hydrin, hydrolyzed and polymerized.
Sec. 1150. Isobutyl parahydroxybenzoic acid and its sodium salt.
Sec. 1151. Phosphinic acid, diethyl-, aluminum salt.
Sec. 1152. Exolit OP 1312.
Sec. 1153. Sodium hypophosphite.
Sec. 1154. Cyanuric chloride.
Sec. 1155. Certain leather footwear for persons other than men or women.
Sec. 1156. Certain other work footwear.
Sec. 1157. Certain turn or turned footwear.
Sec. 1158. Certain work footwear with outer soles of leather.
Sec. 1159. Certain footwear with outer soles of rubber or plastics and
           with open toes or heels.
Sec. 1160. Certain athletic footwear.
Sec. 1161. Certain work footwear.
Sec. 1162. Certain footwear.
Sec. 1163. 1-Naphthyl methylcarbamate.

           [[Page 120 STAT. 2927]]

Sec. 1164. Certain 16-inch variable speed scroll saw machines.
Sec. 1165. 3,4-Dimethoxybenzaldehyde.
Sec. 1166. 2-Aminothiophenol.
Sec. 1167. Solvent Red 227.
Sec. 1168. Mixtures of formaldehyde polymer and toluene.
Sec. 1169. 1,2-Bis(3-aminopropyl)ethylenediamine, polymer with N-butyl-
           2,2,6,6-tetramethyl-4-piperidinamine and 2,4,6-trichloro-
           1,3,5-triazine.

```
Sec. 1170. Mixture of barium carbonate, strontium carbonate, calcium
          carbonate, methoxy-2-propanolacetate-1, for use as emitter
          suspension cathode coating.
Sec. 1171. Resin cement.
Sec. 1172. Phosphor yox, yttrium oxide phosphor, activated by europium.
Sec. 1173. Phosphor-bag-barium magnesium aluminate phosphor.
Sec. 1174. Yttrium vanadate phosphor.
Sec. 1175. Phosphor scap strontium chloroapatite-europium.
Sec. 1176. Phosphor zinc silicate.
Sec. 1177. Strontium magnesium phosphate-tin doped.
Sec. 1178. Phosphor-yof flu pdr yox; yttrium oxide phosphor, activated
          by europium.
Sec. 1179. Calcium chloride phosphate phosphor.
Sec. 1180. Ceramic frit powder.
Sec. 1181. Phosphor lite white and phosphor blue halo.
Sec. 1182. Phosphor-sca, strontium halophosphate doped with europium.
Sec. 1183. Phosphor-cool white small particle calcium halophosphate
          phosphor activated by manganese and antimony.
Sec. 1184. Phosphor lap lanthanum phosphate phosphor, activated by
          cerium and terbium.
Sec. 1185. Kashmir.
Sec. 1186. Certain articles of platinum.
Sec. 1187. Nickel alloy wire.
Sec. 1188. Titanium mononitride.
Sec. 1189. High accuracy, metal, marine sextants, used for navigating by
          celestial bodies.
Sec. 1190. Electrically operated pencil sharpeners.
Sec. 1191. Valve assemblies (vacuum relief).
Sec. 1192. Seals, aerodynamic, fireproof.
Sec. 1193. Wing illumination lights.
Sec. 1194. Exterior emergency lights.
Sec. 1195. Magnesium peroxide.
Sec. 1196. Certain footwear other than for men.
Sec. 1197. Grass shears with rotating blade.
Sec. 1198. Cerium sulfide pigments.
Sec. 1199. Kresoxim methyl.
Sec. 1200. 4-piece or 5-piece fireplace tools of iron or steel.
Sec. 1201. RSD 1235.
Sec. 1202. MCPB acid and MCPB sodium salt.
Sec. 1203. Gibberellic acid.
Sec. 1204. Triphenyltin hydroxide.
Sec. 1205. Bromoxynil octonoate.
Sec. 1206. Methyl 3-(trifluoromethyl)benzoate.
Sec. 1207. 4-(Trifluoromethoxy)phenyl isocyanate.
Sec. 1208. 4-Methylbenzonitrile.
Sec. 1209. Diaminodecane.
Sec. 1210. Certain compounds of lanthanum phosphates.
Sec. 1211. Certain compounds of yttrium europium oxide coprecipitates.
Sec. 1212. Certain compounds of lanthanum, cerium, and terbium
          phosphates.
Sec. 1213. Certain compounds of yttrium cerium phosphates.
Sec. 1214. Canned, boiled oysters, not smoked.
Sec. 1215. Boots.
Sec. 1216. Vinylidene chloride-methyl methacrylate-acrylonitrile
          copolymer.
Sec. 1217. 1-Propene, 1,1,2,3,3,3-hexafluoro-, oxidized, polymerized,
          reduced hydrolyzed.
Sec. 1218. 1-Propene,1,1,2,3,3,3-hexafluoro-oxidized, polymerized.
Sec. 1219. 1-Propene, 1,1,2,3,3,3-hexafluoro-, telomer with
          chlorotrifluoroethene, oxidized, reduced, ethyl ester,
          hydrolyzed.
Sec. 1220. Infrared absorbing dye.
Sec. 1221. 1,1,2-2-Tetrafluoroethene, oxidized, polymerized.
Sec. 1222. Methoxycarbonyl-terminated perfluorinated polyoxymethylene-
          polyoxyethylene.
Sec. 1223. Ethene, tetrafluoro, oxidized, polymerized, reduced,
          decarboxylated.
Sec. 1224. Ethene, tetrafluoro, oxidized, polymerized reduced, methyl
          esters, reduced, ethoxylated.
```

[[Page 120 STAT. 2928]]

Sec. 1225. Oxiranemethanol, polymers with reduced methyl esters of reduced polymerized oxidized tetrafluoroethylene.
Sec. 1226. Ethene, tetrafluoro, oxidized, polymerized reduced, methyl esters, reduced.
Sec. 1227. Certain light-absorbing photo dyes.
Sec. 1228. Certain specialty monomers.
Sec. 1229. Suspension of duty on exoflex F BX7011.
Sec. 1230. Triphenyl phosphine.
Sec. 1231. Certain golf bag bodies.
Sec. 1232. Dichlorprop-p acid, dichlorprop-p dimethylamine salt, and dichlorprop-p 2-ethylhexyl ester.
Sec. 1233. 2,4-db acid and 2,4-db dimethylamine salt.
Sec. 1234. Filament fiber tow of rayon.
Sec. 1235. Parts for use in the manufacture of certain high-performance loudspeakers.
Sec. 1236. Certain plastic lamp-holder housings containing sockets.
Sec. 1237. Certain porcelain lamp-holder housings containing sockets.
Sec. 1238. Certain aluminum lamp-holder housings containing sockets.
Sec. 1239. Certain brass lamp-holder housings containing sockets.
Sec. 1240. Staple fibers of viscose rayon, not carded.
Sec. 1241. Staple fibers of rayon, carded, combed, or otherwise processed.
Sec. 1242. Mini DVD camcorder with 680K pixel CCD.
Sec. 1243. Mini DVD camcorder with 20G HDD.
Sec. 1244. Metal halide lamp.
Sec. 1245. Hand-held electronic can openers.
Sec. 1246. Electric knives.
Sec. 1247. Toaster ovens with single-slot traditional toaster opening on top of oven.
Sec. 1248. Ice shavers.
Sec. 1249. Dual-press sandwich makers with floating upper lid and lock.
Sec. 1250. Electric juice extractors greater than 300 watts but less than 400 watts.
Sec. 1251. Electric juice extractors not less than 800 watts.
Sec. 1252. Open-top electric indoor grills.
Sec. 1253. Automatic drip coffeemakers other than those with clocks.
Sec. 1254. Automatic drip coffeemakers with electronic clocks.
Sec. 1255. Electric under-the-cabinet mounting can openers.
Sec. 1256. Dimethyl malonate.
Sec. 1257. Lightweight digital camera lenses.
Sec. 1258. Digital zoom camera lenses.
Sec. 1259. Color flat panel screen monitors.
Sec. 1260. Color monitors with a video display diagonal of 35.56 cm or greater.
Sec. 1261. Color monitors.
Sec. 1262. Black and white monitors.
Sec. 1263. 6 V lead-acid storage batteries.
Sec. 1264. Zirconyl chloride.
Sec. 1265. Naphthol AS-CA.
Sec. 1266. Naphthol AS-KB.
Sec. 1267. Basic Violet 1.
Sec. 1268. Basic Blue 7.
Sec. 1269. 3-Amino-4-methylbenzamide.
Sec. 1270. Acetoacetyl-2,5-dimethoxy-4-chloroanilide.
Sec. 1271. Phenyl salicylate (benzoic acid, 2-hydroxy-, phenyl ester).
Sec. 1272. Synthetic indigo powder.
Sec. 1273. 1,3,5-Triazine-2,4-diamine, 6-[2-(2-methyl-1H-imidazol-1-yl)ethyl]-.
Sec. 1274. 50/50 Mixture of 1,3,5-triazine-2,4,6(1H,3H,5H)-trione, 1,3,5-tris[(2r)-oxiranylmethyl]- and 1,3,5,-triazine-2,4,6(1H,3H,5H)-trione, 1,3,5-tris[(2s)-oxiranylmethyl]-.
Sec. 1275. 9H-Thioxanthene-2-carboxaldehyde, 9-oxo-, 2-(o-acetyloxime).
Sec. 1276. 1H-Imidazole, 2-ethyl-4-methyl-.
Sec. 1277. 1H-Imidazole-4-methanol, 5-methyl-2-phenyl-.
Sec. 1278. 4-Cyclohexene-1,2-dicarboxylic acid, compd. With 1,3,5-triazine-2,4,6-triamine (1:1).
Sec. 1279. 1,3,5,-Triazine-2,4-diamine, 6-[2-(2-undecyl-1H-imidazol-1-yl)ethyl]-.
Sec. 1280. Certain footwear valued over $20 a pair with coated or laminated textile fabrics.

Sec. 1281. Certain women's footwear with coated or laminated textile fabrics.
Sec. 1282. Certain men's footwear with coated or laminated textile fabrics.
Sec. 1283. Certain men's footwear valued over $20 a pair with coated or laminated textile fabrics.
Sec. 1284. Certain women's footwear valued over $20 a pair with coated or laminated textile fabrics.
Sec. 1285. Certain other footwear valued over $20 a pair with coated or laminated textile fabrics.

[[Page 120 STAT. 2929]]

Sec. 1286. Certain footwear with coated or laminated textile fabrics.
Sec. 1287. Certain other footwear covering the ankle with coated or laminated textile fabrics.
Sec. 1288. Certain women's footwear covering the ankle with coated or laminated textile fabrics.
Sec. 1289. Certain women's footwear not covering the ankle with coated or laminated textile fabrics.
Sec. 1290. Felt-bottom boots for use in fishing waders.
Sec. 1291. Lug bottom boots for use in fishing waders.
Sec. 1292. Certain parts and accessories for measuring or checking instruments.
Sec. 1293. Certain printed circuit assemblies.
Sec. 1294. Certain subassemblies for measuring equipment for telecommunications.
Sec. 1295. Chloronebo.
Sec. 1296. p-Nitrobenzoic acid (PNBA).
Sec. 1297. Allyl pentaerythritol (APE).
Sec. 1298. Butyl ethyl propanediol (BEP).
Sec. 1299. BEPD70L.
Sec. 1300. Boltorn-1 (bolt-1).
Sec. 1301. Boltorn-2 (bolt-2).
Sec. 1302. Cyclic TMP formal (CTF).
Sec. 1303. DITMP.
Sec. 1304. Polyol DPP (DPP).
Sec. 1305. Hydroxypivalic acid (HPA).
Sec. 1306. TMPDE.
Sec. 1307. TMPME.
Sec. 1308. TMP oxetane (TMPO).
Sec. 1309. TMPO ethoxylate (TMPOE).
Sec. 1310. Amyl-anthraquinone.
Sec. 1311. T-butyl acrylate.
Sec. 1312. 3-Cyclohexene-1-carboxylic acid, 6-[(di-2-propenylamino)carbonyl]-, rel-(1R,6R)-, reaction products with pentafluoroiodoethane-tetrafluoroethylene telomer, ammonium salt.
Sec. 1313. Mixtures of phosphate ammonium salt derivatives of a fluorochemical.
Sec. 1314. 1-(3H)-isobenzofuranone, 3,3-bis(2-methyl-1-octyl-1H-indol-3-yl)-.
Sec. 1315. Mixture of poly[[6-[(1,1,3,3-tetramethylbutyl)amino]-1,3,5-triazine-2,4-diyl] [2,2,6,6-tetramethyl-4-piperidinyl)imino]-1,6-hexanediyl[(2,2,6,6-tetramethyl-4-piperidinyl)imino]]) and bis(2,2,6,6-tetramethyl-4-piperidyl) sebacate.
Sec. 1316. Certain bitumen-coated polyethylene sleeves specifically designed to protect in-ground wood posts.
Sec. 1317. Nylon woolpacks used to package wool.
Sec. 1318. Magnesium zinc aluminum hydroxide carbonate hydrate.
Sec. 1319. C12-18 alkenes.
Sec. 1320. Acrypet UT100.
Sec. 1321. 5-Amino-1-[2,6-dichloro-4-(trifluoromethyl)phenyl]-4-[(1R,S)-(trifluoromethyl)-sulfinyl]-1H-pyrazole-3-carbonitrile (Fipronil).
Sec. 1322. 2,3-Pyridinedicarboxylic acid.
Sec. 1323. Mixtures of 2-amino-2,3-dimethylbutylnitrile and toluene.
Sec. 1324. 2,3-Quinolinedicarboxylic acid.
Sec. 1325. 3,5-Difluoroaniline.
Sec. 1326. Clomazone.
Sec. 1327. Chloropivaloyl chloride.

Sec. 1328. N,N´-Hexane-1,6-diylbis(3-(3,5-di-tert-butyl-4-
        hydroxyphenylpropionamide)).
Sec. 1329. Reactive Red 268.
Sec. 1330. Reactive Red 270.
Sec. 1331. Certain glass thermo bulbs.
Sec. 1332. Pyriproxyfen.
Sec. 1333. Uniconazole-P.
Sec. 1334. Bispyribac-sodium.
Sec. 1335. Dinotefuran.
Sec. 1336. Etoxazole.
Sec. 1337. Bioallethrin.
Sec. 1338. S-Bioallethrin.
Sec. 1339. Tetramethrin.
Sec. 1340. Tralomethrin.
Sec. 1341. Flumiclorac-pentyl.
Sec. 1342. 1-Propene-2-methyl homopolymer.
Sec. 1343. Acronal-S-600.
Sec. 1344. Lucirin TPO.
Sec. 1345. Sokalan PG IME.
Sec. 1346. Lycopene 10 percent.

[[Page 120 STAT. 2930]]

Sec. 1347. Mixtures of CAS Nos. 181274-15-7 and 208465-21-8.
Sec. 1348. 2-Methyl-1-[4-(methylthio)phenyl]-2-(4-morpholinyl)-1-
        propanone.
Sec. 1349. 1,6-Hexanediamine, N,N- bis(2,2,6,6-tetramethyl-4-
        piperidinyl)-, polymer with 2,4,6-trichloro-1,3,5-triazine,
        reaction products with n-butyl-1-butanamine and N-butyl-
        2,2,6,6-tetramethyl-4- piperidinamine.
Sec. 1350. Vat Black 25.
Sec. 1351. Acid Orange 162.
Sec. 1352. Methyl salicylate.
Sec. 1353. 1,2-Octanediol.
Sec. 1354. Menthone glycerin acetal.
Sec. 1355. Pontamine Green 2b.
Sec. 1356. Bayderm bottom 10 UD.
Sec. 1357. Bayderm finish DLH.
Sec. 1358. Levagard DMPP.
Sec. 1359. Bayderm bottom DLV.
Sec. 1360. Certain ethylene-vinyl acetate copolymers.
Sec. 1361. Cyazofamid.
Sec. 1362. Flonicamid.
Sec. 1363. Zeta-cypermethrin.
Sec. 1364. 2-Ethylhexyl 4-methoxycinnamate.
Sec. 1365. Certain flame retardant plasticizers.
Sec. 1366. Baypure DS.
Sec. 1367. Bayowet C4.
Sec. 1368. Certain bicycle parts.
Sec. 1369. Other cycles.
Sec. 1370. Certain bicycle parts.
Sec. 1371. Certain bicycle parts.
Sec. 1372. (2-Chloroethyl)phosphonic acid (Ethephon).
Sec. 1373. Preparations containing, 2-(1-(((3-chloro-2-
        propenyl)oxy)imino)propyl)-5-(2-(ethylthio)propyl)-3-hydroxy-
        2-cyclohexene-1-one (Clethodim).
Sec. 1374. Urea, polymer with formaldehyde (pergopak).
Sec. 1375. Ortho nitroaniline.
Sec. 1376. 2,2 -(2,5-thiophenediyl)bis(5-(1,1-
        dimethylethyl)benzoxazole).
Sec. 1377. Certain chemicals and chemical mixtures.
Sec. 1378. Acid Red 414.
Sec. 1379. Solvent Yellow 163.
Sec. 1380. 4-Amino-3,6-bis[[5-[[4-chloro-6-[methyl[2-(methylamino)-2-
        oxoethyl]amino]-1,3,5-triazin-2-yl]amino]-2-sulfophenyl]azo]-
        5-hydroxy-2,7-naphthalenedisulfonic acid, lithium potassium
        sodium salt.
Sec. 1381. Reactive Red 123.
Sec. 1382. Reactive Blue 250.
Sec. 1383. Reactive Black 5.
Sec. 1384. 5-[(2-Cyano-4-nitrophenyl)azo]-2-[[2-(2-

pyridinecarbonitrile.

Sec. 1385. Cyano[3-[(6-methoxy-2-benzothiazolyl)amino]-1H-isoindol-1-ylidene]-acetic acid, pentyl ester.

Sec. 1386. [(9,10-Dihydro-9,10-dioxo-1,4-anthracenediyl)bis[imino[3-(2-methylpropyl)-3,1-propanediyl]]]bisbenzenesulfonic acid, disodium salt.

Sec. 1387. [4-(2,6-Dihydro-2,6-dioxo-7-phenylbenzo[1,2-b:4,5-b']difuran-3-yl)phenoxy]-acetic acid, 2-ethoxyethyl ester.

Sec. 1388. 3-Phenyl-7-(4-propoxyphenyl)-benzo[1,2-b:4,5-b']difuran-2,6-dione.

Sec. 1389. 2-[[[2, 5-Dichloro-4-[(2-methyl-1H-indol-3-yl)azo]phenyl]sulfonyl]amino]-ethanesulfonic acid, monosodium salt.

Sec. 1390. 2,7-Naphthalenedisulfonic acid, 5-[[4-chloro-6-[(3-sulfophenyl)amino]-1,3,5-triazin-2-yl]amino]-4-hydroxy-3-[[4-[[2-(sulfoxy)ethyl]sulfonyl]phenyl]azo]-, sodium salt.

Sec. 1391. 7-[2-[(Aminocarbonyl)amino]-4-[[4-[4-[2-[[4-[[3-[(aminocarbonyl) amino]-4-[(3,6,8-trisulfo-2-naphthalenyl)azo]phenyl]amino]-6-chloro-1,3,5-triazin-2-yl]amino]ethyl]- 1-piperazinyl]-6-chloro-1,3,5-triazin-2-yl]amino]phenyl]azo]-1,3,6-naphthalenetrisulfonic acid, lithium potassium sodium salt.

Sec. 1392. 4-[[3-(Acetylamino)phenyl]amino]-1-amino-9,10-dihydro-9,10-dioxo-2-anthracenesulfonic acid, monosodium salt.

Sec. 1393. [4-[2,6-Dihydro-2,6-dioxo-7-(4-propoxyphenyl)benzo[1,2-b:4,5-b ]difuran-3-yl]phenoxy]-acetic acid, 2-ethoxyethyl ester.

Sec. 1394. Basic Yellow 40 chloride based.

Sec. 1395. Direct Yellow 119.

Sec. 1396. Naugard 412s.

Sec. 1397. Triacetonamine.

Sec. 1398. Ipconazole.

Sec. 1399. Omite tech.

Sec. 1400. Pantera technical.

[[Page 120 STAT. 2931]]

Sec. 1401. p-Toluenesulfonyl chloride.

Sec. 1402. Preformed pellets of a mixture of sodium iodide, thallium iodide, dysprosium tri-iodide, holmium tri-iodide, thulium tri-iodide, and sometimes calcium iodide.

Sec. 1403. p-Aminobenzamide (4-aminobenzamide).

Sec. 1404. p-Chloroaniline.

Sec. 1405. 4-Chloro-2-nitroaniline.

Sec. 1406. o-Chloro-p-toluidine (3-chloro-4-methylaniline).

Sec. 1407. 2-Chloroacetoacetanilide.

Sec. 1408. p-Acetoacetanisidide.

Sec. 1409. 1-Hydroxy-2-naphthoic acid.

Sec. 1410. Pigment Green 7 crude, not ready for use as a pigment.

Sec. 1411. 1,8-Naphthalimide (1H-benz[de]isoquinoline-1,3(2H)-dione).

Sec. 1412. Diisopropyl succinate.

Sec. 1413. 2,4-Di-tert-butyl-6-(5-chlorobenzotriazol-2-yl)phenol.

Sec. 1414. Direct Black 22.

Sec. 1415. Methylene bis-benzotriazolyl tetramethylbutylphenol.

Sec. 1416. Bis-ethylhexyloxyphenol methoxyphenol triazine.

Sec. 1417. Reactive Orange 132.

Sec. 1418. Acid Black 244.

Sec. 1419. Certain cores used in remanufacture.

Sec. 1420. ADTP.

Sec. 1421. DCBTF.

Sec. 1422. Noviflumuron.

Sec. 1423. Parachlorobenzotrifluoride.

Sec. 1424. Mixtures of insecticide.

Sec. 1425. Mixture of fungicide.

Sec. 1426. 1,2-Benzisothiazol-3(2H)-one.

Sec. 1427. Styrene, ar-ethyl-, polymer with divinylbenzene and styrene (6CI) beads with low ash.

Sec. 1428. Mixtures of fungicide.

Sec. 1429. 2-Methyl-4-chlorophenoxy-acetic acid, di-methylamine salt.

Sec. 1430. Charge control agent 7.

Sec. 1431. Pro-jet Black 820 liquid feed.

Sec. 1432. Pro-jet Magenta 377 liquid feed.
Sec. 1433. Pro-jet Fast Black 287 NA liquid feed.
Sec. 1434. Pro-jet Fast Black 286 stage.
Sec. 1435. Pro-jet Cyan 485 stage.
Sec. 1436. Pro-jet Black 661 liquid feed.
Sec. 1437. Pro-jet Black Cyan 854 liquid feed.
Sec. 1438. Erasers.
Sec. 1439. Artificial flowers.
Sec. 1440. Suspension system stabilizer bars.
Sec. 1441. Rattan webbing.
Sec. 1442. Tractor body parts.
Sec. 1443. AC electric motors of an output exceeding 74.6 W but not
           exceeding 85 W.
Sec. 1444. AC electric motors of an output exceeding 74.6 W but not
           exceeding 105 W.
Sec. 1445. AC electric motors of an output exceeding 74.6 W but not
           exceeding 95 W.
Sec. 1446. Certain AC electric motors.
Sec. 1447. Viscose rayon yarn.
Sec. 1448. Certain twisted yarn of viscose rayon.
Sec. 1449. Allyl ureido monomer.
Sec. 1450. Synthetic elastic staple fiber.
Sec. 1451. Certain fiberglass sheets.
Sec. 1452. Halophosphor calcium diphosphate.
Sec. 1453. Certain rayon staple fibers.
Sec. 1454. Synthetic quartz or fused silica photomask substrates.
Sec. 1455. Certain integrated machines for manufacturing pneumatic
           tires.
Sec. 1456. Tramway cars.
Sec. 1457. Certain artificial filament single yarn (other than
           sewingthread).
Sec. 1458. Certain electrical transformers rated at 25VA.
Sec. 1459. Certain electrical transformers rated at 40VA.

                    Chapter 2--Reductions

Sec. 1461. Floor coverings and mats of vulcanized rubber.
Sec. 1462. Manicure and pedicure sets.
Sec. 1463. Nitrocellulose.
Sec. 1464. Sulfentrazone technical.

     [[Page 120 STAT. 2932]]

Sec. 1465. Clock radio combos.
Sec. 1466. Thiamethoxam technical.
Sec. 1467. Staple fibers of viscose rayon, not carded, combed, or
           otherwise processed for spinning.
Sec. 1468. Certain men's footwear covering the ankle with coated or
           laminated textile fabrics.
Sec. 1469. Certain footwear not covering the ankle with coated or
           laminated textile fabrics.
Sec. 1470. Acrylic or modacrylic synthetic staple fibers, not carded,
           combed, or otherwise processed for spinning.
Sec. 1471. Certain women's footwear.
Sec. 1472. Numerous other seals made of rubber or silicone, and covered
           with, or reinforced with, a fabric material.
Sec. 1473. Tetrakis.
Sec. 1474. Glycine, N,N-bis[2-hydroxy-3-(2-propenyloxy)propyl]-,
           monosodium salt, reaction products with ammonium hydroxide
           and pentafluoroiodoethane-tetrafluoroethylene telomer.
Sec. 1475. Diethyl ketone.
Sec. 1476. Acephate.
Sec. 1477. Flumioxazin.
Sec. 1478. Garenoxacin mesylate.
Sec. 1479. Butylated hydroxyethylbenzene.
Sec. 1480. Certain automotive catalytic converter mats.
Sec. 1481. 3,3'-Dichlorobenzidine dihydrochloride.
Sec. 1482. TMC114.
Sec. 1483. Biaxially oriented polypropylene dielectric film.
Sec. 1484. Biaxially oriented polyethylene terephthalate dielectric
           film.

Sec. 1485. Certain bicycle tires.
Sec. 1486. Certain bicycle parts.
Sec. 1487. Bifenthrin.
Sec. 1488. Reduced Vat 1.
Sec. 1489. 4-Chlorobenzonitrile.
Sec. 1490. Nail clippers and nail files.
Sec. 1491. Electric automatic shower cleaners.
Sec. 1492. Mesotrione technical.
Sec. 1493. Certain crank-gear and other bicycle parts.

            Subtitle B--Existing Suspensions and Reductions

Sec. 1501. Extensions of existing suspensions and other modifications.

                  Subtitle C--Effective Date

Sec. 1511. Effective date.

                  TITLE II--RELIQUIDATIONS

Sec. 2001. Reliquidation of certain entries of certain small diameter
            carbon and alloy seamless standard, line and pressure pipe
            from Romania.
Sec. 2002. Certain entries of pasta.
Sec. 2003. Clarification of reliquidation provision.
Sec. 2004. Reliquidation of certain drawback claim.
Sec. 2005. Payment of interest on amounts owed pursuant to reliquidation
            of certain entries.

        TITLE III--TECHNICAL CORRECTIONS AND OTHER PROVISIONS

              Subtitle A--Technical corrections

Sec. 3001. Amendments to the HTS.
Sec. 3002. Technical correction to the Tariff Act of 1930.
Sec. 3003. Amendments to the Pension Protection Act of 2006.
Sec. 3004. NMSBA.
Sec. 3005. Certain monochrome glass envelopes.
Sec. 3006. Flexible magnets and composite goods containing flexible
            magnets.
Sec. 3007. Cellar treatment of wine.

                  Subtitle B--Other Provisions

Sec. 3011. Consideration of certain civil actions delayed because of the
            terrorist attacks of September 11, 2001.
Sec. 3012. Effective date of modifications to the Harmonized Tariff
            Schedule.

    TITLE IV--EXTENSION OF NONDISCRIMINATORY TREATMENT (NORMAL TRADE
          RELATIONS TREATMENT) TO THE PRODUCTS OF VIETNAM

Sec. 4001. Findings.

[[Page 120 STAT. 2933]]

Sec. 4002. Termination of application of title IV of the Trade Act of
            1974 to Vietnam.
Sec. 4003. Procedure for determining prohibited subsidies by Vietnam.
Sec. 4004. Consultations upon initiation of investigation.
Sec. 4005. Public participation and consultation.
Sec. 4006. Arbitration and imposition of quotas.
Sec. 4007. Definitions.

                        TITLE V--HAITI

Sec. 5001. Short title.
Sec. 5002. Trade benefits for Haiti.
Sec. 5003. ITC study.
Sec. 5004. Sense of Congress on interpretation of textile and apparel
            provisions for Haiti.

Sec. 5005. Cost of new vehicles.
Sec. 5006. Effective date.

TITLE VI--AFRICAN GROWTH AND OPPORTUNITY ACT

Sec. 6001. Short title.
Sec. 6002. Preferential treatment of apparel products of lesser
           developed countries.
Sec. 6003. Technical corrections.
Sec. 6004. Effective date for AGOA.

TITLE VII--ANDEAN TRADE PREFERENCE ACT

Sec. 7001. Short title.
Sec. 7002. ATPA extension.
Sec. 7003. Technical amendments.

TITLE VIII--GENERALIZED SYSTEM OF PREFERENCES (GSP) PROGRAM

Sec. 8001. Limitations on waivers of competitive need limitation.
Sec. 8002. Extension of GSP program.

        DIVISION A--EXTENSION AND EXPANSION OF CERTAIN TAX RELIEF PROVISIONS,
                       AND OTHER TAX PROVISIONS

SEC. 100. REFERENCE.

    Except as otherwise expressly provided, whenever in this division an
amendment or repeal is expressed in terms of an amendment to, or repeal
of, a section or other provision, the reference shall be considered to
be made to a section or other provision of the Internal Revenue Code of
1986.

        TITLE I--EXTENSION AND MODIFICATION OF CERTAIN PROVISIONS

SEC. 101. DEDUCTION FOR QUALIFIED TUITION AND RELATED EXPENSES.

    (a) In General.--Section 222(e) <<NOTE: 26 USC 222.>> is amended by
striking ``2005'' and inserting ``2007''.

    (b) Conforming Amendments.--Section 222(b)(2)(B) is amended--
         (1) by striking ``a taxable year beginning in 2004 or 2005''
    and inserting ``any taxable year beginning after 2003'', and
         (2) by striking ``2004 and 2005'' in the heading and
    inserting ``After 2003''.

    (c) <<NOTE: 26 USC 222 note.>> Effective Date.--The amendments made
by this section shall apply to taxable years beginning after December
31, 2005.

[[Page 120 STAT. 2934]]

SEC. 102. EXTENSION AND MODIFICATION OF NEW MARKETS TAX CREDIT.

    (a) Extension.--Section 45D(f)(1)(D) <<NOTE: 26 USC 45D.>> is
amended by striking ``and 2007'' and inserting ``, 2007, and 2008''.

    (b) Regulations Regarding Non-Metropolitan Counties.--Section 45D(i)
is amended by striking ``and'' at the end of paragraph (4), by striking
the period at the end of paragraph (5) and inserting ``, and'', and by
adding at the end the following new paragraph:
         ``(6) which ensure that non-metropolitan counties receive a
    proportional allocation of qualified equity investments.''.

    (c) <<NOTE: 26 USC 45D note.>> Effective Date.--The amendments made
by this section shall take effect on the date of the enactment of this
Act.

SEC. 103. ELECTION TO DEDUCT STATE AND LOCAL GENERAL SALES TAXES.

    (a) In General.--Section 164(b)(5)(I) is amended by striking

on the use of such section during the preceding year,
including--

(1) an analysis of the use of such section during the
preceding year and the results of such use, and
(2) any legislative or administrative recommendations
regarding the provisions of such section and its application.

(d) Effective <<NOTE: 26 USC 62 note.>> Date.--The amendments made
by subsection (a) shall apply to information provided on or after the
date of the enactment of this Act.

SEC. 407. FRIVOLOUS TAX SUBMISSIONS.

(a) Civil Penalties.--Section 6702 is amended to read as follows:

``SEC. 6702. FRIVOLOUS TAX SUBMISSIONS.

``(a) Civil Penalty for Frivolous Tax Returns.--A person shall pay a
penalty of $5,000 if--
``(1) such person files what purports to be a return of a
tax imposed by this title but which--
``(A) does not contain information on which the
substantial correctness of the self-assessment may be
judged, or
``(B) contains information that on its face
indicates that the self-assessment is substantially
incorrect, and
``(2) the conduct referred to in paragraph (1)--
``(A) is based on a position which the Secretary has
identified as frivolous under subsection (c), or
``(B) reflects a desire to delay or impede the
administration of Federal tax laws.

``(b) Civil Penalty for Specified Frivolous Submissions.--
``(1) Imposition of penalty.--Except as provided in
paragraph (3), any person who submits a specified frivolous
submission shall pay a penalty of $5,000.
``(2) Specified frivolous submission.--For purposes of this
section--
``(A) Specified frivolous submission.--The term
`specified frivolous submission' means a specified
submission if any portion of such submission--

[[Page 120 STAT. 2961]]

``(i) is based on a position which the
Secretary has identified as frivolous under
subsection (c), or
``(ii) reflects a desire to delay or impede
the administration of Federal tax laws.
``(B) Specified submission.--The term `specified
submission' means--
``(i) a request for a hearing under--
``(I) section 6320 (relating to
notice and opportunity for hearing upon
filing of notice of lien), or
``(II) section 6330 (relating to
notice and opportunity for hearing
before levy), and
``(ii) an application under--
``(I) section 6159 (relating to
agreements for payment of tax liability
in installments),
``(II) section 7122 (relating to
compromises), or
``(III) section 7811 (relating to
taxpayer assistance orders).
``(3) Opportunity to <<NOTE: Deadline.>> withdraw
submission.--If the Secretary provides a person with notice that
a submission is a specified frivolous submission and such person
withdraws such submission within 30 days after such notice, the

penalty imposed under this section with respect to such submission.

``(c) Listing of Frivolous Positions.--The Secretary shall prescribe (and periodically revise) a list of positions which the Secretary has identified as being frivolous for purposes of this subsection. The Secretary shall not include in such list any position that the Secretary determines meets the requirement of section 6662(d)(2)(B)(ii)(II).
    ``(d) Reduction of Penalty.--The Secretary may reduce the amount of any penalty imposed under this section if the Secretary determines that such reduction would promote compliance with and administration of the Federal tax laws.
    ``(e) Penalties in Addition to Other Penalties.--The penalties imposed by this section shall be in addition to any other penalty provided by law.''.
    (b) Treatment of Frivolous Requests for Hearings Before Levy.--
        (1) Frivolous <<NOTE: 26 USC 6330.>> requests disregarded.--Section 6330 (relating to notice and opportunity for hearing before levy) is amended by adding at the end the following new subsection:

    ``(g) Frivolous Requests for Hearing, etc.--Notwithstanding any other provision of this section, if the Secretary determines that any portion of a request for a hearing under this section or section 6320 meets the requirement of clause (i) or (ii) of section 6702(b)(2)(A), then the Secretary may treat such portion as if it were never submitted and such portion shall not be subject to any further administrative or judicial review.''.
        (2) Preclusion from raising frivolous issues at hearing.--Section 6330(c)(4) is amended--
                (A) by striking ``(A)'' and inserting ``(A)(i)'';
                (B) by striking ``(B)'' and inserting ``(ii)'';
                (C) by striking the period at the end of the first sentence and inserting ``; or''; and

[[Page 120 STAT. 2962]]

                (D) by inserting after subparagraph (A)(ii) (as so redesignated) the following:
                ``(B) the issue meets the requirement of clause (i) or (ii) of section 6702(b)(2)(A).''.
        (3) Statement of grounds.--Section 6330(b)(1) is amended by striking ``under subsection (a)(3)(B)'' and inserting ``in writing under subsection (a)(3)(B) and states the grounds for the requested hearing''.

    (c) Treatment of Frivolous Requests for Hearings Upon Filing of Notice of Lien.--Section 6320 <<NOTE: 26 USC 6320.>> is amended--
        (1) in subsection (b)(1), by striking ``under subsection (a)(3)(B)'' and inserting ``in writing under subsection (a)(3)(B) and states the grounds for the requested hearing'', and
        (2) in subsection (c), by striking ``and (e)'' and inserting ``(e), and (g)''.

    (d) Treatment of Frivolous Applications for Offers-in-Compromise and Installment Agreements.--Section 7122 is amended by adding at the end the following new subsection:
    ``(f) Frivolous Submissions, etc.--Notwithstanding any other provision of this section, if the Secretary determines that any portion of an application for an offer-in-compromise or installment agreement submitted under this section or section 6159 meets the requirement of clause (i) or (ii) of section 6702(b)(2)(A), then the Secretary may treat such portion as if it were never submitted and such portion shall not be subject to any further administrative or judicial review.''.
    (e) Clerical Amendment.--The table of sections for part I of subchapter B of chapter 68 is amended by striking the item relating to section 6702 and inserting the following new item:

``Sec. 6702. Frivolous tax submissions.''.

(f) Eff<<NOTE: 26 USC 6702 note.>> The amendments made
by this section shall apply to submissions made and issues raised after
the date on which the Secretary first prescribes a list under section
6702(c) of the Internal Revenue Code of 1986, as amended by subsection
(a).

SEC. 408. ADDITION OF MENINGOCOCCAL AND HUMAN PAPILLOMAVIRUS VACCINES TO
        LIST OF TAXABLE VACCINES.

    (a) Meningococcal Vaccine.--Section 4132(a)(1) (defining taxable
vaccine) is amended by adding at the end the following new subparagraph:
                ``(O) Any meningococcal vaccine.''.

    (b) Human Papillomavirus Vaccine.--Section 4132(a)(1), as amended by
subsection (a), is amended by adding at the end the following new
subparagraph:
                ``(P) Any vaccine against the human
        papillomavirus.''.

    (c) Effective <<NOTE: 26 USC 4132 note.>> Date.--
        (1) Sales, etc.--The amendments made by this section shall
    apply to sales and uses on or after the first day of the first
    month which begins more than 4 weeks after the date of the
    enactment of this Act.
        (2) Deliveries.--For purposes of paragraph (1) and section
    4131 of the Internal Revenue Code of 1986, in the case of sales
    on or before the effective date described in such paragraph

[[Page 120 STAT. 2963]]

        for which delivery is made after such date, the delivery date
        shall be considered the sale date.

SEC. 409. CLARIFICATION OF TAXATION OF CERTAIN SETTLEMENT FUNDS MADE
        PERMANENT.

    (a) In General.--Subsection (g) of section 468B <<NOTE: 26 USC
468B.>> is amended by striking paragraph (3).

    (b) Effective Date.--The <<NOTE: 26 USC 468B note.>> amendment made
by this section shall take effect as if included in section 201 of the
Tax Increase Prevention and Reconciliation Act of 2005.

SEC. 410. MODIFICATION OF ACTIVE BUSINESS DEFINITION UNDER SECTION 355
        MADE PERMANENT.

    (a) In General.--Subparagraphs (A) and (D) of section 355(b)(3) are
each amended by striking ``and on or before December 31, 2010''.
    (b) Effective Date.--The <<NOTE: 26 USC 355 note.>> amendments made
by this section shall take effect as if included in section 202 of the
Tax Increase Prevention and Reconciliation Act of 2005.

SEC. 411. REVISION OF STATE VETERANS LIMIT MADE PERMANENT.

    (a) In General.--Subparagraph (B) of section 143(l)(3) is amended by
striking clause (iv).
    (b) Effective Date.--The <<NOTE: 26 USC 143 note.>> amendment made
by this section shall take effect as if included in section 203 of the
Tax Increase Prevention and Reconciliation Act of 2005.

SEC. 412. CAPITAL GAINS TREATMENT FOR CERTAIN SELF-CREATED MUSICAL WORKS
        MADE PERMANENT.

    (a) In General.--Paragraph (3) of section 1221(b) is amended by
striking ``before January 1, 2011,''.
    (b) Effective Date.--The <<NOTE: 26 USC 1221 note.>> amendment made
by this section shall take effect as if included in section 204 of the
Tax Increase Prevention and Reconciliation Act of 2005.

SEC. 413. REDUCTION IN MINIMUM VESSEL TONNAGE WHICH QUALIFIES FOR
        TONNAGE TAX MADE PERMANENT.

# EXHIBIT F

Part III - Administrative, Procedural, and Miscellaneous

Frivolous Positions

Notice 2007-30
PURPOSE

      Positions that are the same as or similar to the positions listed in this Notice are identified as frivolous for purposes of the penalty for a "frivolous tax return" under section 6702(a) of the Internal Revenue Code and the penalty for a "specified frivolous submission" under section 6702(b).  Persons who file a purported return of tax, including an original or amended return, based on one or more of these positions are subject to a penalty of $5,000 if the purported return of tax does not contain information on which the substantial correctness of the self-assessed determination of tax may be judged or contains information that on its face indicates the self-assessed determination of tax is substantially incorrect.  Likewise, persons who submit a "specified submission" (namely, a request for a collection due process hearing or an application for an installment agreement, offer-in-compromise, or Taxpayer Assistance Order) based on one or more of the positions listed in this Notice are subject to a penalty of $5,000.  The penalty may also be applied if the purported return or any portion of the specified submission is not based on a position set forth in this Notice, yet reflects a desire to delay or impede the administration of Federal tax laws for purposes of section 6702(a)(2)(B) or 6702(b)(2)(A)(ii).

2

BACKGROUND

Section 407 of Tax Relief and Health Care Act of 2006, Pub. L. No. 109-432, 120 Stat. 2922 (2006), amended section 6702 to increase the amount of the penalty for frivolous tax returns from $500 to $5,000 and to impose a penalty of $5,000 on any person who submits a "specified frivolous submission." A submission is a "specified frivolous submission" if it is a "specified submission" (defined in section 6702(b)(2)(B) as a request for a hearing under section 6320 or 6330 or an application under section 6159, 7122 or 7811) and any portion of the submission (i) is based on a position identified by the Secretary as frivolous or (ii) reflects a desire to delay or impede administration of the Federal tax laws. Section 6702 was further amended to add a new subsection (c) requiring the Secretary to prescribe a list of positions identified as frivolous. This Notice contains the prescribed list.

DISCUSSION

*Frivolous Positions.* Positions that are the same as or similar to the following are frivolous.

(1) Compliance with the internal revenue laws is voluntary or optional and not required by law, including arguments that:

   a. Filing a Federal tax or information return or paying tax is purely voluntary under the law, or similar arguments described as frivolous in Rev. Rul. 2007-20, 2007-14 I.R.B. ___

   b. Nothing in the Internal Revenue Code imposes a requirement to file a

3

return or pay tax, or that a person is not required to file a tax return or pay a tax unless the Internal Revenue Service responds to the person's questions, correspondence, or a request to identify a provision in the Code requiring the filing of a return or the payment of tax.

c.  There is no legal requirement to file a Federal income tax return because the instructions to Forms 1040, 1040A, or 1040EZ or the Treasury regulations associated with the filing of the forms do not display an OMB control number as required by the Paperwork Reduction Act of 1980, 44 U.S.C. § 3501 *et seq.*, or similar arguments described as frivolous in Rev. Rul. 2006-21, 2006-15 I.R.B. 745.

d.  Because filing a tax return is not required by law, the Service must prepare a return for a taxpayer who does not file one in order to assess and collect tax.

e.  A taxpayer has an option under the law to file a document or set of documents in lieu of a return or elect to file a tax return reporting zero taxable income and zero tax liability even if the taxpayer received taxable income during the taxable period for which the return is filed, or similar arguments described as frivolous in Rev. Rul. 2004-34, 2004-1. C.B. 619.

f.  An employer is not legally obligated to withhold income or employment taxes on employees' wages.

g.  A taxpayer may "untax" himself or herself at any time or revoke the consent to be taxed and thereafter not be subject to internal revenue

4

        taxes.

    h.  Only persons who have contracted with the government by applying for a governmental privilege or benefit, such as holding a Social Security number, are subject to tax, and those who have contracted with the government may choose to revoke the contract at will.

    i.  A taxpayer may lawfully decline to pay taxes if the taxpayer disagrees with the government's use of tax revenues, or similar arguments described as frivolous in Rev. Rul. 2005-20, 2005-1 C.B. 821.

    j.  An administrative summons issued by the Service is per se invalid and compliance with a summons is not legally required.

(2)  The Internal Revenue Code is not law (or "positive law") or its provisions are ineffective or inoperative, including the sections imposing an income tax or requiring the filing of tax returns, because the provisions have not been implemented by regulations even though the provisions in question either (a) do not expressly require the Secretary to issue implementing regulations to become effective or (b) expressly require implementing regulations which have been issued.

(3)  A taxpayer's income is excluded from taxation when the taxpayer rejects or renounces United States citizenship because the taxpayer is a citizen exclusively of a State (sometimes characterized as a "natural-born citizen" of a "sovereign state"), that is claimed to be a separate country or otherwise not subject to the laws of the United States.  This position includes the argument

5

that the United States does not include all or a part of the physical territory of the 50 States and instead consists of only places such as the District of Columbia, Commonwealths and Territories (e.g., Puerto Rico), and Federal enclaves (e.g., Native American reservations and military installations), or similar arguments described as frivolous in Rev. Rul. 2004-28, 2004-1 C.B. 624, or Rev. Rul. 2007-22, 2007-14 I.R.B. ___.

(4)   Wages, tips, and other compensation received for the performance of personal services are not taxable income or are offset by an equivalent deduction for the personal services rendered, including an argument that a taxpayer has a "claim of right" to exclude the cost or value of the taxpayer's labor from income or that taxpayers have a basis in their labor equal to the fair market value of the wages they receive, or similar arguments described as frivolous in Rev. Rul. 2004-29, 2004-1 C.B. 627, or Rev. Rul. 2007-19, 2007-14 I.R.B. ___ .

(5)   United States citizens and residents are not subject to tax on their wages or other income derived from sources within the United States, as only foreign-based income or income received by nonresident aliens and foreign corporations from sources within the United States is taxable, and similar arguments described as frivolous in Rev. Rul. 2004-30, 2004-1 C.B. 622.

(6)   A taxpayer has been removed or redeemed from the Federal tax system though the taxpayer remains a United States citizen or resident, or similar arguments described as frivolous in Rev. Rul. 2004-31, 2004-1 C.B. 617.

(7)   Only certain types of taxpayers are subject to income and employment taxes,

6

such as employees of the Federal government, corporations, nonresident aliens, or residents of the District of Columbia or the Federal territories, or similar arguments described as frivolous in Rev. Rul. 2006-18, 2006-15 I.R.B. 743.

(8)    Only certain types of income are taxable, for example, income that results from the sale of alcohol, tobacco, or firearms or from transactions or activities that take place in interstate commerce.

(9)    Federal income taxes are unconstitutional or a taxpayer has a constitutional right not to comply with the Federal tax laws for one of the following reasons:

    a.  The First Amendment permits a taxpayer to refuse to pay taxes based on religious or moral beliefs.

    b.  A taxpayer may withhold payment of taxes or the filing of a tax return until the Service or other government entity responds to a First Amendment petition for redress of grievances.

    c.  Mandatory compliance with, or enforcement of, the tax laws invades a taxpayer's right to privacy under the Fourth Amendment.

    d.  The requirement to file a tax return is an unreasonable search and seizure contrary to the Fourth Amendment.

    e.  Income taxation, tax withholding, or the assessment or collection of tax is a "taking" of property without due process of law or just compensation in violation of the Fifth Amendment.

    f.  The Fifth Amendment privilege against self-incrimination grants taxpayers

7

the right not to file returns or the right to withhold all financial information from the Service.

g.  Mandatory or compelled compliance with the internal revenue laws is a form of involuntary servitude prohibited by the Thirteenth Amendment.

h.  Individuals may not be taxed unless they are "citizens" within the meaning of the Fourteenth Amendment.

i.  The Sixteenth Amendment was not ratified, has no effect, contradicts the Constitution as originally ratified, lacks an enabling clause, or does not authorize a non-apportioned, direct income tax.

j.  Taxation of income attributed to a trust, which is a form of contract, violates the constitutional prohibition against impairment of contracts.

k.  Similar constitutional arguments described as frivolous in Rev. Rul. 2005-19, 2005-1 C.B. 819.

(10)  A taxpayer is not a "person" within the meaning of section 7701(a)(14) or other provisions of the Internal Revenue Code, or similar arguments described as frivolous in Rev. Rul. 2007-22, 2007-14 I.R.B. ___.

(11)  Federal Reserve Notes are not taxable income when paid to a taxpayer because they are not gold or silver and may not be redeemed for gold or silver.

(12)  In a transaction using gold and silver coins, the value of the coins is excluded from income or the amount realized in the transaction is the face value of the coins and not their fair market value for purposes of determining taxable

8

income.

(13)   A taxpayer with a home-based business may deduct as business expenses the costs of maintaining the taxpayer's household along with personal expenses, or similar arguments described as frivolous by Rev. Rul. 2004-32, 2004-1 C.B. 621.

(14)   A "reparations" tax credit exists, including arguments that African-American taxpayers may claim a tax credit on their Federal income tax returns as reparations for slavery or other historical mistreatment, that Native Americans are entitled to an analogous credit (or are exempt from Federal income tax on the basis of a treaty), or similar arguments described as frivolous in Rev. Rul. 2004-33, 2004-1 C.B. 628, or Rev. Rul. 2006-20, 2006-15 I.R.B. 746.

(15)   A Native American or other taxpayer who is not an employer engaged in a trade or business may nevertheless claim (for example, in an amount exceeding all reported income) the Indian Employment Credit under section 45A, which explicitly requires, among other criteria, that the taxpayer be an employer engaged in a trade or business to claim the credit.

(16)   A taxpayer's wages are excluded from Social Security taxes if the taxpayer waives the right to receive Social Security benefits, or a taxpayer is entitled to a refund of, or may claim a charitable-contribution deduction for, the Social Security taxes that the taxpayer has paid, or similar arguments described as frivolous in Rev. Rul. 2005-17, 2005-1 C.B. 823.

(17)   Taxpayers may reduce or eliminate their Federal tax liability by altering a tax

9

return, including striking out the penalty-of-perjury declaration, or attaching documents to the return, such as a disclaimer of liability, or similar arguments described as frivolous in Rev. Rul. 2005-18, 2005-1 C.B. 817.

(18)   A taxpayer is not obligated to pay income tax because the government has created an entity separate and distinct from the taxpayer—a "straw man"—that is distinguishable from the taxpayer by some variation of the taxpayer's name, and any tax obligations are exclusively those of the "straw man," or similar arguments described as frivolous in Rev. Rul. 2005-21, 2005-1 C.B. 822.

(19)   Inserting the phrase "nunc pro tunc" on a return or other document filed with or submitted to the Service has a legal effect, such as reducing a taxpayer's tax liability, or similar arguments described as frivolous in Rev. Rul. 2006-17, 2006-15 I.R.B. 748.

(20)   A taxpayer may avoid tax on income by attributing the income to a trust, including the argument that a taxpayer can put all of the taxpayer's assets into a trust to avoid income tax while still retaining substantial powers of ownership and control over those assets or that a taxpayer may claim an expense deduction for the income attributed to a trust, or similar arguments described as frivolous in Rev. Rul. 2006-19, 2006-15 I.R.B. 749.

(21)   A taxpayer may lawfully avoid income tax by sending income offshore, including depositing income into a foreign bank account.

(22)   By purchasing equipment and services for an inflated price (which may or may not have been actually paid), a taxpayer can use the section 44 Disabled

10

Access Credit to reduce tax or generate a refund irrespective of whether the taxpayer is a small business that purchased the equipment or services to comply with the requirements of the Americans with Disabilities Act.

(23)   A taxpayer is allowed to buy or sell the right to claim a child as a qualifying child for purposes of the Earned Income Tax Credit.

(24)   An IRS Form 23C, *Assessment Certificate - Summary Record of Assessment*, is an invalid record of assessment for purposes of section 6203 and Treas. Reg. § 301.6203-1, the Form 23C must be personally signed by the Secretary of the Treasury for an assessment to be valid, the Service must provide a copy of the Form 23C to a taxpayer if requested before taking collection action, or similar arguments described as frivolous in Rev. Rul. 2007-21, 2007-14 I.R.B. ___.

(25)   A tax assessment is invalid because the assessment was made from a section 6020(b) substitute for return, which is not a valid return.

(26)   A statutory notice of deficiency is invalid because the taxpayer to whom the notice was sent did not file an income tax return reporting the deficiency or because the statutory notice of deficiency was unsigned or not signed by the Secretary of the Treasury or by someone with delegated authority.

(27)   A Notice of Federal Tax Lien is invalid because it is not signed by a particular official (such as by the Secretary of the Treasury), or because it was filed by someone without delegated authority.

(28)   The form or content of a Notice of Federal Tax Lien is controlled by or subject

to a state or local law, and a Notice of Federal Tax Lien that does not comply in form or content with a state or local law is invalid.

(29)  A collection due process notice under section 6320 or 6330 is invalid if it is not signed by the Secretary of the Treasury or other particular official, or if no certificate of assessment is attached.

(30)  Verification under section 6330 that the requirements of any applicable law or administrative procedure have been met may only be based on one or more particular forms or documents (which must be in a certain format), such as a summary record of assessment, or that the particular forms or documents or the ones on which verification was actually determined must be provided to a taxpayer at a collection due process hearing.

(31)  A Notice and Demand is invalid because it was not signed, was not on the correct form (e.g., a Form 17), or was not accompanied by a certificate of assessment when mailed.

(32)  The United States Tax Court is an illegitimate court or does not, for any purported constitutional or other reason, have the authority to hear and decide matters within its jurisdiction.

(33)  Federal courts may not enforce the internal revenue laws because their jurisdiction is limited to admiralty or maritime cases or issues.

(34)  Revenue Officers are not authorized to issue levies or Notices of Federal Tax Lien or to seize property in satisfaction of unpaid taxes.

(35)  A Service employee lacks the authority to carry out the employee's duties

12

because the employee does not possess a certain type of identification or credential, for example, a pocket commission or a badge, or it is not in the correct form or on the right medium.

(36)   A person may represent a taxpayer before the Service or in court proceedings even if the person does not have a power of attorney from the taxpayer, has not been enrolled to practice before the Service, or has not been admitted to practice before the court.

(37)   A civil action to collect unpaid taxes or penalties must be personally authorized by the Secretary of the Treasury and the Attorney General.

(38)   A taxpayer's income is not taxable if the taxpayer assigns or attributes the income to a religious organization (a "corporation sole" or ministerial trust) claimed to be tax-exempt under section 501(c)(3), or similar arguments described as frivolous in Rev. Rul. 2004-27, 2004-1 C.B. 625.

(39)   The Service is not an agency of the United States government but rather a private-sector corporation or an agency of a State or Territory without authority to administer the internal revenue laws.

(40)   Any position described as frivolous in any revenue ruling or other published guidance in existence when the return adopting the position is filed with or the specified submission adopting the position is submitted to the Service.

Returns or submissions that contain positions not listed above, which on their face have no basis for validity in existing law, or which have been deemed frivolous in a published opinion of the United States Tax Court or other court of competent

jurisdiction, may be determined to reflect a desire to delay or impede the administration of Federal tax laws and thereby subject to the $5,000 penalty.

The list of frivolous positions above will be periodically revised as required by section 6702(c).

DRAFTING INFORMATION

The principal author of this notice is the Office of Associate Chief Counsel (Procedure & Administration).  For further information regarding this notice contact the Office of Associate Chief Counsel (Procedure & Administration), Administrative Provisions & Judicial Practice Division, Branch 2, at (202) 622-4940 (not a toll-free call).