# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

ROBERT L. SCHULZ,

                        Plaintiff,                  1:15-cv-01299 (BKS/CFH)

v.

UNITED STATES,

                        Defendant.

**APPEARANCES:**

*For Plaintiff:*
Robert L. Schulz, pro se
Queensbury, NY 12804

*For Defendant:*
Michael R. Pahl
U.S. Department of Justice, Tax Division
Ben Franklin Station
P.O. Box 7238
Washington, DC 20044

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I.    INTRODUCTION

Plaintiff pro se Robert L. Schulz brings this action against Defendant United States (the "Government") under 26 U.S.C. § 6703(c)(2), alleging that the Internal Revenue Service (the "IRS"): (i) erroneously assessed a penalty of $225,000 against him for promoting an abusive tax shelter; and (ii) seeking to bar the Government from retaliating against him. (Dkt. No. 8). On May 20, 2016, the Government asserted a counterclaim against Schulz, seeking a judgment for the unpaid $224,000 balance of the penalty the IRS assessed. (Dkt. No. 29, at 11). On March 7, 2017, the Court granted partial summary judgment to the Government, finding Schulz liable for

promoting an abusive tax shelter under 26 U.S.C. § 6700, "leaving only the issue of the penalty due . . . which Schulz may challenge on the basis that he received no income from the abusive tax shelter." (Dkt. No. 88, at 10). Currently pending before the Court are: (i) the Government's motion for summary judgment, (Dkt. No. 196), which Schulz opposes, (Dkt. No. 213); and (ii) Schulz's motion for summary judgment, (Dkt. No. 197), which the Government opposes, (Dkt. No. 211). On June 11, 2018, the Court directed the parties to submit additional briefing as to whether We the People ("WTP"), "derived more than $225,000 in gross income in 2003 from the 'activity' at issue in this case, that is, organizing, selling, or participating in the organization of abusive tax shelters." (Dkt. No. 216). The Government and Schulz submitted their letter briefs on the issue on June 22, 2018 and June 25, 2018, respectively.[1] (Dkt. Nos. 219, 220). For the following reasons, the Government's motion for summary judgment is granted in part and denied in part; Schulz's motion for summary judgment is denied.

---

[1] On July 6, 2018, Schulz informed the Court that he "recently discovered hundreds of documents" related to requests for Blue Folders and communications from donors. (Dkt. No. 222). This does not alter the Court's determination that there are material issues of fact remaining for trial.

## II. BACKGROUND[2]

### A. WTP's Operations

Schulz is the founder of two not-for-profit entities known as We The People for Constitutional Education and We The People Congress, together known as "WTP." (Dkt. No. 197-2, ¶ 2). Schulz claims that he, through the activities of WTP, has devoted "his life to helping people understand the history, meaning, effect and significance of the provisions of the Declaration of Independence and their State and Federal constitutions and how to hold their public officials accountable to the rule of law pursuant to the First Amendment's Petition Clause." (*Id.*, ¶ 4). Schulz has served as WTP's Chairman, President, and Chief Executive Officer since he founded the organization in 1997. (Dkt. No. 196-5, at 2; Dkt. No. 196-12, at 3). Schulz personally performed the administrative tasks required to establish and maintain WTP. (Dkt. No. 197-2, ¶¶ 9–11, 13–17, 20–21). WTP's corporate address has always been the same as Schulz's home address, and its offices have always been located in Schulz's home. (Dkt. No. 196-5, at 3–5). Schulz, however, has never received rent in exchange for providing the space, nor has he taken a deduction on his tax returns for donating the space to WTP. (*Id.*, at 3–4). Other than Schulz's wife, only Schulz has an office at WTP. (Dkt. No. 196-12, at 6).

---

[2] The Court assumes familiarity with the procedural and factual history of this case, as set out in *United States v. Schulz*, 529 F. Supp. 2d 341 (N.D.N.Y. 2007), *aff'd*, 517 F.3d 606 (2d Cir. 2008) ("*Schulz I*"), as well as the Court's previous decisions dated February 11, 2016, May 6, 2016, and March 7, 2017, (Dkt. Nos. 23, 25, 88). Only those facts relevant to the parties' motions are set out below, and are drawn from the parties' statements of material facts (Dkt. Nos. 196-15, 197-2), responses thereto (Dkt. Nos. 211-1, 213-1), and exhibits attached to the parties' submissions, to the extent that they would be admissible as evidence. Where facts stated in a party's statement of material facts are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court has found such facts to be true. *See* N.D.N.Y. L.R. 7.1(a)(3); Fed. R. Civ. P. 56(e). Furthermore, Schulz's response (Dkt. No. 213-1) to the Government's statement of material facts (Dkt. No. 196-15) denies and objects to nearly all of the Government's factual assertions, primarily on the basis that any activity he performed was not as an individual, but in his "official capacity as an officer" of WTP, (*see, e.g.*, Dkt. No. 213-1, ¶¶ 1–5, 7, 8, 13, 15, 17). As explained in Section IV.B., *infra*, such objections are irrelevant to the Court's analysis. Finally, Schulz has filed a "Reply to United States' Response to Schulz Statement of Material Facts" (Dkt. No. 214), along with his reply papers (Dkt. No. 214-1). Even if the Local Rules permitted such a reply, which they do not, *see* N.D.N.Y. L.R. 7.1, the contents of this submission are immaterial to the disposition of the pending motions.

Schulz used WTP funds to defend himself in IRS actions and litigation, regardless of whether WTP was a named defendant.[3] (Dkt. No. 196-5, at 73). Schulz paid corporate expenses with personal credit cards, after which "WTP sent payments to American Express [and Chase] to reimburse Schulz for his WTP related expenses if WTP had the funds to do so." (Dkt. No. 196-4, at 48–49). "Otherwise[,] the amount was considered as an unsecured loan from Schulz to WTP." (*Id.*). Schulz estimates that he made more than $100,000 in unsecured loans, in the form of "unreimbursed expenses," to WTP. (Dkt. No. 196-12, at 13).

Although Schulz claims that WTP had no employees,[4] (Dkt. No. 196-5, at 5), he acknowledges that WTP was his "full-time" occupation. (Dkt. No. 213-1, ¶ 14; Dkt. No. 196-3, at 160). Schulz himself carried out WTP's activities: he personally "Petitioned the federal government" and "distributed copies of that Petition," (Dkt. No. 8, ¶ 13–14), including by mailing 225 copies of the petition materials to requesting individuals across the country, (Dkt. No. 196-15, at ¶ 8). At deposition, Schulz described his role at WTP as "the voice of the organization." (Dkt. No. 196-12, at 11). WTP's 2003 "Chairman's Reports," which are simply posts authored by Schulz and posted to WTP's website, indicate that Schulz alone determined WTP's mission, message, and strategy. (*See, e.g.*, Dkt. No. 197-3, at 12–160; Dkt. No. 197-4, at 1–113). Although the WTP organizations had various board members and officers since its founding, (Dkt. No. 196-5, at 26, 54, 58; Dkt. No. 197-9, at 9, 69, 89), Schulz was the only person constantly affiliated with WTP in an official capacity throughout its existence.

---

[3] Schulz denies this fact, arguing that "[o]ther than the first case in 1978 and a case in 2004," these cases "almost always included other members and supporters of the organization," "there were probably other plaintiffs," and, in some instances, involved efforts to quash IRS efforts to obtain WTP records. (Dkt. No. 213-1, ¶ 38). Taking judicial notice of the cases that the Government has identified, (Dkt. No. 196-15, ¶ 37 n.49), however, the Court notes that WTP is a party in none of them.

[4] An undated document indicates that WTP's board passed a resolution stating that Schulz "shall be compensated at the rate of $12,000 per calendar year for his services." (Dkt. No. 196-5, at 55). Schulz disputes, and the record does not indicate, whether he ultimately received any of the salary due from WTP. (Dkt. No. 213-1, ¶ 25).

In 2003, the board accepted Schulz's strategy to reform the WTP board with a national focus and granted Schulz "the power to remove and add members to the Board based solely upon his discretion." (Dkt. No. 196-5, at 55–61). In October 2003, explaining that he had "settled on a reorganization plan for" WTP, Schulz used this power to remove all but two members of WTP's board—himself and Burr Deitz, who also served as Secretary and Treasurer. (Dkt. No. 196-4, at 113). In January 2004, Schulz and Deitz—the only remaining board members—authorized Schulz "to have WTP continue to pay out-of-pocket expenses related to" the IRS's investigation into WTP and Schulz's violations of § 6700. (Dkt. No. 196-5, at 73).[5] In March 2006, Schulz and Deitz authorized WTP to "continue paying" for the litigation costs associated with several cases without regard to whether WTP was itself a litigant, but "provided those activities are directly related to and further the objectives" of WTP's mission. (Dkt. No. 196-7, at 68).

B. **The Blue Folder**

One of WTP's goals was to "claim[] and exercis[e]" what Schulz has described as his "First Amendment Right to Petition the Government for Redress of Grievances" for the purpose of "obtaining the answers to important questions by Petitioning the leaders of the federal government." (Dkt. No. 8, ¶¶ 7, 11). To that end, WTP "repeatedly petitioned Defendant United States to respond to Petitions for Redress of Grievances related to alleged violations by the United States of," *inter alia*, "the Constitution's tax clauses (via the direct, un-apportioned tax on labor)." (Dkt. No. 197-2, ¶ 6). WTP's "written Petition for Redress of Grievances regarding tax

---

[5] The record indicates that Deitz, an electrician by trade with no accounting experience, was the sole other board member from October 2003 until January 2007, (Dkt. No. 196-5, at 70), when he resigned and was replaced by Vanessa Astrup as Secretary, (Dkt. No. 196-12, at 6). Schulz testified that he asked Deitz to resign after Deitz "fell victim to an online scam" and wrote himself checks for $8,700 from WTP's bank account. (*Id.*). Although Schulz testified that he verbally informed the board—which consisted of only himself and Astrup—he did not "think it was appropriate" to report the incident to police. (*Id.* at 6–7). WTP reported the amount under "loans receivable" on its 2007 federal tax return. (Dkt. No. 196-3, at 111).

5

withholding" was packaged in a blue folder titled "Legal Termination of Tax Withholding for Companies, Workers and Independent Contractors" (the "Blue Folder"). (*Id.* ¶ 8). The Blue Folder contained materials that "encouraged companies, workers and independent contractors to submit the content of the Blue Folder to their corporate lawyers and CPAs for a 'rigorous review' of its accuracy with the goal of . . . legally ending tax withholding." (*Id.* ¶ 9). WTP distributed physical copies of the Blue Folder at WTP events and through the mail; a digital version was available by download from the WTP website. (*Id.* ¶¶ 11–13). Schulz argues that WTP never sold the contents of the Blue Folder, but only requested a "nominal donation of $20" from individuals who requested a physical copy to offset costs associated with printing and mailing the materials.[6] (*Id.* ¶¶ 12, 15, 23). It is undisputed that WTP distributed 225 copies of the Blue Folder to individuals by mail, "some of whom volunteered to send $20 to cover the cost of printing and mailing; WTP did not send invoices to any of these individuals and did not require any payment or donation to be made prior to mailing the Blue Folder." (*Id.* ¶ 24).[7]

WTP reported $485,351 in "total revenue" to the IRS in 2003. (Dkt. No. 196-3, at 8). Schulz argues that, during that period, WTP's "Blue Folder-related activities took up an insignificant amount of WTP's time and resources," and were "small and unimportant in view of WTP's overall activities, total revenues and total expenses." (Dkt. No. 197-2, ¶ 28). The record indicates that WTP solicited and received donations in support of its other efforts to, *inter alia*, organize and sponsor a "Give Me Liberty national conference" and to "bring an action in 2004 against the United States . . . for a declaration of the Rights of People and the obligations of the

---

[6] The Government states that WTP's website offered the Blue Folder for sale for $39.95, citing to *Schulz I* in support of the factual proposition. (Dkt. No. 196-15, ¶ 7). Schulz disputes that the Blue Folders were ever "for sale," and contends that they were offered for free, with a requested donation of $20. (Dkt. No. 197-2, ¶ 24).

[7] Altogether, WTP prepared at least "three thousand, five hundred (3,500) copies of the Blue Folder," which were "available for pick up, free of charge and anonymously" during events held across the United States in 2003. (Dkt. No. 197-2, ¶ 20).

6

government under the last ten words of the First Amendment—that is, the 'petition clause.'"
(*Id.*, ¶ 30). Schulz asserts that, cumulatively calculated, the "gross revenue of 225 [Blue Folder] donations of $20 would represent .84% of WTP's [g]ross [r]evenue" as reported in 2003.[8] (*Id.*, ¶ 29).

## III. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

---

[8] The Government objects to Schulz's calculation on the basis that "the question of gross *income* derived from the scheme (as opposed to gross *revenue* as stated by Schulz) is a legal conclusion [and] not a 'fact' for summary judgment purposes." (Dkt. No. 211-1, ¶ 29). Construing Schulz's statement liberally, however, his argument that any hypothetical revenue directly derived from donations requested in exchange for each of the 225 Blue Folders ($4,500) comprises a comparatively minor proportion of WTP's reported gross income ($485,351) is not unfounded.

7

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks omitted).

Where a plaintiff proceeds pro se, the Court must read his or her submissions liberally and interpret them "to raise the strongest arguments that they suggest." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). However, a pro se party's "'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Jordan v. New York*, 773 F. Supp. 2d 255, 268 (N.D.N.Y. 2010) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)); *see also Wagner v. Swarts*, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011).

## IV. DISCUSSION

### A. Calculation of Penalty Under § 6700

The Government assessed penalties against Schulz pursuant to 26 U.S.C. § 6700 for promoting an abusive tax shelter. (Dkt. No. 197-2, ¶ 41). As the Court has already ruled that Schulz is liable for promoting an abusive tax shelter by virtue of WTP's distribution of the Blue Folders, (Dkt. No. 88), the only remaining issue is the propriety of the penalty assessed against him.[9] Section 6700 provides that any person who violates the statue "shall pay, with respect to each activity [proscribed by the statute], a penalty equal to $1,000 or, if the person establishes that it is lesser, 100 percent of the gross income derived (or to be derived) by such person from such activity." 26 U.S.C. § 6700.[10] The Government is entitled to a presumption that the size of

---

[9] Schulz also argues that the penalty assessed against him is invalid because "IRS Agent Gordon did not get written approval of the initial penalty determination from his supervisor prior to the date the IRS issued the Notice of Penalty" in violation of 26 U.S.C. § 6751. (Dkt. No. 213, at 6–11). Although the Government responds that the issue was settled when Schulz failed to raise the issue before the Court's March 7, 2017 ruling as to Schulz's liability, (Dkt. No. 215, at ), it appears that the Form 8278 giving rise to Schulz's argument was first disclosed to Schulz on December 4, 2017, (Dkt. No. 190). In any event, the record indicates that an IRS supervisor approved the penalty on November 18, 2014, (Dkt. No. 190-2, at 48), and that the IRS subsequently issued the Notice of Penalty on March 9, 2015, (Dkt. No. 13-1, at 6). Accordingly, even were the Court to consider Schulz's argument here, it would be rejected.

[10] Congress amended § 6700 in 1989, significantly changing the method by which the IRS calculated penalties for promoting an abusive tax shelter. The parties do not dispute that the relevant version of the statute was in effect from 1989 to 2004:

> Promoting abusive tax shelters, etc.
>
> (a) Imposition of penalty. Any person who—
>
>     (1)(A) organizes (or assists in the organization of)—
>
>         (i) a partnership or other entity,
>
>         (ii) any investment plan or arrangement, or
>
>         (iii) any other plan or arrangement, or
>
>     (B) participates (directly or indirectly) in the sale of any interest in an entity or plan or arrangement referred to in subparagraph (A), and
>
>     (2) makes or furnishes or causes another person to make or furnish (in connection with such organization or sale)—
>
>     (A) a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by reason of holding an interest in the entity or participating in the plan or arrangement which the person knows or has reason to know is false or fraudulent as to any material matter, or

9

the calculated penalty is correct. *In re MDL-731 Tax Refund Litig.*, 989 F.2d 1290, 1303 (2d Cir. 1993). Thus, a "taxpayer is liable for a $1,000 penalty for each violation of section 6700 unless the taxpayer can establish that the amount of gross income derived from the activity was less than $1,000." *Gardner v. C.I.R.*, 145 T.C. 161, 179 (2015), *aff'd sub nom. Gardner v. Comm'r of Internal Revenue*, 704 F. App'x 720 (9th Cir. 2017). "Accordingly, when the Government establishes that a defendant sold a certain number of materials, the burden shifts to the defendant to show that the income derived was less tha[n] $1,000 per transaction." *United States v. Alexander*, No. 08-cv-03760, 2010 WL 1643425, at *7, 2010 U.S. Dist. LEXIS 40108, at *17–18 (D.S.C. Apr. 22, 2010), *aff'd*, 434 F. App'x 246 (4th Cir. 2011) (granting Government's motion for summary judgment and imposing "per activity" penalty where taxpayer failed to adduce evidence that he derived less than $1,000 for each tax avoidance package sold).

The Government calculated Schulz's penalty by first determining that the 225 Blue Folders Schulz distributed by mail constitute the "activities" that violated § 6700. (*See* Dkt. No. 215, at 6 ("Here, the *transaction attacked* is Schulz's organization, promotion, and distribution of the Tax Termination Packages in 2003.")). The Government then asserts that the "gross income" Schulz derived from those activities is properly considered as the gross revenue that WTP reported to the IRS in 2003, or $485,351. The Government therefore concludes that the

---

(B) a gross valuation overstatement as to any material matter,

shall pay, with respect to each activity described in paragraph (1), a penalty equal to the $ 1,000 or, if the person establishes that it is lesser, 100 percent of the gross income derived (or to be derived) by such person from such activity. For purposes of the preceding sentence, activities described in paragraph (1)(A) with respect to each entity or arrangement shall be treated as a separate activity and participation in each sale described in paragraph (1)(B) shall be so treated.

26 U.S.C. § 6700 (2000).

penalty is correctly assessed at $225,000, i.e., the lesser of the "per activity" calculation and WTP's gross income.[11]

"For purposes of calculating a Section 6700 penalty," however, "the government is concerned only with gross income to be derived from a particular, well-defined activity." *In re MDL-731 Tax Refund Litig.*, 989 F.2d at 1302; *see also Gardner*, 145 T.C. at 179 ($47,000 penalty calculated by identifying "47 corporations sole organized by petitioners and *correlat[ing] payments made by the customers*" (emphasis added)); *Alexander*, 2010 WL 1643425, at *7, 2010 U.S. Dist. LEXIS 40108, at *17–18 (penalty of $1,152,000 appropriate where business record indicated 1,152 transactions and defendant's wife "burned all other records" of income from sales of tax shelter). Here, the particular activities at issue, as defined by the Government, are 225 distributions of the Blue Folder. Viewed in the light most favorable to Schulz, the evidence that the Blue Folders were offered for a suggested donation of $20 is sufficient to raise a question of fact as to whether WTP received less than $1,000 in gross income from each Blue Folder it distributed. (Dkt. No. 197-2, ¶ 24; Dkt. No. 211-1, ¶ 24). Furthermore, because there is evidence in the record indicating that WTP solicited and received donations in support of a variety of activities other than its distribution of 225 copies of the Blue Folder, (*see, e.g.*, Dkt. Nos. 197-3; 197-4), there are material issues of fact as to whether WTP's total gross income—$485,351—constitutes the "gross income derived" from the specified activities by

---

[11] Schulz argues that, because $1,000 "was meant to be a flat amount," the "IRS improperly calculated the penalty . . . by imposing a monetary amount with regard to each Blue folder." (Dkt. No. 197-1, at 9). The cases he cites in support of this proposition are either inapposite or pertain only to the pre-1989 version of the statute. *See Hargrove & Costanzo v. United States*, No. 06-cv-046, 2008 WL 4133928, at *7, 2008 U.S. Dist. LEXIS 79606, at * (E.D. Cal. Sept. 4, 2008) (declining to determine validity of assessment of penalty on motion for summary judgment, but indicating that 1989 amendment to Section 6700 requires a penalty calculation based on the number of issuances rather than the total number of individual bonds sold); *Emanuel v. United States*, 705 F. Supp. 434, 436 (N.D. Ill. 1989) (applying pre-1989 amendment statute).

which the Government calculated the penalty.[12] (*See* Dkt. No. 197-2, at ¶ 28–29, 62 ("Defendant has admitted [that] the IRS made no effort to determine if any copies of the Blue Folder were sold and what gross income was derived from the sale(s).")).

Thus, without evidence correlating the amount of WTP's annual gross in 2003 with the amount of gross income WTP derived from distribution of each of the 225 Blue Folders, there remains a dispute of material fact as to whether the penalty is properly assessed at $225,000 or some lesser amount.

### B. Whether WTP Is Schulz's Alter-Ego

Regardless of whether the penalty is properly assessed as the gross income "derived . . . from such activity" or calculated on a "per activity" basis, no penalty can be assessed against Schulz unless WTP's income—as derived from the distribution of the 225 Blue Folders at issue here—can be imputed to him as an individual. The Government argues that it is entitled to summary judgment because the "undisputed evidence shows" that WTP functioned as Schulz's alter-ego at the time the income was generated, and that, therefore, any income generated by

---

[12] Although arising in the context of the "full-payment rule," *Humphrey v. United States* explains that "no matter if a sale requires a penalty of $1,000, or some lesser amount, that penalty is always a function of a single sale." 854 F. Supp. 2d 1301, 1307 (N.D. Ga. 2011). In *Humphrey*, the plaintiff tax preparer was penalized the "gross income she received for all of her sales" of tax shelters, calculated by "totaling the annual gross reflected in [her] 1099-B's" from sales that year. *Id.* at 1307. The court concluded that, while "practical," this "gross annual income method" improperly rendered the penalty indivisible:

> Section 6700 clearly requires a per sale method for calculating a penalty: (1) if the taxpayer grossed at least $1,000 from an individual sale, the penalty is $1,000; and (2) if the taxpayer can show that she grossed less than $1,000 from an individual sale, the penalty is the gross from that individual sale. The statute does not compel or allow the use of an annual gross income method. No matter the amount of the penalty or the income earned from a sale, the relevant quantum is an individual sale.

*Id.* at 1308 (citation omitted). Here, the Government has not attempted to demonstrate how WTP's gross income exceeded $1,000 with respect to each of the 225 Blue Folders "sold." Rather, relying entirely on its presumption of correctness, the Government simply asserts that 100% of WTP's annual gross revenue for 2003 is attributable to distribution of the Blue Folder. The record is devoid of evidence indicating what proportion of WTP's annual revenue, if any, corresponds to the distribution of all 225 Blue Folders collectively—let alone what income may be attributed to the sale of each Blue Folder individually.

WTP can be imputed to Schulz in his individual capacity. (*Id.* at 16–23). Schulz, on the other hand, argues that he is entitled to summary judgment because the Government "has failed to show a factual basis . . . against Schulz's claim that the penalty should be zero because he derived no income from the activity." (Dkt. No. 197-1, at 7).

"Questions relating to the internal affairs of corporations—for profit or not-for-profit—are generally decided in accordance with the law of the place of incorporation." *United States v. Funds Held in the Name or for the Benefit of Wetterer*, 210 F.3d 96, 106 (2d Cir. 2000). The parties do not dispute that the two WTP entities were incorporated in New York. (Dkt. No. 196-3, at 1; Dkt. No. 196-5, at 33). "New York law permits a court to disregard the corporate form whenever necessary to prevent a fraud or to achieve equity." *United States v. Cohn*, 682 F. Supp. 209, 216 (S.D.N.Y. 1988). "Under New York law, an entity is a taxpayer's alter ego . . . where the taxpayer exercised control over the entity at issue, such that the entity has become a mere instrumentality of the taxpayer, and the taxpayer used this control to commit a fraud or other wrong resulting in unjust loss or injury." *Magesty Sec. Corp. v. IRS*, No. 10-cv-0638, 2012 WL 1425100, at *4, 2012 U.S. Dist. LEXIS 57514, at *12 (S.D.N.Y. Apr. 24, 2012)); *see also Morris v. N.Y. State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 141 (1993) (stating that, in New York, "piercing the corporate veil requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury"). "The mere claim that the corporation was completely dominated by the defendants, or conclusory assertions that the corporation acted as their 'alter ego,' without more, will not suffice to support the equitable relief of piercing the corporate veil." *Flushing Plaza Assocs. No. 2 v. Albert*, 102 A.D.3d 737, 739 (2d Dep't 2013).

13

Furthermore, "in determining whether to pierce the corporate veil," New York courts consider multiple factors including: "the absence of the formalities . . . that are part and parcel of the corporate existence, i.e., . . . election of directors, keeping corporate records and the like," "whether funds are put in and taken out of the corporation for personal rather than corporate purposes," "overlap in ownership, officers, directors, and personnel," "common office space, address and telephone numbers of corporate entities," "the amount of business discretion displayed by the allegedly dominated" entity, and "whether the corporation in question had property that was used by other of the corporations as if it were its own." *Weinreich v. Sandhaus*, 850 F. Supp. 1169, 1178–79 (S.D.N.Y.) (citing *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 138 (2d Cir. 1991)). Considering all of these factors in tandem with the significant harm Schulz sought and inflicted upon the Government, both prevention of fraud and promotion of equity require attributing the gross income WTP derived from promoting the abusive tax shelters to Schulz personally as WTP's alter ego.

First, even viewed in the light most favorable to Schulz, the evidence in the record indicates that Schulz maintained virtually exclusive control over WTP, its activities, and its assets. With regard to operations and finances, it is difficult to distinguish where Schulz ends and where the organization begins. WTP was Schulz's sole occupation, and Schulz was WTP's sole animating force. In addition to functioning as the "voice" of the organization, Schulz alone determined WTP's mission, how to pursue that mission through programming and strategic decisions, and whether and when to change course. Schulz simultaneously served as WTP's President, Chief Executive Officer, and Chairman of WTP's Board of Directors. WTP's only permanent physical presence was inside Schulz's own home, where only he and his wife maintained offices. Schulz was the only person authorized to draw a salary from WTP. Schulz

14

used WTP funds to pay for his health insurance, as well as portions of his electric and telephone bills. Schulz used WTP funds for litigation and other legal expenses, regardless of whether WTP was a named party. Schulz mixed WTP and personal expenses, paying WTP expenses with his personal credit cards and using WTP funds directly to make payments on those cards. Altogether, Schulz acknowledges that he made more than $100,000 in "unsecured loans" to WTP. At Schulz's direction, WTP "loaned" over $8,000 to Burr Deitz after Deitz stole that money from WTP. Finally, Schulz had the power to add or remove board members authority to fire board members "on his sole discretion." And Schulz exercised that power when he removed all board members, except one, in 2003.[13]

Second, as described above, *Schulz I* already determined that together, Schulz and WTP promoted an abusive tax shelter in violation of § 6700, and that the "gravity of harm" caused by their conduct is "manifest." *See Schulz I*, 529 F. Supp. 2d at 346–53 (explaining that although "the exact cost of Defendants' conduct appears to be unknown," the estimated cost to the United States Treasury is approximately $4.8 million). Infliction of such an injury is at the core of Schulz's stated mission: enabling "companies, workers, and independent contractors" to "stop withholding, filing and paying," (Dkt. No. 197-3, at 4), a "tax [that] is fraudulent in its origin and illegal in its operation" for the purpose of "execut[ing] a mass-movement to Cut Government Funding," (*id.*, at 14).[14]

---

[13] Schulz disputes the relevance of this fact, arguing that he removed these board members with the intention of replacing them with a more regionally diverse group. (Dkt. No. 213-1, ¶ 35). Schulz fails to recognize, however, that it is his intent that is irrelevant—the mere fact that he was able to effectively dissolve the board at his discretion is indicative of the degree of his dominion and control over the entity. *See Evseroff*, 270 Fed. App'x at 77 ("[T]he critical issue . . . is not motive, but control . . . .").

[14] The Court need not further explore the degree to which courts have repeatedly rejected this and similar arguments. *See Schulz I*, 529 F. Supp. 2d at 350 (finding that Schulz "relied on fringe opinions of known tax protestors whose theories have repeatedly been rejected by courts across the country," and noting that "[s]everal of the people on whom Defendants claim to rely have been convicted of tax crimes").

15

The record indicates that Schulz exercised dominion and control over the entity to such a degree that WTP is more accurately understood as his mere instrumentality, and that he used that instrumentality to organize and promote abusive tax shelters in violation of § 6700, causing significant injury to the Government. Accordingly, there is no issue of material fact as to whether WTP's income derived from the distribution of the Blue Folders is properly imputed to Schulz as his alter ego. The only issue remaining for trial is the amount of gross income WTP—and by extension, Schulz—derived from the specified activities used to calculate the penalty amount under § 6700, i.e., organizing and promoting an abusive tax shelter through distribution of the 225 Blue Folders at issue in this case.[15]

## V. CONCLUSION

For these reasons, it is hereby

**ORDERED** that the Government's motion for summary judgment (Dkt. No. 196) is **GRANTED on the issue of whether WTP was Schulz's alter ego, but is otherwise DENIED**; and it is further

**ORDERED** that Schulz's motion for summary judgment (Dkt. No. 197) is **DENIED.**

**IT IS SO ORDERED.**

Dated: July 12, 2018
Syracuse, New York

Brenda K. Sannes
U.S. District Judge

---

[15] Schulz makes an additional claim that, because distribution of the Blue Folder constitutes protected speech, the penalty assessed against him is invalid. (Dkt. No. 8, at 18). As the Government notes, this argument was already litigated and rejected in *Schulz I*, 529 F. Supp. 2d at 355–57. Accordingly, the Court need not further address the issue here.